# EXHIBIT 1 (Public)

MATTHEW B. DART (Bar No. 216429)
**DART LAW**
12625 High Bluff Dr., Suite 106
San Diego, CA 92130
Tel:  858.280.8080
matt@dartlawfirm.com

Attorneys for Plaintiffs
Lacuna Sustainable Investments, LLC
Lacuna Sustainable Partners, LLC

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**07/16/2024**
Clerk of the Court
BY: AUSTIN LAM
Deputy Clerk

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO

| | |
|---|---|
| LACUNA SUSTAINABLE INVESTMENTS, LLC; LACUNA SUSTAINABLE PARTNERS, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> NEW ENERGY CAPITAL PARTNERS, LLC; VICTORY CAPITAL MANAGEMENT, INC.; CURT WHITTAKER; RATH, YOUNG, AND PIGNATELLI, P.C.; NECICF II GP, LLC; MARK LERDAL; GREENBERG TRAURIG, P.A.; and DOES 1-10, inclusive. <br><br> Defendants. | CASE NO.   **CGC-24-616430** <br><br> **COMPLAINT FOR (1) INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONSHIP; (2) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; (3) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; (4) AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (LPI AND LPI-II); (5) AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (LSI); (6) DECLARATORY RELIEF (LSI AND LSP); AND (7) DECLARATORY RELIEF (LSI)** |

DART LAW

COMPLAINT

1    Plaintiffs Lacuna Sustainable Investments, LLC and Lacuna Sustainable Partners, LLC,

2    allege as follows:

3    **INTRODUCTION**

4    1.    This is an action to redress tortious interference and breaches of fiduciary duties

5    and obtain declaratory relief regarding conflicts of interests and certain rights, as between parties

6    and persons in the business of investing in renewable energy projects, portfolios, and platforms,

7    and related activities.

8    **PARTIES**

9    2.    Plaintiff **Lacuna Sustainable Investments, LLC ("LSI")**, is a Delaware limited

10    liability company headquartered in Marin County, California.  Pursuant to a General Services

11    Agreement with each of LPI and LPI-II (as described herein), LSI provides investment

12    management and certain administrative services to each of LPI and LPI-II in exchange for

13    compensation in accordance with a General Services Agreement (collectively, **"GSAs"**, as

14    described herein), and equity upside (i.e. a "profits interest") in each of LPI and LPI-II,

15    represented by LSI's membership interest in each of LPI and LPI-II.

16    3.    Plaintiff **Lacuna Sustainable Partners, LLC ("LSP")** is a Delaware limited

17    liability company headquartered in Marin County, California.  LSP is a member of each of LPI

18    and LPI-II and has capital invested in each of LPI and LPI-II.

19    4.    Defendant **New Energy Capital Partners, LLC ("NEC")** is, upon information

20    and belief, a franchisee of Victory (defined below), and is or controls the general partner which

21    has management and fiduciary responsibilities with respect to New Energy Capital Infrastructure

22    Credit Fund II LP (**"NEC Fund II"**) which is the direct or indirect owner of 100% of the interests

23    of NECICF II LPI Investor, LLC (**"NECLPI"**).  NECLPI is a member of each of LPI and LPI-II.

24    On information and belief, NEC does business in California and elsewhere.

25    5.    Defendant **Victory Capital Management, Inc. ("Victory")** is, on information and

26    belief, a New York corporation, headquartered in San Antonio, Texas.  On information and belief,

27    Victory does business in California and elsewhere.  Upon information and belief, Victory owns

28    and/or controls NEC, which is now a franchisee of Victory, pursuant to an acquisition transaction

DART LAW

-2-

1   occurring on or about November 1, 2021 (the "**Victory Acquisition**"). Given that NEC and

2   Victory are not separate legal entities pursuant to information in SEC filings, Victory and NEC

3   will be collectively referred to herein as the "**NEC Defendants**". When referenced below, NEC

4   Defendants shall generally also include NEC Fund II GP, Whittaker and Rath, where such entities

5   were engaged in furthering the conduct complained of in the role as counsel or otherwise.

6       6.      Defendant **Curt Whittaker ("Whittaker")** is an attorney who has worked at and

7   with NEC since 2004. Upon information and belief, Mr. Whittaker had a pecuniary interest in

8   NEC prior to the Victory Acquisition, and thereafter continued to provide legal services. Upon

9   information and belief, Whittaker may still hold a pecuniary interest in the GP of NEC Fund II.

10  Whittaker has often held himself out as outside counsel to NEC and/or Victory and

11  communicated through a law firm email address. On information and belief, Mr. Whittaker is a

12  resident of the County of Sarasota, State of Florida, and provides services to clients on matters in

13  California and elsewhere. Whittaker is presently listed on NEC's website as an "External Legal

14  Advisor", and is also listed as a shareholder of the Rath law firm (discussed below).

15      7.      Defendant **Rath, Young and Pignatelli, P.C. ("Rath")** is a law firm incorporated

16  in and headquartered in New Hampshire doing business in California and elsewhere. Rath

17  provides legal services to its clients NEC and Victory (and others). Whittaker has purportedly

18  acted as an attorney of Rath, advising Victory and/or NEC with respect to the facts complained of

19  herein. Due to conflicts of interest detailed below, neither Rath nor Whittaker may represent

20  NECLPI, LPI, LPI-II, or the Management Committee without conflicts waivers and compliance

21  with other requirements set forth in the Rules of Professional Conduct applicable to attorneys.

22      8.      Defendant **NECICF II GP, LLC ("NEC Fund II GP")** is a Delaware limited

23  liability company which, upon information and belief, is the general partner of NEC Fund II,

24  headquartered in New Hampshire and doing business in California and elsewhere. NEC Fund II

25  GP owes fiduciary duties to the investors of NEC Fund II and upon information and belief is, at

26  the direction of the NEC Defendants, using its control over NECLPI in order to attempt to bypass

27  the fiduciary obligations of Fox and Collier and to otherwise tortiously interfere with the

28  contractual and other relationships detailed herein.

DART LAW

-3-

COMPLAINT

9.      Defendant **Mark Lerdal ("Lerdal")** is an individual resident of the County of San Francisco, State of California. Lerdal was formerly a consultant to LSI for periods of calendar years 2022 and 2023, and, upon information and belief, was actively involved in an attempt to, in coordination with others, obtain controlling management authority over LSI for the benefit of the NEC Defendants, himself and McConnell (discussed below). Lerdal has served as an NEC representative and/or independent director on various NEC investments unrelated to the LPIs' investments and, on information and belief, acted at all relevant times under the influence and direction of the NEC Defendants. Upon information and belief, Lerdal's involvement with LSI in the past was done at the behest of, and for the benefit of, the NEC Defendants.

10.     Defendant **Greenberg Traurig, P.A. ("GT")** is a law firm incorporated and headquartered in Florida, doing business in California and elsewhere. Upon information and belief, GT has previously represented NEC and/or Victory. The Management Committee (defined below) purported to retain GT to represent LPI and LPI-II in connection with an ongoing sale transaction relating to certain LPI and LPI-II investments. However, GT cannot represent NECLPI, LPI, LPI-II, or the Management Committee without conflicts waivers and compliance with other requirements set forth in the Rules of Professional Conduct applicable to attorneys, which requirements were communicated to GT. Upon information and belief, GT has been paid for its purported services complained of herein by the NEC Defendants and not by GT's purported client, in violation of the Rules of Professional Conduct.

## OTHER RELEVANT ENTITIES AND PERSONS

11.     **Lacuna Project Investments, LLC ("LPI")**, is a Delaware limited liability company. LPI is in the business of investing in companies that are engaged in acquiring, developing, managing and selling solar energy power plants and related energy storage facilities, or otherwise involved in the renewable energy industry. LPI is governed by a limited liability operating agreement (**"LPI LLC Agreement"**, as described herein).

12.     **Lacuna Project Investments II, LLC ("LPI-II")**, is a Delaware limited liability company. LPI-II is in the business of investing in companies that are engaged in acquiring, developing, managing and selling solar energy power plants and related energy storage facilities,

-4-

1  or otherwise involved in the renewable energy industry.  LPI-II is governed by a limited liability
2  operating agreement ("**LPI-II LLC Agreement**", as described herein).

3      13.    **Brad Bauer ("Bauer")** is an individual resident of the County of Marin, State of
4  California.  Bauer is a member and officer of LSI and a member of LSP.

5      14.    **Kevin Rolston ("Rolston")** is an individual resident of the County of Marin, State
6  of California.  Rolston is a member of and works at LSI.

7      15.    **Sukhraj Sandhu ("Sandhu")** is an individual resident of the County of Marin,
8  State of California.  Sandhu is a member of and works at LSI.

9      16.    **Adam Medoff ("Medoff")** is an individual resident of the County of Wake, State
10  of North Carolina.  Medoff is a member of and works at LSI.

11      17.    **NECICF II LPI Investor, LLC ("NECLPI")** is a Delaware limited liability
12  company.  Upon information and belief, NECLPI is a direct or indirect subsidiary of NEC Fund
13  II, and is a member of each of LPI, LPI II and LSI.  NECLPI has invested capital in each of LPI
14  and LPI-II which capital has been deployed to various investments made by each of LPI and LPI-
15  II which are administered and managed by LSI under the GSAs.

16      18.    LPI and LPI-II each have three members: LSI, LSP and NECLPI.

17      19.    **Patrick Fox ("Fox")** has, upon information and belief, at all times since the
18  Victory Acquisition, been an employee of Victory.  Since the inception of each of LPI and LPI-II,
19  Fox has been an appointed Manager of each of LPI and LPI-II.  Fox was appointed Manager by
20  NECLPI, which appointment was made prior to the Victory Acquisition.  Fox was a partner at
21  NEC prior to the Victory acquisition.

22      20.    **Bennett Collier ("Collier")** has, upon information and belief, at all times since
23  the Victory Acquisition, been an employee of Victory.  Since the inception of each of LPI and
24  LPI-II, Collier has been an appointed Manager of each of LPI and LPI-II. Collier was appointed
25  Manager by NECLPI, which appointment was made prior to the Victory Acquisition. Collier was
26  a partner at NEC prior to the Victory acquisition.

27      21.    Fox and Collier comprise the "**Management Committee**" of each of LPI and LPI-
28  II pursuant to the LPI LLC Agreement and the LPI-II LLC Agreement.

DART LAW

-5-

22.    **Claude Patrick McConnell ("McConnell")** is a member of LSI and was involved in efforts, in concert with Lerdal and the NEC Defendants, to obtain management control of LSI for the benefit of the NEC Defendants, Lerdal and himself. Plaintiffs are continuing to investigate the role of McConnell in acts alleged herein.

23.    **NEC Fund VI, GP, LLC ("Fund VI GP")** is a Delaware limited liability company and is believed, upon information and belief, to be the general partner of a NEC Fund VI, L.P. a Delaware limited partnership. Upon information and belief, Fund VI GP may be misrepresenting the relationship of the NEC Defendants with LSI in a way that is defamatory and harms LSI. Plaintiffs' investigation remains ongoing.

24.    Plaintiffs are unaware of the true names or capacities of DOE defendants 1 through 10, inclusive, and therefore sues such defendants by such fictitious names pursuant to California Code of Civil Procedure section 474. Plaintiffs are informed and believe, and based thereon allege, that each of the defendants designated herein as a DOE is in some manner responsible for, and contributed to, the injuries and damages hereinafter alleged. Plaintiffs will seek leave of this court to amend the complaint to assert the true names of these defendants when the same has been ascertained.

## JURISDICTION AND VENUE

25.    This Court has jurisdiction over each of the named defendants hereto because each has sufficient minimum contacts with the State of California to confer jurisdiction over said parties and this dispute.

26.    Venue in proper in that one or more defendants reside in this venue.

## THE CONTRACTS AND BUSINESS RELATIONSHIPS

### GSAs

27.    On or about June 3, 2021, LPI and LSI entered into a General Services Agreement (the "**LPI GSA**"). The LPI GSA amended and restated and superseded a previous GSA between such parties which was effective March 12, 2020 (the same date as the LPI LLC Agreement).

-6-

28.     On or about October 22, 2021 (the same date as the LPI-II LLC Agreement), LPI-II and LSI entered into a General Services Agreement (the "**LPI-II GSA**" and together with the LPI GSA, collectively, the "**GSAs**").

29.     The GSAs generally provide, in relevant part, that:

a.     LSI has the responsibility and obligation to provide day-to-day administrative and management activities of the business of (a) with respect to the LPI GSA, LPI, and (b) with respect to the LPI-II GSA, LPI-II, and to use commercially reasonable efforts to source, acquire and advance legal and beneficial interests in investments of LPI or LPI-II, as applicable. (LPI GSA § 2.1(a), (b); LPI-II GSA § 2.1(a), (b).)

b.     In exchange for the Services, LSI receives a profits interest in LPI and LPI-II which is in the form of a membership interest in each of LPI and LPI-II, as well as the right to receive a management "Base Fee". For the LPI GSA, the Base Fee was paid at a set amount and on a set schedule. For the LPI-II GSA, that structure was modified to allow LSI to elect to invoice a lesser amount of Base Fee if it so desired, so as to improve the economics of its "carried interest".

c.     Under the GSAs, LSI has been delegated all managerial *power* of the Management Committee, other than the power to enforce the GSAs, which power the Management Committee retained to exercise "for the benefit of the Company". However, LSI was not (nor is it possible under Delaware law to have been) assigned the concomitant managerial *responsibilities* of the Management Committee, namely fiduciary duties of loyalty and care. As such, LSI was contractually obligated to provide the Services in accordance with "Good Industry Practice" (as defined in the GSA), a standard different from fiduciary duties applicable to the Management Committee. NECLPI has no power to enforce the GSAs as a member of LPI or LPI-II, except in situations where one or more of the Managers has been appointed by a party other than NECLPI.

**LLC Agreements**

30.  On or about March 12, 2020, NECLPI, LSP and LSI entered into an Amended and Restated Limited Liability Company Agreement of Lacuna Project Investments, LLC ("**LPI LLC Agreement**").

31.  On or about October 22, 2021, NECLPI, LSP and LSI entered into an Amended and Restated Limited Liability Company Agreement of Lacuna Project Investments II, LLC ("**LPI-II LLC Agreement**" and collectively, the "**LLC Agreements**").

32.  The LLC Agreements provide that:

a.  "<u>Member Duties; Operative Documents.</u>  On or about the date hereof the Company and LSI will enter into the General Services Agreement. None of the parties hereto would enter this Agreement absent the concurrent execution of the other Operative Documents. However, each Operative Document is intended to be enforceable in accordance with its own terms. The exercise by a Member (directly or through its control of the Management Committee) of any right or remedy specifically set forth herein or in any Operative Document, or the enforcement by any Member of any express provision of this Agreement or another Operative Document, shall not be deemed a violation of any duty of conduct owed to the Company or the other Members under the Act. Otherwise, nothing herein is intended to modify any duty of conduct applicable to a Member arising under the Act." (LPI-II LLC Agreement § 3.11.)

33.  The LPI-II LLC Agreement further provides that:

a.  "Consistent with Section 3.11 hereof, the Management Committee shall manage and control the affairs of the Company to the best of their ability, and the Management Committee shall use commercially reasonable efforts to carry out the purposes of the Company *for the benefit of the Company*. Such efforts shall specifically include the enforcement and performance of the Company's rights, remedies and obligations under the General Services Agreement *for the benefit of the Company*. The Members acknowledge that material aspects of the Company's business have been delegated to LSI through the General Services Agreement, inclusive of investment decisions and investment management, subject to certain oversight by the Management Committee as provided therein, and the Management Committee will not be in

-8-

breach of its duties to the Company by causing the Company to enter into, perform, and enforce its rights and remedies under the General Services Agreement. So long as the General Services Agreement is in effect, the Management Committee will not either directly perform, or delegate to other Persons, any aspect of the Services provided to the Company under the General Services Agreement. . . ." (*Id.* § 8.5 (emphasis added).)

        b.     The LLC Agreement further defined "Material Misconduct" as a breach of the LLC Agreement, fraud, breach of a fiduciary duty to the Company or any Member . . . or gross negligence or willful misconduct."

34.     Given the LLC Agreements (1) do not expressly waive fiduciary duties of the Managers, (2) give power to the Management Committee for enforcement of the GSA, but such enforcement must be done "for the benefit of the Company", and (3) restrain the Managers from engaging in willful misconduct (duty of loyalty), gross negligence (duty of care), or breaches of fiduciary duty; therefore, it is clear that the Management Committee owes the LPIs and *all* of their respective Members fiduciary duties of loyalty and care.

35.     Further, to the extent the Management Committee purports to act for NECLPI (or conversely, to the extent NECLPI purports to "control" the Management Committee), NECLPI is bound by the implied covenant of good faith and fair dealing, in addition to the express contractual covenants in the LLC Agreements. It is believed that the NEC Defendants have used or will use NECLPI's purported rights as a member in LPI and LPI-II to attempt to bypass the fiduciary obligations of the Management Committee, or to otherwise take intentional action in bad faith to harm LPI, LPI-II or their constituent members. Such actions may also constitute breaches of fiduciary duties owed by NEC Fund II GP to NEC Fund II, which breaches also harm Plaintiffs as alleged herein.

36.     Fox and Collier are employees of Victory, but (especially after giving effect to the change in structure due to the Victory Acquisition) with employment incentives which motivate Fox and Collier to source and raise new funds and to deploy more capital and obtain more assets under management (AUM). In such capacity as employees of Victory, it is believed that Fox and Collier also control the GP of NEC Fund II. NEC Fund II, by virtue of its ownership of NECLPI,

1  has an economic interest in each of the LPIs, as well as a membership interest in LSI (which

2  interest excludes the rights to any distributions earned from LPI and LPI II investments). In other

3  words, the LP investors of NEC Fund II are benefitted when returns for LPI and LPI-II are good

4  (and when LSI grows outside the LPI and LPI II relationship and becomes more profitable), but,

5  NECLPI (and the LPI investors) stand to benefit more within the LPI/LPI-II relationship if the

6  economic interests of LSI and/or LSP in each of LPI and LPI-II are forfeited, as it would redirect

7  distributable cash away from LSI and LSP to NECLPI). Fox and Collier have repeatedly

8  threatened to terminate the GSAs without basis, which would have the impact of causing an LSI

9  Forfeiture Event and/or LSP Forfeiture Event and therefore increase NECLPI's returns from the

10  LPIs at the expense of the returns of LSP and LSI. Fox and Collier have also repeatedly

11  attempted (on information in belief in their role as employees of Victory) to obtain or exercise

12  control over the LPIs in order to resolve investor concerns that LPI and LPI-II are in reality a

13  "fund of funds" which LSI believes has had a chilling effect on the NEC Defendants' ability to

14  raise a new fund after NEC Fund II, assist with fundraising for new funds, and otherwise take

15  action to benefit the NEC Defendants with respect to future, yet-to-exist funds in order to better

16  their employment incentives with Victory at the expense or detriment of the other members of the

17  LPIs. Fox and Coller has also repeatedly taken actions that limit the growth prospects of LSI and

18  therefore the economic potential of NECLPI's membership interests therein.

19         37.  It is believed that, after the Victory Acquisition, the amount of "carried interest"

20  that would be payable to Fox, Collier, and/or Whittaker in the NEC Fund II GP was decreased

21  (with a significant portion of such carry diverted instead to Victory). Additionally, on

22  information and belief, Fox and Collier's employment incentives after the Victory Acquisition

23  (which incentives are tied to obtaining additional AUM and raising and deploying more capital,

24  among other things) became more lucrative to Fox and Collier than the potential value of their

25  carried interest in the NEC Fund II GP. As such, it is believed that the NEC Defendants have

26  created perverse incentives (for Fox and Collier specifically) thereby creating an inherent conflict

27  of interest (both as it respects NEC Fund II GP, and the Management Committee) and have been

28

1  seeking to benefit themselves and the NEC Defendants at the expense of all members of LPI and

2  LPI-II.

3       38.    Fox and Collier have repeatedly and routinely used their positions on the

4  Management Committee to act how Fox and Collier deem best for the NEC Defendants, rather

5  than comport with their fiduciary duties of care and loyalty as contemplated by the Delaware

6  Limited Liability Company Act. It is believed that the NEC Defendants have induced or directed

7  any such actions by the Management Committee, with knowledge of the Management

8  Committee's contractual and fiduciary obligations.

9       39.    To the extent that the actions complained of herein were taken in the name of

10  NECLPI, then the same conduct constitutes a breach of the implied covenant of good faith and

11  fair dealing (or otherwise creates a patent conflict of interest between the Management

12  Committee and NECLPI), or constitutes a breach of fiduciary duties owed by NEC Fund II GP to

13  NEC Fund II, in each case which harms the Plaintiffs. It is believed that the NEC Defendants

14  have induced or directed any such actions by NECLPI with knowledge of NECLPI's contractual

15  obligations and NEC Fund II's fiduciary obligations.

16      **DEFENDANTS' INTERFERENCE WITH CONTRACT AND BUSINESS**

17       40.    The actions of NECLPI and the Management Committee, as alleged herein, were

18  undertaken at the direction of defendants NEC, Victory and Whittaker. Defendants, fully aware

19  of the contractual and business relationships and LSI's rights and expectations thereunder,

20  nonetheless directed NECLPI and the Management Committee to violate the terms of the GSAs

21  and LLC Agreements, as well as their applicable fiduciary duties, to the detriment of the Plaintiffs

22  (and to the determinant, in many instances, to NECLPI and its upstream LP investors), as alleged

23  herein.

24       41.    NECLPI, LSP and LSI entered into the LPI LLC Agreement and LPI GSA on or

25  about March 12, 2020. Thereafter, LSI provided Services under the LPI GSA and deployed

26  capital originally contemplated to be up to $50,000,000.00 (inclusive of Base Fees). In

27  negotiating the original LPI LLC Agreement, LPI GSA, and LSI OA, NEC sought to control LSI

28  and LPI and individuals as NEC had concerns about how this relationship could create a

1  competitor to NEC. The operative documents did not give NEC the desired controls over LSI or

2  LPI. NEC proceeded with the transaction despite its concerns.

3       42.  On or about October 22, 2021, NECLPI, LSP and LSI entered into the LPI II LLC

4  Agreement and LPI II GSA, in an effort to have LSI, as part of the Services, deploy additional

5  capital up to an additional $99,100,000.00 (inclusive of Base Fees). LPI-II documents were

6  structured in a similar way to the LPI documents, but with a few differences.

7       43.  Upon information and belief, the capital committed and deployed by LPI and LPI

8  II is one of the largest, if not the largest, investments of NECICF. As such, one of NEC's largest

9  investments is, in reality, a "fund of funds" which, upon information and belief, has been an

10  impediment to NEC's ability to raise capital for a new fund after NEC Fund II.

11       44.  From March 12, 2020 through present day, LSI sourced investments and deployed

12  capital consistent with its obligations under the respective GSAs. To date, returns on LSI

13  investments on behalf of LPI and LPI II have generated a 30% internal rate of return and a 1.45X

14  multiple on invested capital on $54.7M of invested capital with an average 24 month holding

15  period.

16       45.  On or about November 1, 2021 (after the closing of LPI-II), New Energy Capital

17  Partners, LLC was acquired by Victory. As part of the acquisition, existing equity holders of

18  New Energy Capital Partners, LLC were paid and either left the business (e.g. Whittaker, Ian

19  Marcus, Jeph Shaw, Tom Naughton and later NEC founder Scott Brown), and remaining

20  members of New Energy Capital Partners, LLC become employees of Victory, with NEC

21  thereafter being a franchise of Victory.

22       46.  After the Victory acquisition, the remaining members of NEC who became

23  employees of Victory were incentivized to source and increase assets under management (AUM)

24  in order to meet incentive compensation targets. It is believed that this new incentive structure

25  motivated the NEC Defendants (via the actions of Whittaker, Fox and Collier), to seek to usurp

26  control of LSI, LPI and LPI-II for the benefit of NEC as a means to, among other things, increase

27  AUM (raise a new fund) by claiming LSI's stellar investment return track record as its own, and

28  removing the "fund of funds" optics of LSI in the eyes of existing and potential investors.

-12-

COMPLAINT

47.     NEC Defendants sought to solve the "creating a competitor" issue through various provisions in the GSA, LSI OA and Key Person Agreements - namely the Special Member Rights and the LPI Business Focus provisions. As these rights were extinguished over time and with LSI performance, LSI had an opportunity to expand its AUM with other investors and grow its business. Upon being made aware of LSI's intentions NEC began to take actions to assert control, create strife within the LSI organization and undermine LSI's business prospects (including NEC Defendants approaching potential LSI investments which Fox and Collier learned of by virtue of knowing LSI was pursuing investments in said prospects through the LPI entities, and instead offering that such prospects should take NEC FUND II rather than LPI or LPI-II capital, in violation of the duty of loyalty/corporate opportunity doctrine).

48.     One aspect of such campaign of interference was encouraging LSI to work with Lerdal, who, upon information and belief, would gather information regarding LSI and coordinate with Fox and Collier in an effort to gain control of LSI to have it serve the interests of the NEC Defendants or otherwise remedy the "problems" the NEC Defendants sought to solve in connection with its core business (namely those identified two paragraphs above). It is believed that Lerdal engaged in an effort to have McConnell, a manager and officer of LSI, breach his fiduciary duties to LSI and instead work to have LSI, LPI and LPI-II serve the interests of the NEC Defendants. Upon information and belief, Fox asked Lerdal if he could "run" LSI and it appears that NEC Defendants desired to have Lerdal and McConnell take control of LSI and thereafter restructure or change LSI to fit the NEC Defendants' desire for control.

49.     On or about November 22, 2022, McConnell emailed a letter to Bauer purporting to resign from LSI. It is believed that prior to this date, McConnell and Lerdal, together with the NEC Defendants (and Fox and Collier), were involved in an effort to remove Bauer from his CEO position at LSI and to usurp control of LSI for the benefit of the NEC Defendants and themselves.

50.     On or about December 29, 2022, Bauer, on behalf of LSI, sent a draft response to McConnell regarding his purported resignation letter and reminding McConnell of his fiduciary duties to LSI. McConnell elected to involve the NEC Defendants (via Fox and Collier) in such

-13-

1     internal LSI management affairs.  McConnell later lamented that he "underestimated how far Pat

2     would go to remove Brad."

3          51.     On or about March 12, 2023, Bauer invited Fox, Collier, and/or the NEC

4     Defendants to speak with all members/employees of LSI in response to the above matters.  Upon

5     information and belief, neither Fox nor Collier investigated the situation by communicating with

6     Bauer, Rolston, Sandhu or Medoff until July 2023 (instead the fiduciaries of the Management

7     Committee ostensibly elected to take McConnell's and/or Lerdal's representations at face value,

8     without investigation, and even inserted itself in a position of advocacy on McConnell's behalf,

9     as it related to LSI internal management affairs).  This was a breach of the duty of care owed by

10    the Management Committee.

11         52.     Despite having failed to undertake proper investigation regarding LSI as invited by

12    Bauer, the Management Committee summarily made a "determination" to distribute proceeds that

13    the LPI-II LLC Agreement required be reinvested during the reinvestment term, which proceeds

14    were realizing in or about April 2023.  Such "determination" should have been made by the

15    Management Committee consistent with fiduciary duties of care and loyalty.  The Management

16    Committee breached the LPI-II LLC Agreement and these fiduciary duties when it forced

17    distribution of proceeds in violation of the LPI-II LLC Agreement without investigation. It is

18    believed these breaches were done at the direction of the NEC Defendants, with the intention of

19    disallowing LSI to realize its beneficial economics later in the waterfall provision of the LPI-II

20    LLC Agreement.  On information and belief, the distribution was not made for the purposes of

21    pursuing investments with similar or better returns for NEC Fund II investors. Therefore, such

22    distribution of investment proceeds harmed all members of LPI-II: LSI, LSP, NECLPI.

23         53.     Furthermore, the Management Committee acted in or around April 2023 to

24    "suspend" all new investment activity by LSI and instructed LSI to stop sourcing new investment

25    opportunities.  Upon information and belief, the Management Committee took this action at

26    behest of the NEC Defendants because as offered by Whittaker, NECLPI was seeking more

27    modest returns and wanted to prevent LSI from reaching its favorable economic splits that arise

28    under 6.1(b)(v) of the LPI LLC Agreement, and 6.1(b)(iii) of the LPI-II LLC Agreement, and as

1  such, took such action contrary to the interests of the Companies in breach of fiduciary duties

2  (and done by inducing NECLPI to breach its capital call obligations under the LLC Agreements)

3  in order to achieve such goals of the NEC Defendants. In connection with this "suspension" of

4  new investments by the LPI entities, the NEC Defendants then pursued investment opportunities

5  previously-identified to the Management Committee by LSI, directly, in violation of the duty of

6  loyalty and corporate opportunity doctrine.

7      54.    In connection with McConnell's departure, LSI proposed a transition plan for LSI

8  management. The transition plan was summarily rejected without investigation or comment, or

9  without any rationale of how such rejection was in the best interests of LPI-II or LPI other than

10 that it did not include two "senior managers" (it did), which is believed to have been offered as a

11 pretextual reason to take action in the interest of the NEC Defendants (given that the people who

12 could not be "senior managers" as alleged by Fox were later solicited by Fox to come work as

13 employees of NEC or to otherwise manage the LPI and LPI-II investments). The NEC

14 Defendants, by and through the Management Committee, continued to demand that the only

15 solution to McConnell's departure was for NEC to control LPI and LPI-II and to control all

16 investment management decisions going forward. Against this backdrop, the Management

17 Committee routinely used LSI management issues as pretext for taking action purportedly

18 beneficial to the NEC Defendants at the expense of LSI and LSP. Functionally, the position of

19 the Management Committee was that LSI could not properly function without McConnell. This

20 is in spite of the Management Committee being told otherwise by, among others, Rolston, Sandhu

21 and Medoff. The Management Committee never spoke to Bauer as "they knew what he would

22 say." LSI's performance in every manner since McConnell's departure speaks for itself in this

23 regard. It is believed that this play for control in connection with McConnell's departure was in

24 an effort to show (1) that LSI's investment track record would be, in reality, the NEC Defendants'

25 track record, and (2) that the LPI and LPI-II entities are not a "fund of funds", both of which

26 narratives the NEC Defendants sought to pursue in an effort to raise capital from new investors

27 for a new fund, in order to deploy more capital and increase AUM.

28

-15-

55.     Furthermore, if the Management Committee believed that McConnell's departure prevented LSI's performance under the GSAs such that the LPIs would be harmed by McConnell's absence (a conclusion not supported by facts, which the Management Committee refused to investigate), then the Management Committee was *obligated* to enforce the remedies in the GSAs relating to McConnell's departure, under the fiduciary duty of care.  It is believed that the Management Committee did not pursue remedies because it knew, at all times, that McConnell was not meaningfully involved in LSI operations at any time prior to or after the November 2022 resignation, and that, therefore, enforcing remedies in the GSA as a result of McConnell's departure would not be in the best interests of the LPIs.  Alternatively, it is possible that the Management Committee did not enforce the GSA as it induced McConnell to usurp control of LSI for the benefit of the NEC Defendants, a fact which it did not want to be discovered.

56.     In the months that followed, Whittaker and Fox routinely advocated on behalf of McConnell in connection with discussions surrounding his departure from LSI – emboldening McConnell and ultimately making separation impossible (though McConnell has been a full-time employee of a competitor, for approximately a year).  Whittaker and Fox also routinely created standards not in the GSAs or LLC Agreements and then alleged breaches of such made-up standards (e.g., that LSI management be "cohesive" or that the managers be "arm-in-arm" or that "in-person" meeting are required).

57.     Despite all of this, Whittaker and Fox were not interested in any resolution that didn't involve NEC obtaining control of the LPIs, which is improper and also a tacit admission of what was understood at the time the definitive documents were signed - that such control does not exist under the operative documents.

58.     Additionally, upon information and belief, Fox engaged in communications that were intended for Rolston, Sandhu, and Medoff to believe their jobs at LSI were at risk, that NEC could take action to suspend their paychecks, and that those individuals should come work at NEC or manage the investments of the LPIs for the benefit of NEC.  The Management Committee has no budgetary controls as respects LSI and cannot influence the compensation of

-16-

DART LAW

1   any member in any way.  Nonetheless, it is believed that Fox took actions with the intent to cause

2   distress and motivate employees to leave LSI and join NEC so that those employees could

3   administer the investments as employees of or otherwise on behalf of NEC.  It is believed that

4   Fox engaged in this conduct as Fox was aware that the NEC Defendants were incapable of

5   driving value from the investments of the LPIs themselves, and that the LSI professionals are

6   instrumental to the success of such investments.  Moreover, it is believed that Fox implemented

7   his threat by failing and refusing the pay the Base Fee in full.  It is believed that Fox took all of

8   these actions at the direction or for the benefit of the NEC Defendants.  In addition to these being

9   breaches of the operative contracts and fiduciary duties, all such actions made LSI's performance

10  of its obligations more expensive and costly.

11      59.    On or about September 29, 2023, Whittaker sent a long missive advocating on

12  behalf of various parties which are not Whittaker or Rath's client, and among other things,

13  demanding an in-person meeting with LSI.

14      60.    Whittaker and the president of Rath were reminded of the conflicts of interests in

15  or about October 6, 2023, and asked to identify their client, to which the only client identified was

16  Victory/NEC, as identified by the president of Rath, in writing.  Upon information and belief,

17  Whittaker at all times has acted on behalf of the NEC Defendants, purportedly as outside counsel.

18  After this email exchange, Whittaker ceased communicating directly and is believed to have been

19  ghost-writing documents and emails for Fox ever since.  In May 2024, Fox indicated that

20  Whittaker can advise Fox as to his role on the Management Committee because NECLPI

21  appointed the managers, and Whittaker participated in a phone call with LSI (using his Rath

22  email address) to state that a condition of a pending sale transaction of the portfolio would be

23  conditioned upon the NEC Defendants receiving a release of all claims from LSI/LSP (which

24  would be a breach of the Management Committee's fiduciary duties to require as a condition to

25  the sale; and even if requested by NECLPI as a member, such request would still be for the

26  benefit of the NEC Defendants and not the investors in NEC Fund II).  If Whittaker has been

27  communicating and directing the Management Committee, it is believed that he never informed

28

-17-

1  the Management Committee that such communications were not privileged (or even if they were,

2  such privilege could be waived upon showing of good cause under the *Garner* exception).

3      61.    In late 2023, Fox followed on Whittaker's September missive and demanded an in-

4  person meeting with LSI, but refused to have counsel present. LSI, fearing that an in-person

5  meeting would be used as pretext to spin a narrative for the NEC Defendants' benefit or to

6  otherwise improperly influence or distress the LSI professionals, requested that counsel be

7  present. Fox refused to meet if counsel were to be present.

8      62.    LSI called a meeting of all LSI members and the Management Committee which

9  occurred via videoconference on November 7, 2023, and which was recorded. The Management

10 Committee refused to respond to the meeting invitation and did not attend. Upon information and

11 belief, the Management Committee never watched the recording of such meeting which was

12 provided to them.

13     63.    On November 29, 2023, Fox purported to send a notice of breach via email.

14 However, no specific breaches of the GSA are identified, and there is no explanation how sending

15 a notice of breach and pursuing remedies was taken "for the benefit of the Company [i.e. LPI and

16 LPI-II, respectively]." Instead, Fox indicated he was not satisfied with the services as they are

17 being provided, which is not a basis for termination of the GSAs or any other remedies

18 thereunder. Fox was instructed that such email was not a valid notice of default and instructed

19 how to cure such deficiencies in order to deliver a valid notice. Fox never cured such deficiencies

20 or delivered a valid notice of default.

21     64.    On or about December 13, 2023, LSI executed a non-binding offer with a

22 purchaser of all the investments of LPI and LPI-II. Negotiations in pursuit of this sale are

23 ongoing and the Management Committee has expressed in writing that it views the sale as being

24 in the best interests of the LPIs and all of their constituent Members. As such, the Management

25 Committee is obligated to act reasonably and in pursuit of such sale in order to comply with their

26 fiduciary duties. A key component of the offer to purchase the investments is the continued

27 involvement of the LSI professionals in the day-to-day administration of the investments. The

28 Management Committee has since encouraged LSI to continue to provide the Services and is

-18-

therefore estopped from asserting the validity of the November 29, 2023 email as a valid notice of default.

65.    The Management Committee purported to engage Greenberg Traurig on behalf of the LPIs, despite the prohibition in the definitive documents that the Management Committee shall not perform directly, nor engage others, to perform the services to be provided by LSI under the GSAs.  Greenberg Traurig has previously represented the NEC Defendants and therefore has a conflict of interest in representing the LPIs, a conflict for which informed written consent was never sought.  Furthermore, upon information and belief, Greenberg Traurig is being paid by the NEC Defendants.  Recently, Greenberg Traurig has advocated positions benefitting the NEC Defendants and to the detriment of LSI and LSP, in connection with the pending sale.

66.    Since the signing of the non-binding offer to sell, the Management Committee, acting at the direction of Whittaker and the NEC Defendants, has done the following: (1) refused to call capital for or to pay the Base Fee due to LSI under the LPI-II GSA, (2) indicated in a follow up telephone conference that the purpose of not paying the Base Fee is to delay payment for a period of time it takes to arbitrate the issue, (3) communicated directly with the potential buyer of the portfolio when the buyer has instructed the Management Committee that it only wants to communicate regarding the transaction through LSI, (4) communicated to the buyer that any sale of the portfolio will be conditioned upon the NEC Defendants obtaining a release of all claims by LSI and LSP (which condition is a breach of the duty of loyalty owed by the Management Committee to the LPIs, as well as the duty of loyalty owed by NEC Fund II GP to the investors of NEC Fund II), (5) inconsistent with four (4) years of past practice, required LSI to pay outside consultants and legal advisors to the LPIs with LSIs own funds (resulting in a capital shift for the LPI members and also, presumably, requiring direct transfers of equity in existing investments from LPI and/or LPI-II to LSI in exchange for such invested capital), and requiring such payment be made while refusing to fund the Base Fee, (6) filed an arbitration in bad faith in a purported attempt to prevent LSI from exercising remedies under the GSA, and (7) refused to provide meaningful responses to LSI's good faith attempts to resolve the NEC Defendants' complaints.

**FIRST CAUSE OF ACTION**

**Intentional Interference with Contractual Relationship**

**(LSI and LSP vs Victory, NEC, Rath, Whittaker, NEC Fund II GP, GT and Lerdal)**

67.     The allegations of the preceding paragraphs are incorporated herein by reference with the same force and effect as if set forth in full below.

68.     Valid and enforceable contracts exist between LSI and LSP and third parties as alleged herein.

69.     Defendants knew of the contracts between LSI and LSP and these third parties.

70.     Defendants engaged in conduct that prevented or hindered performance of the contract, or which induced parties to the contract to breach such contracts to the determinant of LSI and LSP.

71.     Defendants intended this result, or at minimum, knew that it was likely.

72.     LSI and LSP were harmed and LSI's performance was made more expensive or burdensome.

73.     Defendants' conduct was a substantial factor in causing LSI's and LSP's harm in an amount to be proven at trial.

74.     The aforementioned actions were also undertaken with malice, fraud and/or oppression, thus entitling Plaintiffs to punitive damages.

**SECOND CAUSE OF ACTION**

**Intentional Interference with Prospective Economic Advantage**

**(LSI and LSP vs Victory, NEC, Rath, Whittaker, NEC Fund II, GP, GT and Lerdal)**

75.     The allegations of the preceding paragraphs are incorporated herein by reference with the same force and effect as if set forth in full below.

76.     An economic relationship existed between LSI and LSP and third parties, as alleged herein, that was likely to result in future economic benefit to LSI and LSP.

77.     Defendants were aware of this relationship.

78.     Defendants engaged in independent wrongful conduct as alleged herein.

79.     By engaging in such conduct, Defendants intended to disrupt the economic relationship alleged herein, or at minimum, knew that disruption was likely because of their conduct.

80.     The economic relationship between LSI and LSP and the third parties alleged herein was disrupted.

81.     LSI and LSP were harmed, and LSI's performance was made more expensive or burdensome.

82.     Defendants' conduct was a substantial factor in causing harm to LSI and LSP.

83.     LSI and LSP have been harmed in an amount to be proven at trial.

84.     The aforementioned actions were also undertaken with malice, fraud and/or oppression, thus entitling Plaintiffs to punitive damages.

## THIRD CAUSE OF ACTION

### Negligent Interference with Prospective Economic Advantage

### (LSI and LSP vs Victory, NEC, Rath, Whittaker, NEC Fund II, GP, GT and Lerdal)

85.     The allegations of the preceding paragraphs are incorporated herein by reference with the same force and effect as if set forth in full below.

86.     An economic relationship existed between LSI and LSP and third parties, as alleged herein, that was likely to result in future economic benefit to LSI and LSP.

87.     Defendants were aware of this relationship.

88.     Defendants knew or should have known that this relationship would be disrupted if they failed to act with reasonable care.

89.     Defendants failed to act with reasonable care.

90.     Defendants engaged in wrongful conduct as alleged herein.

91.     The economic relationship was disrupted.

92.     Plaintiffs were harmed in an amount to be proven at trial.

93.     Defendants' wrongful conduct was a substantial factor in causing Plaintiffs' harm.

1

## FOURTH CAUSE OF ACTION

2

### Aiding and Abetting Breach of Fiduciary Duty

3

#### (LSI and LSP vs Victory, NEC, Rath, Whittaker, NEC Fund II, GP, GT and Lerdal)

4        94.    The allegations of the preceding paragraphs are incorporated herein by reference

5    with the same force and effect as if set forth in full below.

6        95.    A fiduciary relationship existed between the Management Committee members

7    and each of LPI and LPI-II, for the benefit of all its members, including LSI and LSP.

8        96.    The Management Committee breached its fiduciary duties as alleged herein.

9        97.    Defendants knowingly participated in or induced the Management Committee's

10    breaches of its fiduciary duties to LPI and LPI-II (and therefore to LSI and LSP).

11        98.    LSI and LSP were damaged as a result of the concerted actions of Defendants and

12    the fiduciaries on the Management Committee.

13        99.    The aforementioned actions were also undertaken with malice, fraud and/or

14    oppression, thus entitling Plaintiffs to punitive damages.

15

## FIFTH CAUSE OF ACTION

16

### Aiding and Abetting Breach of Fiduciary Duty

17

#### (LSI vs Victory, NEC, Rath, Whittaker, NEC Fund II GP and Lerdal)

18        100.    The allegations of the preceding paragraphs are incorporated herein by reference

19    with the same force and effect as if set forth in full below.

20        101.    A fiduciary relationship existed between the McConnell and LSI.

21        102.    McConnell breached his fiduciary duties as alleged herein.

22        103.    The NEC Defendants, Rath, Whittaker and Lerdal knowingly participated in or

23    induced McConnell's breaches of its fiduciary duties to LSI.

24        104.    LSI was damaged as a result of the concerted actions of the NEC Defendants,

25    Rath, Whittaker and Lerdal and McConnell.

26        105.    The aforementioned actions were also undertaken with malice, fraud and/or

27    oppression, thus entitling Plaintiffs to punitive damages.

28

1

## SIXTH CAUSE OF ACTION

2

### Declaratory Relief

3

### (LSI and LSP vs Rath, Whittaker and GT)

4      106.    The allegations of the preceding paragraphs are incorporated herein by reference

5   with the same force and effect as if set forth in full below.

6      107.    An actual and justifiable controversy exists between Plaintiffs and defendants

7   Rath, Whittaker and GT as to whether those lawyers and law firms have conflicts of interest that

8   preclude their representation of NECLPI, LPI, LPI-II, and/or the Management Committee without

9   conflicts waivers and compliance with other requirements set forth in the Rules of Professional

10   Conduct applicable to attorneys.

11      108.    Plaintiff desires a declaratory determination by this Court with respect to the

12   conflicts of interest asserted herein.

13

## SEVENTH CAUSE OF ACTION

14

### Declaratory Relief

15

### (LSI and LSP vs Victory, NEC, and NEC Fund II GP)

16      109.    The allegations of the preceding paragraphs are incorporated herein by reference

17   with the same force and effect as if set forth in full below.

18      110.    An irreconcilable conflict of interest exists between employees of the NEC

19   Defendants (namely Fox and Collier) and such employees' abilities to serve as fiduciaries,

20   respectively, with respect to NEC Fund II GP (for the benefit of investors of NEC Fund II), and

21   LPI and LPI-II (for the benefit of LSI, LSP, and NECLPI).

22      111.    An actual controversy has arisen regarding the rights and obligations of these

23   parties with respect to the conflicts asserted herein.

24      112.    Plaintiffs desire a declaratory determination by this Court with respect to the

25   conflicts of interest asserted herein.

26

27

28

DART LAW

-23-

COMPLAINT

## **PRAYER FOR RELIEF**

Plaintiffs pray for the following relief:

1.     For damages in an amount to be proven at trial;

2.     For punitive damages on all causes of action for which such damages are available;

3.     For an award of pre and post-judgment interest;

4.     For an award of attorneys' fees and costs pursuant to the extent recoverable by contract or law;

5.     For a judicial declaration as requested herein; and

6.     For such further relief as the Court deems just and proper.

Dated:  July 16, 2024

🟢 DART LAW

By _____
MATTHEW B. DART
Attorneys for Plaintiffs