1   Matthew B. Dart (Bar No. 216429)
    **DART LAW**
2   12625 High Bluff Drive, Suite 106
    San Diego, California 92130
3   Telephone: 858.280.8080
    matt@dartlawfirm.com
4
    Attorney for Plaintiffs
5   Lacuna Sustainable Investments, LLC
    Lacuna Sustainable Partners, LLC
6

7

8                   **UNITED STATES DISTRICT COURT FOR**

9               **THE NORTHERN DISTRICT OF CALIFORNIA**

10                      **SAN FRANCISCO DIVISION**

11  LACUNA SUSTAINABLE INVESTMENTS, LLC;    CASE NO.    3:24-cv-7705
    LACUNA SUSTAINABLE PARTNERS, LLC;
12  LACUNA PROJECT INVESTMENTS, LLC;        **PLAINTIFFS' NOTICE OF MOTION**
    LACUNA PROJECT INVESTMENTS II, LLC.     **AND MOTION FOR PRELIMINARY**
13                                          **INJUNCTION**
                    Plaintiffs,
14
         vs.                                Date:  March 20, 2025
15                                          Time:  2:00 p.m.
    PATRICK FOX; BENNETT COLLIER; VICTORY
16  CAPITAL MANAGEMENT, INC.; CURT          Dept: 10 – 19th Floor
    WHITTAKER; RATH, YOUNG, AND             Judge: Hon. Araceli Martínez Olguín
17  PIGNATELLI, P.C.; NECICF II GP, LLC; MARK
    LERDAL; and DOES 1-10, inclusive,
18
                    Defendants.
19

20

21

22

23

24

25

26

27

28

**TO THE COURT, ALL PARTIES AND ALL ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on March 20, 2025, at 2:00 p.m., in Department 10, 19th floor, of the United States District Court for the Northern District of California, San Francisco Courthouse, 450 Golden Gate Avenue, San Francisco, California, 94102, the Hon. Araceli Martinez Olguin presiding, Plaintiffs Lacuna Sustainable Investments, LLC ("LSI"), Lacuna Sustainable Partners, LLC ("LSP"), directly, and derivatively on behalf of Plaintiffs Lacuna Project Investments, LLC ("LPI") and Lacuna Project Investments II, LLC ("LPI II", and together with LPI, the "LPIs", and collectively with LSP, the "Plaintiffs") will move for a preliminary injunction against defendants Patrick Fox and Bennett Collier (the "Managers").

This motion for preliminary injunction seeks an order (1) restraining the forfeiture of LSI's and LSP's membership interests in each of the LPIs, (2) restraining the Managers from pursuing fraud and taking further actions to harm the LPIs or their various investments in an effort to benefit one member (NECLPI) at the expense of the other members, and (3) restraining the Managers from retaining, or discharging (as applicable) the law firm of Ropes & Gray as counsel the LPIs on the basis of conflict of interest, and otherwise restrain the Managers from retaining counsel for the LPIs for purposes of furthering the Managers scheme to defraud (or, alternatively, to compel the retention of independent counsel for the LPIs).  This Motion is based on the points and authorities below, the accompanying declarations of Brad Bauer ("Bauer Decl.") and Matthew Dart ("Dart Decl.") and the pleadings and papers on file in this action.

# TABLE OF CONTENTS

I.    INTRODUCTION AND SUMMARY……………………………………...……3

II.   STATEMENT OF RELEVANT FACTS………………………………………..6

   A.  The LLC and its Managers…………………………………………………...6

   B.  McConnell's Departure………………………………………………………6

   C.  LSI Sources a Buyer Despite Managers' Self-Interested Actions……………………..9

   D.  The Managers on Behalf of NECLP Commence Arbitration Against LSI……………10

   E.  NECLPI Retains Ropes & Gray Despite Clear Conflicts and Managers Enact Their

       Scheme to Defraud……………………………………………………………10

III.  APPLICABLE LEGAL STANDARD………………………………………15

   A.  Injunctive Relief……………………………………………………………15

   B.  Disqualification of Counsel…………………………………………………16

IV.   ARGUMENT………………………………………………………………...18

   A.  A Preliminary Injunction Should be Issued…………………………………...19

       a.  Likelihood of Success on the Merits…………………………………..19

       b.  Likelihood of Irreparable Harm………………………………………21

       c.  Balance of the Equities………………………………………………...22

       d.  Injunction is in the Public Interest……………………………………23

V.    CONCLUSION………………………………………………………………23

1

2                                    **TABLE OF AUTHORITIES**

3    **Federal Case Authorities**

4    *Weinberger v. Romero-Barcelo* (1982) 456 US 305……………………………………..……..16

5    *Amoco Production Co. v. Village of Gambell, Alaska* (1987) 480 US 531………………..…...16

6    *Hill v. McDonough* (2006) 547 U.S. 573……………………………………………….………16

7    *Winter v. Natural Resources Defense Council, Inc.* (2008) 555 US 7……………………….……16

8    *Drakes Bay Oyster Co. v. Jewell* (9th Cir. 2014) 747 F.3d 1073…………………………….………16

9    *University of Texas v. Camenisch* (1981) 4511 US 390…………………………………………16

10   *Garcia v. Google, Inc.* (9th Cir. 2015) 786 F.3d 733……………………………………..………16

11   *Chambers v. NASCO, Inc.* (1991) 501 U.S. 32………………………………………..………..16

12   *In re Cnty. of L.A.* (9th Cir. 2000) 223 F.3d 990…………………………………….………..16

13   *Hitachi. Ltd v. Tatung Co.* (N.D. Cal. 2006) 419 F.Supp.2d 1158……………………………16, 17

14   *Rodriguez v. W. Publ'g Corp.* (9th Cir. 2009) 563 F.3d 948……………………….……………16

15   *Lennar Mare Island, LLC v. Steadfast Ins. Co.* (E.D. Cal. 2015) 105 F.Supp.3d 110.0,………….17

16   *Concat LP v. Unilever, PLC* (N.D. Cal. 2004) 350 F.Supp.2d 796…………………………………17

17   *State Farm Mut. Auto. Ins. Co. v. Fed. Ins. Co.* (1999) 72 Cal.App.4th 1422…………………….18

18

19   **State Case Authorities**

20   *In re Atlas Energy Res. LLC,* 2010 WL 4273122 (Del. Ch. Oct. 28, 2010)………..…………..3, 18

21   *Feeley v. NHAOCG, LLC*, 62 A.3d 649 (Del. Ch. 2012)…………………………..…………6, 18, 19

22   *Gatz Props., LLC v. Auriga Capital Corp, LLC*, 59 A.3d 1206 (Del. 2012)……..……6, 18, 19, 20

23   *People ex rel. Dept of Corp. v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135……..17

24   *In re Lee G.* (1991) 1 Cal.App.4th 17…………………………………………………………..17

25   *Phillips v. Hove*, 2011 WL 4404034, at *24 (Del.Ch. Sept. 22, 2011)……………………………18

26   *William Perm P'ship v. Saliba*, 13 A.3d 749 (Del. 2011)…………………………………………19

27   *Destra Targeted Income Unit Inv. Trust v. Parmar*, 2017 Del. Ch. Lexis 906……………….20, 21

28   *Leb. Cnty. Employees' Ret. Fund v. Collis*, 287 A.3d 1160 (Del. Ch. 2022)……………….……20

*Revlon, Inc. v. Macandrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986)....................20

*In re Tri-Star Pictures*, 634 A.2d 319 (Del. 1993)...........................................................20

*Kaplan v. Centex Corp.*, 284 A.2d 119 (Del. Ch. 1971)...................................................20

*Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156 (Del. 1995)......................................20

*T. Rowe Price Recovery Fund, L.P. v. Rubin*, 770 A.2d 536 (Del. Ch. 2000).......................21

*Prakashpalan v. Engstrom, Lipscomb & Lack* (2014) 223 Cal.App.4th 1105.......................22

*Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106 (Del. 2006)..............................22

*In re RJR Nabisco S'holders Litig.*, C.A. No. 10389, 1989 WL 7036, at *12 (Del. Ch. 1989)......23

**Statutes and Rules**

Del. Code § 18-1104.................................................................................3, 6, 18, 20

Model Rule Prof. Conduct 1.3........................................................................11

Model Rule Prof. Conduct 4.2........................................................................11

Del. Code Ann. § 18-1001.............................................................................14

Model Rule Prof. Conduct 8.4(c)....................................................................14

Model R. Prof. Conduct 5.4(c))......................................................................14

Cal. Civ. Code § 1573..................................................................................22

**POINTS AND AUTHORITIES**

**I.    INTRODUCTION AND SUMMARY**

Plaintiffs LSI and LSP directly, and derivatively on behalf of LPI and LPI II, brought this action seeking redress for extensive wrongful conduct by various individual and entity defendants arising out of business relationships and agreements between the parties and non-parties related to investments in solar and storage projects in California and elsewhere.  The operative First Amended Complaint alleges sixteen tort causes of action against defendants who acted in concert with one another to harm Plaintiffs.  Since the filing of this action, the Managers, who are fiduciaries to Plaintiffs LSI and LSP, have taken further action to harm Plaintiffs in order to benefit themselves and entities in which they have pecuniary interest.  This motion seeks to enjoin the fiduciary Managers from further harming Plaintiffs pending a trial on the merits.

This entire case, and any arbitration proceedings being commenced by the Managers (but captioned in the name of the LPIs), come down to one legal principal: do managers of a Delaware, manager-managed limited liability company have a separate and distinct legal existence from the entity they manage?  Plaintiffs take the position that the Managers are separate from the entity, and that the Managers owe fiduciary duties to the entity and are constrained by the LLCA.  *See* Del. Code § 18-1104; *In re Atlas Energy Res. LLC,* 2010 WL 4273122, at *6 (Del.Ch. Oct. 28, 2010) ("in the absence of explicit provisions in an [LLC] agreement to the contrary, the traditional fiduciary duties owed by corporate directors ... apply in the [LLC] context.").  The Managers have treated the LPIs as their alter ego, with such entities' sole purpose to serve whatever ends the Managers deem best for themselves and any third-party entity they might control or in which they hold an equity interest, namely NECLPI (by way of NEC Fund II GP in which the Managers have a pecuniary interest).  As such, the Managers have engaged in a pattern of fraudulent conduct which has significantly harmed the LPIs and its constituent members, and such harm will continue if not immediately restrained.

The Defendants will take the position that inane issues relating to "material participation" or "Moral Turpitude Events" need to be addressed under the General Services Agreements ("GSAs") prior to this litigation proceeding, or the Managers' conduct being restrained.  However,

that analysis gets the correct order of operations backwards; in order for the Managers to enforce the GSAs or exercise remedies thereunder, they must first determine, pursuant to the limited liability company operating agreement of each of the LPIs and their fiduciary duties, that the exercise of such remedies will be in the best interests of the LPIs. (*See* Bauer Decl., Exs. NN, OO (LPIs LLCAs, at § 8.5); *see also* Bauer Decl. Exs. W, X (Written Consents, wherein the Managers state this analysis themselves in paragraphs 3 thereof).)  The GSAs also state, throughout, that exercise of remedies must be in the best interests of the LPIs. (Bauer Decl., Exs. LL, MM (GSAs §§ 7.1, 7.2).)  At no point have the Managers recognized this obligation or offered how their actions benefit the LPIs. The Managers are also prohibited under the LLCAs from enforcing the GSAs in a manner that harms the LPIs.  (Bauer Decl., Exs. NN, OO (LLCAs, at § 8.5).)  As such, the GSAs are entirely irrelevant to the instant Motion or, in fact, this entire lawsuit.

In other words, the Managers cannot enforce the GSAs in a manner that harms the LPIs with the intention of benefitting one member in which the Managers have a pecuniary interest (NECLPI) at the expense of the Company and the other member(s), even if LSI hypothetically breached every single provision of the GSAs.  Further, the Managers are empowered only to enforce the "express provisions" of the GSAs, but the Managers have instead for years tried to create new standards (that LSI management be cohesive, constructive and professional, that there be two "senior" LSI managers, that the managers be "arm-in-arm", that the managers must "actively manage" the investments, etc.)

Finally, all of the complained-of conduct to date either (a) pre-dates the Managers directing LSI to pursue a Sale Transaction (as defined herein) that is in the best interests of the LPIs and for which the buyer required LSI's continued involvement, or (b) relates to allegations for which the Managers have no personal knowledge and never sought to investigate.  This entire case will be decided on the language in the LLCAs and application of the law of fiduciary duties which Managers owe to the LPIs.

The sad reality is that the LPIs could have already distributed sale proceeds of over $100M pursuant to the waterfall provisions of their LLCAs in connection with a sale of the entire investment portfolio at a premium to fair value as to the LPIs and wound up the affairs of those

entities with every member having made significant returns, but instead the Managers chose to attempt to benefit NECLPI (an entity controlled by the managers of the LPIs and in which they have a pecuniary interest) at the expense of the LPIs' other members LSI and LSP by: (a) "firing" LSI; (b) attempting to forfeit the equity of LSI and LSP; and (c) immediately pursuing the sale transaction LSI sourced and was pursuing at the direction of the Managers, but (d) thereafter abandoning the Sale Transaction when told by the buyer that it would not proceed without LSI's involvement (a requirement that had previously and repeatedly been disclosed). The Managers—unable to face the unfortunate reality that their scheme to defraud has failed and the LPIs' portfolio will likely now need significantly more capital and is likely to be liquidated at a significant loss—seek to force the companies in which LPIs are invested to buy out the LPIs' interests in an apparent attempt to extract as much immediate value as possible from the LPIs' investment portfolio. If not restrained, the Managers are likely to continue to destroy equity value at the companies in which the LPIs are invested, rather than taking reasonable efforts to create or extract equity value therefrom, or accepting reasonable and above-market offers for the sale of such interests. In short, the Managers' conduct has substantially harmed the LPIs and have made the conduct of the LPIs' business, or the orderly liquidation of their assets, impossible.

    As part of the scheme to defraud LSI and LSP, the Managers, either directly or through their control of NECLPI, have retained Ropes & Gray to file arbitration and demand discovery therein unrelated to any actual case, controversy or dispute between LSI and the LPIs. Such discovery is sought in furtherance of the Managers' fraud, self-dealing, and attempts to create post-hoc justifications for the Managers' "firing" of LSI on August 8, 2024. However, Ropes & Gray is and always was ethically prohibited from representing the LPIs due to obvious and unwaivable conflicts of interest. Plaintiffs' operative First Amended Complaint alleges that Ropes & Gray aided and abetted the Managers' breach of fiduciary duty and pursuit of fraud (Amended Complaint, ¶¶ 29, 132-133) and the evidence in hand substantiates the same. Therefore Ropes & Gray should be disqualified as counsel and the Managers should be restrained from retaining that firm to represent the LPIs, or be required to discharge that firm if so retained.

## II.    STATEMENT OF RELEVANT FACTS

### A.    The LLCs and its Managers

The LPIs are Delaware limited liability companies, and each has three members: LSP, LSI and NECICF II LPI Investor, LLC ("NECLPI"). The LPIs are now and have always been managed by Patrick Fox and Bennett Collier (the "Managers"). The Managers have a pecuniary interest in NECLPI. (Bauer Decl., ¶ 2.) The Managers therefore have a conflict of interest, in that they are incentivized to harm LSI and LSP's interests to benefit NECLPI (or its "upstream investors" as discussed herein).

The Managers owe fiduciary duties to the LPIs and their constituent members by default. Del. Code § 18-1104; *see Feeley v. NHAOCG, LLC*, 62 A.3d 649 (2012). Section 8.5 of the LLCAs also impose contractual fiduciary duties. *See Gatz Props., LLC v. Auriga Capital Corp, LLC*, 59 A.3d 1206 (2012). Yet, to the Plaintiffs' understanding, at no point have the Managers ever retained counsel for themselves, or for the LPIs, as it relates to the administration of the LPI fund-of-funds relationship. (Bauer Decl. ¶ 2.)

### B.    McConnell's Departure

As set forth in the First Amended Complaint, Patrick McConnell sent a resignation letter in November 2022. (Am. Compl. ¶75.) The Managers were told by Brad Bauer in February 2023 that McConnell would be leaving LSI. (*Id.* ¶ 77.) The Managers received McConnell's resignation letter no later than March 24, 2023. (*Id.* ¶ 81.) In response, Patrick Fox took the position that McConnell could not leave (despite him being allowed to resign per the terms of the LSI Operating Agreement and the Key Person Agreement (Bauer Decl. ¶ 12)) and took steps to cause McConnell to deadlock LSI management by retroactively appointing McConnell as co-CEO of LSI by email dated March 28, 2023. (Am. Compl., ¶ 82; Bauer Decl. ¶ 12.) The Managers then "exercised remedies" under the GSAs on April 17, 2023 by dictating that LSI must continue to provide the "Services" under the GSAs, but that LSI be prohibited from making any further investments. (*Id.* ¶86; Bauer Decl. ¶ 14.) The "Services" include sourcing and making new investments; however, and as such, the "no new investments" remedy is not an available remedy under the GSA (the remedies being to suspend the Services in their entirety or to terminate the

GSAs); therefore, the Managers' edict was ultra vires and a breach of fiduciary duty as such a remedy could never have been for the benefit of the LPIs.  (Bauer Decl, Exs. NN, OO (LPI LLCAs, at §§ 3.11 & 8.5 stating that the Managers may only enforce the "express provisions" of the GSAs "for the benefit of the [LPIs]"). This "no new investments" remedy was done with the intention of turning LSI and the LPIs into a liquidating trust, and no benefit could redound to the LPIs from being turned into a liquidating trust (and, the requirement that LSI continue to provide the Services is a tacit admission that LSI was best positioned to do so despite McConnell's departure). (Am. Compl. ¶ 86; Bauer Decl. ¶ 14.)  LSI principals will testify that the level of McConnell's participation remained constant from at least November 2022 to the present day. (Bauer Decl., ¶ 49.)  The Managers or their counsel Curt Whittaker knew that (1) McConnell had sent a resignation letter in November 2022, (2) LSI treated such letter as a resignation, (3) McConnell was removed from payroll due to his performance issues and intended separation from LSI's business, and (4) McConnell's departure would have no impact on how LSI operates. (Bauer Decl., ¶ 17.) Despite repeated suggestions to investigate and consider the impact McConnell's departure would have on LSI, the Managers first chose not to investigate and later, upon interviewing the LSI principals in July 2023 (but never having discussed with Bauer) chose to ignore what they had learned and continue to chase a pre-determined result.  (*Id.*)

Despite LSI's willingness to stipulate to Claimants' core requested relief in the arbitration proceeding, the LPIs through their counsel Ropes & Gray has taken the position that the parties must arbitrate to determine the actual date that McConnell allegedly stopped materially participating in LSI's management.  (Dart Decl. ¶¶ 10-11, Ex. H). The simple facts are as follows: (1) the level of McConnell's participation has not changed for over two years, (2) the Managers asserted that LSI could not provide the Services without McConnell (though on April 17, 2023 required LSI to continue providing the Services despite knowledge of McConnell's intended departure and performance issues); (3) LSI generated returns of just below 30% on LPI investments it originated, managed and monetized; (4)  the Managers enjoyed the results of LSI's provision of the Services between November 2022 and August 2024 without regard to whether McConnell was "materially participating", (5) now that LSI has created equity value in the LPI

portfolios the Managers seek to forfeit the equity interests of LSI and LSP (at the cost of millions of dollars of earned and invested to LSI and LSP members) on the basis that McConnell was not "materially participating in LSI management". If the Managers were sincere in their claims that LSI could not operate without "two senior Managers" (a made-up term and requirement created by the Managers and Whitaker) the Managers had the obligation to exercise its remedy of termination in April of 2023 or earlier (or the remedy of termination for convenience at any time thereafter). (Bauer Decl. ¶ 48.) And this ignores that after the Special Restrictions Period, McConnell was allowed to resign under the express terms of his Key Person Agreement and the LSI operating agreement, and LSI was permitted to appoint new managers without the Special Member's consent.

Said another way, the Managers are seeking to treat McConnell's participation as adequate during the time they needed LSI to create value in the LPI investments and thereafter, once value has been created, claim McConnell's participation inadequate and use as justification when such conclusion serves the Managers' attempts to defraud LSI and LSP. (*Id.*) It will be shown in this action that the Managers did not terminate the GSAs in response to McConnell's departure in 2023 because the facts will show that such a termination would not be supported by fact, contract, or law.

Putting all of this aside, the Managers cannot possibly explain how forcing someone to remain at LSI who had no interest in being there (and LSI no interest given the level of performance), and then using the level of his participation as an albatross to make repeated and unwarranted threats against LSI, ever benefitted the LPIs. (Bauer Decl. Ex. R.) Thus, this course of conduct is ultra vires and a breach of fiduciary duties and the Plaintiffs should not be forced to arbitrate those factual issues in a proceeding where neither LSP nor the Managers are a party and which proceeding will have no collateral estoppel or res judicata effect on this proceeding. (*See* Bauer Decl., Exs. NN, OO (LLCAs, at § 8.5 prohibiting Managers from exercising the GSAs in a manner that harms the LPIs; *see also* Dart Decl. ¶ 3, Ex. B (wherein Managers take position they cannot be compelled to arbitrate)).

**C.    LSI Sources a Buyer Despite the Managers' Self-Interested Actions**

After continuing to enjoy LSI's provision of the Services for many months, the Managers re-iterated their moratorium on investments on October 13, 2023. (Bauer Decl., ¶ 21.)  Of note, the Managers indicated both on April 17, 2023 and October 13, 2023 that the Managers intended only to serve the interests of "the upstream investors of [NECLPI]."  (*Id*, ¶¶ 14, 21.)  These are open admissions that the Managers desired to serve the interests of a third party rather than the entities they managed, namely, the LPIs (each owned by LSP, LSI and NECLPI).  The Managers are also believed to be the managers and two of the "upstream investors of [NECLPI]" themselves.  On October 16, 2023, counsel advised the Managers and Curt Whittaker that the actions they had taken were inappropriate and unlawful and likely adverse to the LPIs.  (Bauer Decl.,¶ 21, Ex. S.)  Bauer also responded on October 17,  2023 to point out that the Managers' conduct was contrary to their fiduciary obligations to the LPIs. (Bauer Decl., ¶ 21.)

After being forcefully converted into a liquidating trust in violation of the LLCAs, LSI sourced a buyer for the LPIs' entire investment portfolio.  (Bauer Decl. ¶ 28, Ex. Y.)  In December 2023 and throughout the first half of 2024, the Managers encouraged LSI to pursue the transaction (the "Sale Transaction") as part of the Services, while acknowledging that McConnell was no longer part of the LSI management team. (Bauer Decl. ¶¶ 29-33).  Notably, this encouragement came after Ropes & Gray's alleged date that McConnell stopped materially participating in September 2023.

On a May 1, 2024 telephone conference, and subsequent emails, the Managers and Whittaker attempted to condition the Sale Transaction on obtaining a release and possible cram down of LSI and LSP's economics, for the benefit of Victory Capital Management and/or NECLPI, in breach of their fiduciary obligations.  (Bauer Decl. ¶ 37.)  These attempts to negotiate directly with the buyer were also harmful to the LPIs, delayed the deal, and were a breach of Section 2.1(c) of the GSAs and Section 8.5 of the LLCAs. Bauer asked the Managers if they had any other ideas for increasing equity value or sourcing other buyers for the investments, to which the Managers have never responded.  (Bauer Decl., ¶ 41, Ex. DD.)

At some point, the Managers became agitated that the Sale Transaction (which involved

education, valuation and diligence of distinct equity and debt investments in ten companies) was not proceeding on their desired schedule, and through their chosen counsel at the time (Greenberg Traurig) stated on June 28, 2024 that the Managers determined that pursuing the Sale Transaction was no longer in the best interests of the LPIs. (Bauer Decl., ¶ 42, Ex. DD.)  No rationale was given for making this determination other than the Sale Transaction should close within 60 days. Greenberg Traurig stated that comments to the term sheet would be forthcoming, but no comments were ever provided.  Given the 60-day deadline, it is bewildering that the Managers continued to pursue the Sale Transaction well beyond the date that was 60 days after Greenberg Traurig's email.  (*Id.*)

Plaintiffs understand that the Managers abandoned the Sale Transaction when they were unable to convince the buyer to close to the exclusion of LSI's and LSP's equity or without involving LSI, and now the Managers have no other potential buyers or ideas for disposing of the LPIs' investments, other than to demand the investments find a solution to the Managers' liquidity problem themselves.  (Bauer Decl. ¶ 53.)

### D.    The Managers on Behalf of NECLPI Commence Arbitration Against LSI

On July 9, 2024, Patrick Fox through NECLPI, commenced Arbitration in the name of LPI II against LSI, seeking a narrow declaratory judgment that LPI II did not need to pay the full amount of the Base Fee payable under the LPI II GSA. (Bauer Decl., ¶46.)  There is no indication within the filing itself or given contemporaneously as to how Patrick Fox determined that commencing such arbitration was in the best interests of LPI II.  (*Id.*)  NECLPI commenced the arbitration in the name of LPI II pursuant to Section 8.1(b) of the LPI II LLCA ("NECLPI shall have sole authority at all times to enforce the Company's rights and remedies under the General Services Agreement in the name of the Company").

### E.    NECLPI Retains Ropes & Gray as Counsel Despite Clear Conflicts and Managers Enact Their Scheme to Defraud

NECLPI retained Ropes & Gray as counsel in the arbitration in mid- to late-July 2024. (Dart Decl., ¶ 3.)  Shortly after being retained by NECLPI (and presumably in reaction to LSI's arbitration response, which indicated that LSI had the remedy under the LPI II LLCA of obtaining

control of the Management Committee due to the Managers' refusal to call capital to pay the Base Fee (i.e. an "NECLPI Default" under the LPI II LLCA)), Ropes & Gray prepared a Notice of Termination which, on August 8, 2024, was sent in an effort to terminate the GSAs, and strip the equity of LSI and LSP.  (Bauer Decl., ¶ 50, Ex. JJ.)  The Notice of Termination contains the signatures of Patrick Fox and Bennett Collier as the Managers, as well as Patrick Fox on behalf of NECLPI.  (*Id.*)  Ropes & Gray prepared the Notice of Termination to be signed by two fiduciaries who were unrepresented by counsel, to have drastic legal effect on two parties to whom those fiduciaries owed fiduciary duties, without advising the fiduciaries that Ropes & Gray could not properly represent the Managers or the LPIs due to the conflict of interest in first having been retained by NECLPI (Model R. Prof. Conduct 1.7 & 4.3).  (*Id.*)  Ropes & Gray also did this without either (1) first consulting years-long counsel to the LPIs (Model Rule Prof. Conduct 1.3), or (2) sending the Notice of Termination to counsel (Model R. Prof. Conduct 4.2). (*Id.*).  Ropes & Gray thereafter indicated on August 14, 2024 that it represents the LPIs, NECLPI and the Managers. (Dart. Decl., Ex. B.)

To put a finer point on the conflict of interest (which if it had been identified, acknowledged and respected by Ropes & Gray, the disastrous loss of $30-$50 Million in equity value may have been avoided), the Managers' scheme to defraud can be described as follows:

> a.     Assume the LPIs plan to sell all the assets of the LPIs to a buyer for $100 million.  Based on the equity position of LSI, LSP, and NECLPI, the parties would earn as follows: NECLPI: $80M; LSI: $18M; and LSP: $2M, for a total of $100M.  Note that LSP's position is based on actual, invested capital, while LSI's position is a profits interest, and each such position is behind NECLPI's position in the waterfall.

> b.     NECLPI would always be incentivized to strip equity from LSI and LPI in such a situation in order to close the same $100M deal, but have the economics go entirely to NECLPI.  This is why the Managers (who have a pecuniary interest in NECLPI) are appointed as fiduciaries – they cannot take action that would result in harm to the LPIs and which constitutes self-dealing.  Counsels to the Managers or to the LPIs would be required to act as fiduciaries to those clients as well – they could not harm the LPIs in an effort to benefit NECLPI.

> c.     The conflict of interest as it relates to counsel comes from the hypothetical wherein NECLPI counsel could seek to strip equity of LSI and LSP, *sell at a discount*, and therefore harm the LPIs (as fewer dollars would be earned), while benefitting NECLPI (as a higher overall return would redound to NECLPI).

d.      With respect to the above hypothetical, assume NECLPI would attempt to strip the equity of LSI and LSP and then seek to close the same $100M deal, but at a discount so the sale price is $90M. In that circumstance, NECLPI has made the deal more attractive to the buyer by lowering the overall price, while earning $10M more than it otherwise would have. But the LPIs were harmed as the LPIs received $10M less than they otherwise would have (and LSI and LSP were harmed as they receive $0). This hypothetical is referred to herein as the "**Scheme to Defraud**". Counsel to the Managers or to the LPIs could not let this hypothetical come to pass without violating their fiduciary or ethical duties (Model R. Prof. Conduct 1.7). Given the interests of NECLPI and the LPIs in this scenario are diametrically opposed and adverse, the same counsel could not represent NECLPI and the LPIs and/or the Managers here without creating an unwaivable conflict of interest.

e.      Note that LSI's profits interest, by virtue of where it sits in the waterfall, contains incentives that are aligned with, and not adverse to, the LPIs; namely, if LSI drives additional value for the LPIs, the LSI's profits interest correspondingly increases in value. As such, while the GSAs are in effect, LSI's and LPIs' respective interests are not in conflict.

Rather than seek a conflict waiver or otherwise attempt to address the conflict of interest, Ropes & Gray assisted Patrick Fox, Bennett Collier and NECLPI in stripping the equity of LSI and LSP, in an effort to make the LPIs each a single-member LLC where NECLPI is the sole member. (Dart Decl., Ex. E (the "**Whistleblower Letter**")). Patrick Fox has made statements to third parties that the Notice of Termination was done with an intent to pursue the Scheme to Defraud (e.g. that the Managers will be cheaper to buy out now that LSI is no longer involved). (Bauer Decl., ¶ 51.) As such, the action is and always was ultra vires and a breach of fiduciary duties under the LPIs' LLCAs, as the Notice of Termination was done with the intent to harm the LPIs. (*See* LPIs LLCAs § 8.5). To pursue the same transaction sourced by LSI but to the exclusion of LSI's equity would constitute constructive fraud even if it did not result in harm to the LPIs (but here, such harm occurred).

Importantly, the original non-binding offer of December 2023, the proposed term sheet and exclusivity agreement prepared in June 2024, and multiple emails between the buyer and Patrick Fox state expressly that the Sale Transaction was always contingent upon LSI remaining engaged to provide the Services through closing and that the LSI management team included everyone at LSI *other than McConnell*. (Bauer Decl. ¶¶ 29-32.) Therefore, the actual, direct, proximate and but-for cause of the loss of value from not closing the Sale Transaction results from the Managers "firing" of LSI, and resultant refusal to include LSI when the buyer reiterated such a requirement,

1   which was done by the Managers with actual knowledge that such action would make the Sale

2   Transaction unavailable, and ostensibly with an intent to harm LSI and LSP.  (*Id.*)  The Managers

3   thereafter pursued the Sale Transaction, and now seek to blame others for the fact that the Sale

4   Transaction is no longer appears to be a viable exit opportunity for the LPIs' portfolio of

5   investments. (Bauer Decl., ¶ 53.)

6         On August 27, 2024, Ropes & Gray sent a letter to years-long counsel to the LPIs ("LPI

7   Counsel A") demanding "client files" that would assist in the Managers' scheme to defraud.  (Dart

8   Decl., Ex. C.) This letter had a file stamp footer that matched the file stamp on the Notice of

9   Termination, indicating that Ropes & Gray had prepared the Notice of Termination. (*Id.*)  LPI

10   Counsel A called Ropes & Gray on September 3, 2024, to inquire as to who prepared the Notice

11   of Termination, and to inquire as to who Ropes & Gray represents, to which Ropes & Gray

12   indicated it represents the LPIs but not NECLPI or the Managers.  (Dart Decl., ¶ 14.)  On

13   September 4, 2024, Patrick Fox requested LPI Counsel A's engagement letter for the first time.

14   (Dart Decl., Ex. J.)  On September 5, 2024, Patrick Fox indicated to LPI Counsel A that the

15   Managers view LPI Counsel A as representing the LPIs (despite previous positions taken by the

16   Managers and Curt Whittaker that the very same counsel was not authorized to represent the

17   LPIs).  (Dart Decl., Ex. K.)

18         On September 9, 2024, such counsel provided a report to the Managers regarding, among

19   other things, the Notice of Termination's likelihood to cause substantial harm to the LPIs, and

20   indicating that pursuit of the Sale Transaction in light of stripping the equity of LSI and LSP

21   would likely constitute fraud.  (Dart Decl., Ex. E (Whistleblower Letter).)  This report identified

22   the conflicts of interests of each of Ropes & Gray and Defendant Rath and Curt Whittaker.  (*Id.*).

23   This report also gave specific instructions to the Managers how to avoid further harm to the LPIs

24   and how to avoid committing fraud. (*Id.*)  The Managers, however, ignored the report and

25   continued committing wrongful acts, and thus LPI Counsel A provided a report to higher authority

26   of such wrongdoing on September 11, 2024. (Dart Decl., Ex. F (the "**Whistleblower Letter 2**")).

27   The Managers discharged LPI Counsel A as counsel to the LPIs on September 13, 2024. (Dart

28   Decl., ¶ 8, Ex. G.)  None of the Defendants nor their counsels have contacted such counsel since to

ascertain how to avoid harm to the LPIs as a result of the conduct described in the Whistleblower Letter, but have sought materials relating to the Sale Transaction in an apparent effort to complete their Scheme to Defraud.  (Dart Decl., ¶ 9.)  As a result of the Managers' failure to follow the advice of counsel, the Sale Transaction is apparently no longer available to the LPIs; in other words, the Managers' failure to follow the advice of counsel in their pursuit of fraud and self-dealing is believed to have caused a loss of equity value of $30-$50 Million, thereby eviscerating any value the LSI profits interest could have had. (Bauer Decl. ¶¶ 53-54.)  The facts in this paragraph evidence that the Managers have been directed to act consistent with the relief requested in this motion and have failed to do so, and also indicates that any future requests made on the Managers to prevent further harm to the LPIs will be ignored and are futile. *See* Del. Code Ann. § 18-1001 (requirements for derivative action; *see* Dart Decl., Ex. E (Whistleblower Letter).)

It is the Plaintiffs' understanding that the Managers have, through other entities and not the LPIs, either made capital contributions to existing LPI investments (depriving LSP of its right to co-invest and earn a return, and depriving LSI of its equity upside), or caused the LPIs or existing investments to return capital to entities other than the LPIs and its constituent members.  The Whistleblower Letters set out how these actions constitute fraud.  Given that the Plaintiffs lack access to the relevant bank accounts, Plaintiffs will be seeking accounting records as part of discovery in this action, and are further entitled to an accounting pursuant to Delaware law[1] and Section 7.1(a) of the LPIs' LLCAs in order to ascertain what actions have been taken.  It is believed that these accounting records will show that the Managers treat the LPIs as existing at the Managers' convenience and that they have no obligation to act consistent with the LLCAs or fiduciary duties with respect thereto.  This despite Section 8.5 of the LPIs LLCAs stating that the Managers shall at all times have fiduciary responsibility for preserving LPI property (of which the only property is, at this point, the investments).  All of the foregoing conduct is part of the Managers' pattern of fraudulent conduct as set forth in the Amended Complaint.

Ropes & Gray has continued to request from discharged counsel files relating to the Sale Transaction over the past few months.  (Dart Decl., ¶¶ 12-13, Ex. I.)  Ropes & Gray has never

---

[1] The LLCAs are governed and construed in accordance with Delaware law.  (LLCAs, § 11,8)

14

1   sought to understand the facts recited in the Whistleblower Letter or determine how to avoid the

2   harm to the LPIs that has redounded as a result of failing to follow counsel's instructions; instead

3   Ropes & Gray has sought only to further the interests of NECLPI or the Managers only in their

4   attempts at self-dealing. Determining who is paying Ropes & Gray may help answer the foregoing

5   question.  Ropes & Gray' actions give the appearance of actively engaging in assisting the

6   Managers in the commission of fraud (Model Rule Prof. Conduct 8.4(c)).  (*Id.*)  Finally, Plaintiffs

7   expect to confirm in discovery that Ropes & Gray's legal fees are being paid by a non client

8   (Model R. Prof. Conduct 5.4(c)), namely "the upstream investors of [NECLPI].")

9        The Managers have not ceased their attempts at fraud by rescinding the Notice of

10  Termination, and instead appear to have realized that what they were told by the buyer and LSI in

11  June 2024 is true – that the buyer in the Sale Transaction will not close at its originally-offered

12  price if the GSAs are terminated and LSI is excluded from the transaction.  (Bauer Decl., ¶ 53.)

13  The Managers are now seeking to extract value from the companies in which the LPIs are

14  invested, attempting to force those companies to acquire the LPIs' interests at prices the market

15  does not support, with the implicit threat being that the LPIs will not contribute additional capital

16  or approve annual budgets that require additional investment, and that the investee companies

17  themselves must create liquidity for the Managers.  (Bauer Decl., ¶ 53-55.) The Managers have

18  stated that they refuse to sell at a loss, despite the market dictating that they will likely have to.

19  (Bauer Decl., ¶ 55.)  All of this evidences that, despite years of access to information, valuation

20  reports, etc. from LSI, the Managers simply have no idea what the value of the LPIs' investments

21  are or how equity value can be created. (Bauer Decl., ¶ 56.)

22  **III.    APPLICABLE LEGAL STANDARD**

23          **A.    Injunctive Relief**

24        Federal courts have inherent equitable jurisdiction in actions before them and may issue an

25  injunction in any case for which equitable relief is proper under applicable substantive law.

26  *Weinberger v. Romero-Barcelo* (1982) 456 US 305, 311-312. "The basis for injunctive relief in

27  the federal courts has always been *irreparable injury* and the *inadequacy of legal remedies.*"  *Id.*

28  (emphasis in original).  "In each case, a court must *balance* the competing claims of injury and

must consider the *effect on each party* of the granting or withholding of the requested relief." *Amoco Production Co. v. Village of Gambell, Alaska* (1987) 480 US 531, 542. The moving party has the burden of persuasion. *Hill v. McDonough*, 547 U.S. 573, 584 (2006). To obtain a preliminary injunction, the plaintiffs must establish (i) "that he is likely to succeed on the merits", (ii) that he is likely to suffer irreparable harm in the absence of preliminary relief, (iii) that the balance of equities tips in his favors, and (iv) "that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.* (2008) 555 US 7, 20. In the Ninth Circuit courts continue to have "authority to balance the elements of the preliminary injunction test, so long as a certain threshold showing is made on each factor." *Drakes Bay Oyster Co. v. Jewell* (9th Cir. 2014) 747 F.3d 1073, 1085.

To satisfy these elements, a movant need not prove its case in full at the preliminary injunction hearing. *University of Texas v. Camenisch* (1981) 4511 US 390, 395. Instead, the movant must establish that he or she is "likely" to prevail on the merits. *Garcia v. Google, Inc.* (9th Cir. 2015) 786 F.3d 733, 740.

### B.    Disqualification of Counsel

The Federal Rules do not supplant the Court's inherent power to disqualify counsel at its discretion. *Chambers v. NASCO, Inc.* (1991) 501 U.S. 32, 50. Motions to disqualify counsel are decided under state law. *In re Cnty. of L.A.* (9th Cir. 2000) 223 F.3d 990, 995; *Hitachi. Ltd v. Tatung Co.* (N.D. Cal. 2006) 419 F.Supp.2d 1158, 1160. The local rules for this District direct the Court to apply the rules and law of professional conduct of California. *Rodriguez v. W. Publ'g Corp.* (9th Cir. 2009) 563 F.3d 948, 967 ("By virtue of the district court's local rules, California law controls whether an ethical violation occurred.").

Here, Ropes & Gray has stated in writing that it represents the LPIs, NECLPI and the Managers. The Managers have not yet appeared in this action, and actively attempted to avoid service. Stakeouts were required to successfully serve both. (Dart Decl., ¶ 15.) It is unclear whether Ropes & Gray intends to make an appearance in this proceeding, or instead will continue on its course of starting myriad arbitration proceedings to pursue ulterior motivations of the Managers; regardless the conflicts of interest rules should preclude their continued representation

1   in this dispute, or of the LPIs in general.[2]  Given the foregoing, the relief sought is to restrain

2   Ropes & Gray from acting on behalf of the LPIs (which may be done via a restraining order upon

3   the Managers' conduct), and not a traditional motion to disqualify counsel in a litigation

4   proceeding.

5         The decision to grant a motion to disqualify counsel due to a conflict of interest is within

6   the trial court's discretion. *Lennar Mare Island, LLC v. Steadfast Ins. Co.* (E.D. Cal. 2015) 105

7   F.Supp.3d 1100, 1108. "Under California law the starting point for deciding a motion to disqualify

8   counsel is the recognition of interests implicated by a motion." *Hitachi*, 419 F.Supp.2d at 1160.

9   Disqualification motions involve such considerations as a client's right to chosen counsel, an

10   attorney's interest in representing a client, and the financial burden on a client to replace

11   disqualified counsel. *Id.* at 1161 (citing *People ex rel. Dept of Corporations v. SpeeDee Oil*

12   *Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1145; *Lennar Mare Island*, 105 F.Supp.3d at 1108

13   (stating court must weigh same factors, as well as "any tactical abuse underlying a disqualification

14   proceeding against the fundamental principle that the fair resolution of disputes within our

15   adversary system requires vigorous representation of parties by independent counsel

16   unencumbered by conflicts of interest.") (quoting *In re Lee G.* (1991) 1 Cal.App.4th 17, 26).

17         "Disqualification is a blunt tool meant to encourage wide berth of ethical grey areas, its

18   ruthlessness warranted only after a clear showing of conflict." *Lennar Mare Island*, 105 F.Supp.3d

19   at 1107. Because "disqualification is a drastic measure, it is generally disfavored and should only

20   be imposed when absolutely necessary." *Id.* (quoting *Concat LP v. Unilever, PLC* (N.D. Cal.

21   2004) 350 F.Supp.2d 796, 814. "On the other hand, particularly when a party alleges a conflict

22   between two of a firm's current clients, 'the paramount concern must be the preservation of public

23   trust both in the scrupulous administration of justice and in the integrity of the bar. Consequently,

24   the recognizably important right to choose one's counsel must yield to the ethical considerations

25   that embody the moral principles of our judicial process.'" *Id.* at 1108 (quoting *State Farm Mut.*

26   *Auto. Ins. Co. v. Fed. Ins. Co.* (1999) 72 Cal.App.4th 1422, 1428.

27

28   [2] The Model Rules of Professional Conduct are cited herein as it is not clear whether California's or Massachusetts (or some other State's) rules would apply – the violations are obvious no matter what state's rules ultimately apply

IV.    **ARGUMENT**

The LLCAs require that the GSAs only be enforced for the benefits of the LPIs.  *See* LLCAs § 8.5 ("the Management Committee shall manage and control the affairs of the Company to the best of their ability, and the Management Committee shall use commercially reasonable efforts to carry out the purposes of the Company for the benefit of the Company. Such efforts shall specifically include the enforcement and performance of the Company's rights, remedies and obligations under the General Services Agreement for the benefit of the Company.")  The Managers are also subject to fiduciary obligations to protect and preserve LPI property, namely the investments of the LPIs. (*Id.*)  Furthermore, Managers of Delaware limited liability companies are constrained by fiduciary duties.  Del. Code § 18-1104; *see Feeley v. NHAOCG, LLC*, 62 A.3d 649 (2012); *Gatz Props., LLC v. Auriga Capital Corp, LLC*, 59 A.3d 1206 (2012); *See Phillips v. Hove*, 2011 WL 4404034, at *24 (Del.Ch. Sept. 22, 2011) ("Unless limited or eliminated in the entity's operating agreement, the member-managers of a Delaware limited liability company [ ] owe traditional fiduciary duties to the LLC and its members."); *In re Atlas Energy Res. LLC*, 2010 WL 4273122, at *6 (Del.Ch. Oct. 28, 2010) ("in the absence of explicit provisions in an [LLC] agreement to the contrary, the traditional fiduciary duties owed by corporate directors ... apply in the [LLC] context.").  In that sense, any contractual dispute under the GSAs are irrelevant – if the Managers exercised remedies under the GSAs with the intent of benefitting NECLPI but harming the LPIs, that conduct is ultra vires and a breach of fiduciary duties, and likely constitutes constructive fraud. *Id.*; *see* Whistleblower Letter.  Even if the GSAs are considered, the GSAs repeatedly state that remedies must only be exercised for the benefit of the LPIs, *see* GSA § 7.1, 7.2, and the Managers have confirmed this via resolutions, *see* Bauer Decl,. Exs. W, X. Nowhere in the Notice of Termination or the voluminous arbitration filings have the Managers indicated how it benefitted the LPIs to terminate the GSAs, strip the equity of LSI and LSP and then pursue, but ultimately fail, to close the Sale Transaction simply because the buyer required LSI to be involved.  In fact, such conduct resulted in an almost-immediate loss of value of $30-$50 Million. (Bauer Decl., ¶ 55.)  The Managers will cause further harm if not restrained. (*Id.*) This conduct is prohibited by the LLCAs and the law of fiduciary duties, and any analysis of whether a party was

1   in breach of the GSAs is not relevant to that determination (though even consideration of the

2   GSAs and the Managers' conduct would show that such termination was invalid as a matter of

3   contract).

4       Importantly, the Managers are not subject to the arbitration provisions of the LPI LLCAs

5   (*See* Section 11.12).  And such clause allows seeking injunctive relief in Court outside of

6   arbitration.

7       **A.    A Preliminary Injunction Should be Issued.**

8           **a.  Likelihood of Success on the Merits**

9       Plaintiffs are highly likely to succeed on the merits of, *inter alia,* breach of fiduciary duty

10  claim against the fiduciary Managers.  Defendant and Manager Patrick Fox has openly admitted

11  that for years he has been serving the interests of "the upstream investors of [NECLPI]" rather

12  than the LPIs.  (Bauer Decl., ¶ 9.)  The Managers never retained counsel for themselves while

13  taking actions to benefit themselves and harm certain LLC members.  The Managers went against

14  the advice of counsel and caused substantial harm to the LPIs and committed fraud, and are

15  intending to commit further fraud.  All of this is being done openly and admittedly by the

16  Managers, who seem to believe that their status as Manager allows them to dictate whatever they

17  want for the LPIs, i.e. elevating their own interests over the interests of the LPIs and its constituent

18  members.

19      "[M]anagers of a Delaware limited liability company owe traditional fiduciary duties of

20  loyalty and care to the members of the LLC unless the parties expressly modify or eliminate those

21  duties in the operating agreement." *William Penn P'ship v. Saliba*, 13 A.3d 749, 756 (Del. 2011);

22  see also *Feeley v. NHAOCG, LLC,* 62 A.3d 649, 660 (Del. Ch. 2012) (discussing *Auriga Capital*

23  *Corp. v. Gatz Props.*, LLC, 40 A.3d 839 (Del. Ch. 2012) (Strine, C), aff'd sub nom. *Gatz Props.,*

24  *LLC v. Auriga Capital Corp.*, 59 A.3d 1206 (Del. 2012)).  Even an action made by a party where a

25  membership interest is arguably forfeited or no longer exists can be supported if the Plaintiff

26  makes a showing that such loss of membership interest resulted from a violation of fiduciary duty

27  or other wrong. *See Destra Targeted Income Unit Inv. Trust v. Parmar*, 2017 Del. Ch. Lexis 906.

28  ("The plaintiffs have established a reasonable likelihood of success on the merits of their

1   challenges to the [challenged action] as a self-interested transaction that was not entirely fair, as

2   well as their theories that the [challenged action] was approved in violation of the relevant entity

3   documents and constituted a fraudulent conveyance.")

4       Delaware law treats managers of a manager-managed LLC as fiduciary in nature. Del.

5   Code § 18-1104. The specific fiduciary duties generally include the following: duty of loyalty,

6   duty of honesty, duty of good faith and fair dealing, duty to exercise due care, duty to fully

7   disclose all material facts, etc. *See, e.g., Leb. Cnty. Employees' Ret. Fund v. Collis*, 287 A.3d

8   1160, 1195 (Del. Ch. 2022); *Revlon, Inc. v. Macandrews & Forbes Holdings, Inc.*, 506 A.2d 173

9   (Del. 1986); *In re Tri-Star Pictures*, 634 A.2d 319, 333 (Del. 1993).  The business judgement rule

10  is a presumption that directors acted in a manner that satisfied their fiduciary duties absent a

11  showing of (1) gross negligence, (2) fraud, (3) self-dealing, or (4) bad faith. *Kaplan v. Centex

12  Corp.*, 284 A.2d 119. (Del. Ch. 1971).

13      Here, the Whistleblower Letters indicates that the Notice of Termination is a self-

14  interested, grossly negligent, and fraudulent action taken in bad faith, and therefore entire fairness

15  applies.  (Dart Decl., Ex. E (Whistleblower Letter)); *see Gatz Props., LLC v. Auriga Capital

16  Corp.*, 59 A.3d 1206 (Del. 2012).  Plaintiffs intend to prove, with discovery, that the April 17,

17  2023 "moratorium" on new investments was a self-interested action by the Managers, given the

18  Managers thereafter invested in at least one investment target that had been previously identified

19  and diligence conducted by LSI.  Once entire fairness applies, the defendants must establish "to

20  the Court's satisfaction that the transaction was the product of both fair dealing and fair price."

21  *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1163 (Del. 1995).  The Notice of

22  Termination and forfeiture of equity is premised entirely on the participation of an individual that

23  resigned two years ago.  (Bauer Decl., ¶¶ 50-51.)  LSI was directed to continue providing the

24  Services, and thereafter directed to pursue the Sale Transaction, despite this individual's departure,

25  all at the direction of the Managers.  (*Id.*, ¶ 33.)  As such it is not fair dealing to now use that

26  individual's lack of participation as a method by which to remove the equity of LSI, and even

27  more so the equity of LSP, which is based on real, invested capital.  And there was not a fair price

28  for such forfeiture – the Notice of Termination indicates the payment of $2.00 to forfeit a multi-

1   million dollar investment (though the $2.00 payment has not yet been paid). (Bauer Decl.¶ 50, Ex.

2   JJ.)  As such, the Notice of Termination, being subject to entire fairness review, is not entirely fair

3   and constitutes a breach of fiduciary duty.

**b.  Likelihood of Irreparable Harm**

5   Harm is irreparable unless "alternative legal redress [is] clearly available and [is] as

6   practical and efficient to the ends of justice and its prompt administration as the remedy in equity."

7   *T. Rowe Price Recovery Fund, L.P. v. Rubin*, 770 A.2d 536, 557 (Del. Ch. 2000).  If the

8   Managers' are not restrained, they are likely to harm the companies in which the LPIs are

9   invested, causing further reduction in value of the LPIs.

10   It is not practical or efficient to the ends of justice to allow the Managers to use the LPIs to

11   further their own interests or to seek post-hoc justifications for having taken punitive action

12   intended to harm LSI and LSP.  The LPIs do not have any counsel to represent their interests (*see*

13   analysis regarding Ropes & Gray herein, and previous counsel having been discharged by the

14   Managers), and the Managers of the LPIs are seeking to only enrich themselves (or find or create

15   ways to protect themselves in litigation) at the expense of the LPIs.  Thus, if this conduct is not

16   restrained, the LPIs may not have a viable legal avenue to protect their own interests. *See Destra*

17   *Targeted Income Unit Inv. Trust v. Parmar*, 2017 Del. Ch. Lexis 906 ("The balancing of the

18   equities favors an interim remedy that will preserve the court's ability to fashion meaningful relief

19   at a later date. Absent equitable relief, the plaintiffs face the prospect of litigating seemingly

20   strong claims, only to have their ability to obtain relief rendered a nullity. The defendants suffer

21   near-term inconvenience from being constrained in their use of assets. That is doubtless a burden,

22   but it is less significant than the risk faced by the plaintiffs.").  Further, the liability of the

23   Managers may be quite high; Plaintiffs have alleged theories of liability that may be viable against

24   other, more solvent defendants, but proving such liability is not certain.  As such, there is a

25   possibility that if a judgment is obtained, it may not be possible to obtain recovery, at least not for

26   the full amount.  Finally, LSI and LSP are pursuing derivative claims – if equitable relief in the

27   nature of restraining and removing the Managers, and discharging Ropes & Gray, is not obtained,

28   the LPIs will have no avenue by which to protect their own interests.  Independent counsel are

1  likely required to preserve the interests of the LPIs, which outcome can only be obtained via

2  injunctive relief in this Court.

3              c.  **Balance of the Equities**

4        Equitable considerations weigh in favor of restraining fraud and breaches of fiduciary

5  duties. *See Destra, supra*.   "Constructive fraud is a unique species of fraud applicable only to a

6  fiduciary or confidential relationship. Constructive fraud arises on a breach of duty by one in a

7  confidential or fiduciary relationship to another which induces justifiable reliance by the latter to

8  his prejudice. [The] elements of constructive fraud cause of action are (1) a fiduciary or

9  confidential relationship; (2) nondisclosure (breach of fiduciary duty); (3) intent to deceive, and

10  (4) reliance and resulting injury (causation). In its generic sense, constructive fraud comprises all

11  acts, omissions and concealments involving a breach of legal or equitable duty, trust, or

12  confidence, and resulting in damages to another. Constructive fraud exists in cases in which

13  conduct, although not actually fraudulent, ought to be so treated—that is, in which such conduct is

14  a constructive or quasi fraud, having all the actual consequences and all the legal effects of actual

15  fraud." *Prakashpalan v. Engstrom, Lipscomb & Lack* (2014) 223 Cal.App.4th 1105, 1131 (internal

16  citations and quotations omitted); Cal. Civ. Code § 1573.  Elements of equitable or constructive

17  fraud have also been stated in Delaware as being (1) an alignment of the parties' interests, (2) one

18  party exerting control or domination over the other, in order to (3) engage in self-dealing. *See,*

19  *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 113-14 (Del. 2006).  Given LSI's

20  interests were always aligned with the LPIs (when LSI causes the LPIs to do better via provision

21  of the Services, the LSI profits interest increases in value given its position in the waterfall of the

22  LLCAs), it is not equitable to allow the Managers, in a self-interested series of events and

23  transactions predicated on lies, to deprive LSI and LSP of their equity and thereafter engage in a

24  pattern of domination and control in an effort to complete their fraudulent scheme.  Therefore, the

25  equities favor restraining the Managers' conduct.

26        Should Defendants argue that an injunction may prevent them from selling the interests in

27  the various investments, Plaintiffs offer that they would be supportive of any sale that provides

28  fair value to the LPIs – what the Plaintiffs seek to restrain is *refusing to sell* when the price offered

1    is reasonable and at a premium to fair value, where such refusal is done in an effort to extract more

2    concessions, money, and value from the various investment teams, at the expense of those

3    companies, or when those decisions are made apparently for the sole purpose of ensuring LSI and

4    LSP do not derive any value or benefit therefrom.  In other words, the equities favor allowing the

5    investee companies to separate themselves from the Managers as quickly as possible, and

6    Plaintiffs will not seek to restrain any such outcome.  Furthermore, if the Defendants argue that an

7    injunction should have been sought sooner; Plaintiffs will explain that the mere moving for an

8    injunction to try to preserve the Sale Transaction would have jeopardized that transaction.

9    Plaintiffs have just recently learned of the Managers' harmful conduct toward the investee

10   companies that is sought to be restrained in this motion (and the Managers were recently served

11   with process).  Declining to issue an injunction would result in more harm to the Plaintiffs than it

12   would to the Defendants.

13                    **d.  Injunction is in the Public Interest**

14          The public interest is served by restraining fraud and breaches of fiduciary duties. In

15   considering this element, the Court considers the interests of innocent third parties whose property

16   rights or other legitimate interests might be affected if the Managers' conduct is not restrained. *See*

17   *In re RJR Nabisco S'holders Litig.,* C.A. No. 10389, 1989 Del. Ch. LEXIS 9, 1989 WL 7036, at

18   *12 (Del. Ch. Jan. 30, 1989).  The LPIs are invested in several operating companies.  The

19   Managers are engaged in conduct that is intended to harm those companies – in fact, the type of

20   conduct the Managers are pursuing is strikingly similar to the tactics used on LSI; seeking to find

21   a way to harm the companies, exercise remedies or the power of the purse, in an effort to demand

22   distributions, the lowering of salaries, and forced buyouts, all of which will harm those companies.

23   Therefore, this factor weighs in favor of issuing a preliminary injunction.

24   **V.      CONCLUSION**

25          For the reasons set forth herein, Plaintiffs respectfully request the Court grant their Motion

26   to issue a preliminary injunction (1) restraining the forfeiture of LSP and LSI's membership

27   interests in each of the LPIs, (2) restraining Defendants Patrick Fox and Bennett Collier as

28   Managers from pursuing fraud and taking further actions to harm the LPIs or their various

investments in an effort to benefit one member (NECLPI) at the expense of the other members, and (3) restraining the Managers from retaining, or discharging (as applicable) the law firm of Ropes & Gray as counsel for the LPIs on the basis of conflict of interest, and otherwise restrain the Managers from retaining counsel for the LPIs for purposes of furthering the Managers' scheme to defraud (or, alternatively, to compel the retention of independent counsel for the LPIs).

Dated:   February 3, 2025

**◆ DART LAW**

By  */s/ Matthew B. Dart*
_____
MATTHEW B. DART
Attorney for Plaintiffs

1

2

3

4                                **<u>CERTIFICATE OF SERVICE</u>**

5          I, Matthew B. Dart, hereby certify that on February 4, 2025, the foregoing Plaintiffs'

6   Notice of Motion and Motion for Preliminary Injunction, together with the Declarations of Bauer

7   and Dart in support and exhibits thereto, and the proposed order, were filed electronically.  Notice

8   of this filing will be sent by email to all parties by operation of the Court's electronic filing

9   system.  Parties may access this filing through the Court's CM/ECF System.

10

11                                  *<u>/s/ Matthew B. Dart</u>*

12                                  Matthew B. Dart

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Cas No. 3:24-cv-7705