

Rocky Tsai (CSB # 221452)
ROPES & GRAY LLP
Three Embarcadero Center
San Francisco, CA 94111-4006
Tel: (415) 315-6300
Fax: (415) 315-6350
Rocky.Tsai@ropesgray.com

Robert A. Skinner (admitted *pro hac vice*)
Amy D. Roy (admitted *pro hac vice*)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
Tel: (617) 951-7000
Fax: (617) 951-7050
Robert.Skinner@ropesgray.com
Amy.Roy@ropesgray.com

*Attorneys for Defendants Patrick Fox and Bennett Collier*
*and Nominal Defendants Lacuna Project Investments, LLC*
*and Lacuna Project Investments II, LLC*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| LACUNA SUSTAINABLE INVESTMENTS, LLC; LACUNA SUSTAINABLE PARTNERS, LLC,<br><br>        Plaintiffs,<br><br>        vs.<br><br>PATRICK FOX; BENNETT COLLIER; VICTORY CAPITAL MANAGEMENT, INC.; CURT WHITTAKER; RATH, YOUNG, AND PIGNATELLI, P.C.; NECICF II GP; MARK LERDAL; and DOES 1-10, inclusive,<br><br>        Defendants,<br><br>   -and-<br><br>LACUNA PROJECT INVESTMENTS, LLC; and LACUNA PROJECT INVESTMENTS II, LLC,<br><br>        Nominal Defendants. | Case No. 3:24-cv-7705-AMO<br><br>**ANSWER AND COUNTERCLAIMS OF DEFENDANTS PATRICK FOX AND BENNETT COLLIER IN RESPONSE TO PLAINTIFFS' FIRST AMENDED COMPLAINT; COUNTERCLAIMS OF NOMINAL DEFENDANTS LACUNA PROJECT INVESTMENTS, LLC AND LACUNA PROJECT INVESTMENTS II, LLC**<br><br>Ctrm: 10, 19th Floor – San Francisco<br><br>Judge: Hon. Araceli Martínez-Olguín |

| | |
|---|---|
| PATRICK FOX; BENNETT COLLIER; LACUNA PROJECT INVESTMENTS, LLC; and LACUNA PROJECT INVESTMENTS II, LLC, | ) ) ) ) |
| Counterclaim-Plaintiffs, | ) ) ) |
| vs. | ) ) ) |
| LACUNA SUSTAINABLE INVESTMENTS, LLC, and BRAD ALAN BAUER, | ) ) ) ) |
| Counterclaim-Defendants. | ) ) ) ) |

Defendants and Counterclaim Plaintiffs Patrick Fox and Bennett Collier, and Nominal Defendants and Counterclaim Plaintiffs Lacuna Project Investments, LLC ("LPI") and Lacuna Project Investments II, LLC ("LPI-II" and, with LPI, the "LPIs"), by their attorneys, hereby file the following Answer and Counterclaims in response to the First Amended Complaint (the "Amended Complaint") filed by Plaintiffs Lacuna Sustainable Investments, LLC ("LSI") and Lacuna Sustainable Partners, LLC ("LSP") (collectively, "Plaintiffs").

## ANSWER OF DEFENDANTS FOX AND COLLIER

Defendants Fox and Collier file this Answer (the "Answer") in response to the Amended Complaint. This Answer is made without waiving, but instead expressly reserving, all rights that Fox and Collier may have to file dispositive motions or other responses addressing some or all of the allegations and claims asserted in the Amended Complaint. To the extent that the paragraphs of the Amended Complaint are grouped under headings and subheadings, Fox and Collier respond generally that the headings and subheadings do not constitute factual averments. Fox and Collier use the Amended Complaint's headings and subheadings for the convenience of the Court. To the extent that a response to the headings and subheadings is deemed necessary, Fox and Collier deny each and every heading and sub-heading in the Amended Complaint.

Except as expressly admitted herein, Fox and Collier deny all allegations, including, without limitation, any allegations in the preamble, headings, footnotes, and prayer for relief, and incorporate by reference this response in each paragraph below as if fully set forth therein. To the extent Fox and

Collier admit the contents of statements written or made orally by others, such admission does not imply any admission of the truth of such statements. Capitalized terms not otherwise defined in this Answer have the meanings ascribed to them in the Amended Complaint.

Fox and Collier answer the Amended Complaint's allegations as follows:

## INTRODUCTION

1.      The allegations in Paragraph 1 constitute legal conclusions to which no response is required. To the extent a response is required, Fox and Collier deny the allegations in Paragraph 1.

2.      Fox and Collier deny the allegations in sentences one, two, and four of Paragraph 2, except Fox and Collier admit that NEC Fund II is managed by NEC Fund II GP. The allegations in the third sentence of Paragraph 2 constitute legal conclusions to which no response is required. To the extent a response is required, Fox and Collier deny the allegations in Paragraph 2.

3.      The allegations in Paragraph 3 are denied, except Fox and Collier admit that NEC Fund II generally makes debt and equity investments in the renewable energy sector.

4.      Fox and Collier admit that, pursuant to the relevant operating agreements, they are the managers of LPI and LPI-II, and that New Energy Capital Infrastructure Credit Fund II LPI Investor, LLC ("NECLPI") provided 98% and 99% of the capital commitments for LPI and LPI-II, respectively. Fox and Collier otherwise deny the allegations in the first, second, and third sentences of Paragraph 4. The allegations in the fourth sentence of Paragraph 4 constitute legal conclusions to which no response is required. To the extent a response is required, Fox and Collier deny the remaining allegations in Paragraph 4.

5.      Fox and Collier deny the allegations in Paragraph 5.

6.      Fox and Collier deny the allegations in Paragraph 6.

7.      Fox and Collier deny the allegations in Paragraph 7, except Fox and Collier admit that they, as managers of the LPIs, terminated the General Services Agreements ("GSAs") between the LPIs and LSI.

8.      Fox and Collier deny the allegations in Paragraph 8.

9.      Fox and Collier deny the allegations in Paragraph 9.

**PARTIES**

10.    Fox and Collier admit that LSI is a Delaware limited liability company headquartered in Marin County, California, and that each of LPI and LPI-II entered into a GSA with LSI.  Fox and Collier respectfully refer the Court to the referenced GSAs for their complete contents and deny any allegations inconsistent with their terms.  Fox and Collier otherwise deny the allegations in Paragraph 10.

11.    Fox and Collier admit that Lacuna Sustainable Partners, LLC ("LSP") is a Delaware limited liability company headquartered in Marin County, California.  The allegations in Paragraph 11 otherwise state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the remaining allegations in Paragraph 11, including because LSP is not a member of LPI and LPI-II.

12.    Fox and Collier admit that LPI is a Delaware limited liability company, that LPI is governed by a limited liability company agreement, and that LPI is in the business of investing in companies that are engaged in acquiring, developing, managing, and selling solar energy power plants and related energy storage facilities.  Fox and Collier respectfully refer the Court to the referenced limited liability company agreement for its complete contents and deny any allegations inconsistent with its terms.  The allegations in Paragraph 12 otherwise state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the remaining allegations in Paragraph 12.

Fox and Collier further dispute that LPI is a proper plaintiff.  LPI is not a member of LSI or LSP and therefore cannot "enforce derivative claims" through these entities "for the benefit of LPI."  To the extent that LSI or LSP intended to state that they are pursuing derivative claims on behalf of LPI, under Delaware law, LPI is considered a nominal Defendant rather than a named plaintiff.  *See* 2 Corp & Commercial Practice in DE Court of Chancery § 11.06(e) (2025) ("The general rule in derivative litigation is that the entity on whose behalf plaintiff asserts a claim is an indispensable party.  Accordingly, failure to join the entity as a *nominal defendant* will result in a dismissal of the entire action." (emphasis added and footnote omitted) (citing *Sternberg v. O'Neil*, 550 A.2d 1105, 1124 (Del. 1988), and *Levine v. Milton*, 219 A.2d 145, 146–47 (Del. Ch. 1966))).  Fox and Collier

deny that LSI or LSP has standing to pursue a claim derivatively on behalf of LPI, and further direct the Court to Section 8.2(i) of Amended and Restated LPI LLC Agreement, dated March 12, 2020, which gives LPI's Management Committee (Fox and Collier) the sole authority to "institute, prosecute, defend, settle, compromise, and dismiss lawsuits or other judicial or administrative proceedings brought on or in behalf of, or against, the Company or the Members in connection with activities arising out of, connected with, or incidental to this Agreement, and to engage counsel or other advisors in connection therewith."

13.      Fox and Collier admit that LPI-II is a Delaware limited liability company, that LPI-II is governed by a limited liability company agreement, and that LPI-II is in the business of investing in companies that are engaged in acquiring, developing, managing, and selling solar energy power plants and related energy storage facilities.  Fox and Collier respectfully refer the Court to the referenced limited liability company agreement for its complete contents and deny any allegations inconsistent with its terms.  The allegations in Paragraph 13 otherwise state legal conclusions to which no response is required.  To the extent that a response is required, Fox and Collier deny the remaining allegations in Paragraph 13.

Fox and Collier further dispute that LPI-II is a proper plaintiff.  LPI-II is not a member of LSI or LSP and therefore cannot "enforce derivative claims" through these entities "for the benefit of LPI-II."  To the extent that LSI or LSP intended to state that they are pursuing derivative claims on behalf of LPI-II, under Delaware law, LPI-II is considered a nominal Defendant rather than a named plaintiff. *See* 2 Corp & Commercial Practice in DE Court of Chancery § 11.06(e) (2025) ("The general rule in derivative litigation is that the entity on whose behalf plaintiff asserts a claim is an indispensable party.  Accordingly, failure to join the entity as a *nominal defendant* will result in a dismissal of the entire action." (emphasis added and footnote omitted) (citing *Sternberg*, 550 A.2d at 1124, and *Levine*, 219 A.2d at 146–47)).  Fox and Collier deny that LSI or LSP has standing to pursue a claim derivatively on behalf of LPI-II, and further direct the Court to Section 8.2(i) of Amended and Restated LPI-II LLC Agreement, dated October 22, 2021, which gives LPI-II's Management Committee (Fox and Collier) the sole authority to "institute, prosecute, defend, settle, compromise, and dismiss lawsuits or other judicial or administrative proceedings brought on or in behalf of, or

1    against, the Company or the Members in connection with activities arising out of, connected with, or

2    incidental to this Agreement, and to engage counsel or other advisors in connection therewith."

3         14.    Fox and Collier admit that NECLPI is a Delaware limited liability company, is a

4    vehicle through which certain funds of New Energy Capital ("NEC") invested in the LPIs, and is the

5    sole member in each of LPI and LPI-II.  Fox and Collier otherwise deny the allegations in Paragraph

6    14.

7         15.    Fox and Collier admit that Fox is a resident of the State of New Hampshire.   Fox and

8    Collier otherwise deny the allegations in Paragraph 15.

9         16.    Fox and Collier admit that Collier is a resident of the State of Colorado.  Fox and

10   Collier otherwise deny the allegations in Paragraph 16.

11        17.    Fox and Collier admit that they each serve as a manager of each of LPI and LPI-II, that

12   they were appointed as managers by NECLPI, that they are employees of Victory, and that they are

13   not individual parties to the LPI or LPI-II operating agreements.  Fox and Collier respectfully refer

14   the Court to the referenced limited liability company agreements for their complete contents and deny

15   any allegations inconsistent with their terms.  Fox and Collier otherwise deny the allegations in

16   Paragraph 17.

17        18.    Fox and Collier admit that NECLPI is the sole member of each of LPI and LPI-II; that

18   prior to the acquisition of NEC by Victory, NEC was a private equity infrastructure investment fund

19   management company; and that NEC Fund II is the direct or indirect owner of 100% of NECLPI.

20   Fox and Collier otherwise deny the allegations in the first sentence of Paragraph 18.  The remaining

21   allegations in Paragraph 18 otherwise state legal conclusions or refer to events that occurred before

22   Fox and Collier appeared in this Action, to which no response is required.  To the extent that any

23   additional response is required, Fox and Collier deny the allegations in Paragraph 18.

24        19.    Fox and Collier lack knowledge or information sufficient to admit or deny the

25   allegations in Paragraph 19 concerning co-defendant Victory Capital Management, Inc. ("Victory"),

26   and on that basis deny them, except Fox and Collier admit that Victory is a New York corporation, is

27   headquartered in San Antonio, Texas, and acquired NEC in November 2021.

28        20.    Fox and Collier admit that NEC Fund II GP is a Delaware limited liability company

and is headquartered in New Hampshire. Fox and Collier otherwise deny the factual allegations in sentences one, three, four, and five of this paragraph, except to admit that Fox and Collier have a pecuniary interest in NEC Fund II GP, and Fox served on the NEC Fund II GP investment committee. The allegations in Paragraph 20 otherwise state legal conclusions to which no response is required. To the extent that any additional response is required, Fox and Collier deny the remaining allegations in Paragraph 20.

21.     Fox and Collier admit that Mr. Whittaker is an attorney who has advised NEC, is listed on NEC's website as "External Legal Advisor," has a pecuniary interest in NEC Fund II GP, and lives in Sarasota County, Florida. Fox and Collier otherwise lack knowledge or information sufficient to admit or deny the allegations in Paragraph 21 concerning co-defendant Curt Whittaker, and on that basis deny them. The allegations in Paragraph 21 otherwise constitute legal conclusions to which no response is required. To the extent a response is required, Fox and Collier deny the remaining allegations in Paragraph 21.

22.     Fox and Collier lack knowledge or information sufficient to admit or deny the allegations in the first and second sentences of Paragraph 22 concerning co-defendant Rath, Young and Pignatelli, P.C. ("Rath"), and on that basis deny them, except that Fox and Collier admit that Rath is a law firm headquartered in New Hampshire and that Whittaker is an attorney who has advised NEC and Victory. The allegations in the second sentence of Paragraph 22 otherwise constitute legal conclusions to which no response is required. To the extent a response is required, Fox and Collier deny those allegations in Paragraph 22. Fox and Collier otherwise deny the allegations in Paragraph 22.

23.     Fox and Collier admit that co-defendant Mark Lerdal was formerly a consultant to LSI and has served as an independent director on various NEC investments unrelated to the LPIs. Fox and Collier otherwise deny the remaining allegations in Paragraph 23.

**OTHER RELEVANT ENTITIES AND PERSONS**

24.     Fox and Collier lack knowledge or information sufficient to admit or deny the allegations in the first sentence of Paragraph 24. Fox and Collier admit that Brad Bauer is a member, manager and chief executive officer of LSI and a member of LSP.

25.     Fox and Collier admit that Claude Patrick McConnell is or was formerly a member, manager, and president of LSI and formerly a member of LSP.  Fox and Collier otherwise deny the allegations in Paragraph 25.

26.     Fox and Collier admit that NECLPI is a member of LPI, LPI-II, and LSI; that NECLPI is a direct or indirect subsidiary of NEC Fund II; and that capital returned to NECLPI is distributed to NEC Fund II limited partners as well as NEC Fund II GP, although not on a pro rata basis as implied.  Fox and Collier deny the remaining allegations in Paragraph 26.  Fox and Collier respectfully refer the Court to the referenced GSAs for their complete contents and deny any allegations inconsistent with their terms.

27.     Fox and Collier lack knowledge or information sufficient to admit or deny the allegations in Paragraph 27, and on that basis deny them.

28.     Fox and Collier lack knowledge or information sufficient to admit or deny the allegations in Paragraph 28, and on that basis deny them.

29.     Fox and Collier admit that Ropes & Gray LLP ("Ropes") is a law firm that LPI-II's Management Committee retained to represent LPI-II in connection with an arbitration commenced by LPI-II against LSI on July 9, 2024, and that Ropes does business in California.  Fox and Collier otherwise deny the allegations in sentences two and three of Paragraph 29.  The remaining allegations in Paragraph 29 constitute legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the remaining allegations in Paragraph 29.

30.     Fox and Collier lack knowledge or information sufficient to admit or deny the allegations in Paragraph 30 concerning DOE defendants 1 through 10, and on that basis deny them.

## JURISDICTION AND VENUE

31.     The allegations in Paragraph 31 state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 31.

32.     The allegations in Paragraph 32 are legal conclusions to which no response is required. To the extent a response is required, Fox and Collier deny the allegations in Paragraph 32.

33.     The allegations in Paragraph 33 are legal conclusions to which no response is required. To the extent a response is required, Fox and Collier deny the allegations in Paragraph 33.

**THE CONTRACTS AND BUSINESS RELATIONSHIPS**

34.     Fox and Collier admit that on or about March 12, 2020, LSI, NECLPI, and LSP entered into the LPI LLC Agreement and LPI executed a General Services Agreement with LSI, and that LPI's investment term has expired.   Fox and Collier otherwise deny the allegations in Paragraph 34. Fox and Collier respectfully refer the Court to the LPI LLC Agreement and GSA for a true and complete statement of their contents and deny any allegations inconsistent with their terms.

35.     Fox and Collier admit that one of the three managers of LSI left LSI in Spring 2021, and that NECLPI consented to the resignation of this manager from LSI.  Fox and Collier otherwise deny the allegations in Paragraph 35.  Fox and Collier respectfully refer the Court to the referenced written consent and LSI operating agreement for a true and complete statement of their contents and deny any allegations that are inconsistent with their terms.

36.     Fox and Collier admit the allegations in Paragraph 36.

37.     Fox and Collier admit that from March 12, 2020 until the execution of the LPI-II operating agreement, GSA, and Key Person Agreements, LSI did not have quarterly meetings with LPI's Management Committee or NECLPI.  Fox and Collier deny the remaining allegations in Paragraph 37.

38.     Fox and Collier admit the first and second sentences of the allegations in Paragraph 38.  Fox and Collier respectfully refer the Court to the referenced GSA and LPI-II limited liability company agreement for a true and complete statement of their contents and deny any allegations inconsistent with their terms.  Fox and Collier deny the remaining allegations in Paragraph 38.

39.     Fox and Collier admit the first sentence of the allegations in Paragraph 39 and that NECLPI's rights as member of LSI included information rights.  Fox and Collier respectfully refer the Court to the referenced Key Person Agreements and the LSI operating agreement for a true and complete statement of their contents and deny any allegations that are inconsistent with their terms. The remaining allegations in Paragraph 39 state legal conclusions to which no response is required. To the extent a response is required, Fox and Collier deny the allegations in Paragraph 39.

40.     Fox and Collier deny the allegations in Paragraph 40.

41.     Fox and Collier deny the allegations in Paragraph 41.

42.     The allegations in Paragraph 42 state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 42 and respectfully refer the Court to the referenced GSAs for a true and complete statement of their contents.

43.     Fox and Collier admit that LSI, LSP, the LPIs, and NECLPI signed an acknowledgement on May 20, 2022.  Fox and Collier respectfully refer the Court to the referenced acknowledgement for a true and complete statement of its contents and deny any allegations inconsistent with its terms.  Fox and Collier otherwise deny the allegations in Paragraph 43.

44.     The allegations in Paragraph 44 state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 44 and respectfully refer the Court to the referenced KPAs and the LSI limited liability company agreement for a true and complete statement of their contents.

45.     Fox and Collier deny the allegations in Paragraph 45.

46.     Fox and Collier deny the allegations in Paragraph 46.

47.     Fox and Collier admit that the LPIs' Managers terminated the GSAs.  Fox and Collier deny the remaining allegations in Paragraph 47 and respectfully refer the Court to the referenced LPI and LPI-II operating agreements for a true and complete statement of their contents.

## LSI'S PERFORMANCE

48.     Fox and Collier deny the allegations in Paragraph 48.

49.     Fox and Collier deny the allegations in Paragraph 49.

50.     Fox and Collier lack knowledge or information sufficient to admit or deny allegations in Paragraph 50, and on that basis deny them.

51.     Fox and Collier deny the allegations in Paragraph 51.

52.     Fox and Collier deny the allegations in Paragraph 52.

## VICTORY ACQUISITION AND SUBSEQUENT CHANGES TO NEC AND CREATION OR EXACERBATION OF CONFLICTS OF INTEREST

53.     Fox and Collier respond as follows:

a.  Fox and Collier admit that NEC had the following principals prior to its acquisition by Victory: Fox and Collier, Ian Marcus, Jeph Shaw, Tom Naughton, and Scott Brown.  Fox and Collier deny the remaining allegations of Paragraph 53(a).

b.  Fox and Collier deny the allegations in Paragraph 53(b).

c.  Fox and Collier admit that NEC Fund II GP previously had an investment committee comprised of Scott Brown, Curt Whittaker, and Patrick Fox.  Fox and Collier deny the remaining allegations in Paragraph 53(c).

d.  The allegations in Paragraph 53(d) state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 53(d).

e.  Fox and Collier admit that the NEC investment committee, comprised of Scott Brown, Curt Whittaker, and Patrick Fox, approved NEC's investment into each of LPI and LPI-II, which contemplated the creation and capitalization of NECLPI.  Fox and Collier deny the remaining allegations in Paragraph 53(e).

f.  Fox and Collier admit that they were appointed to serve as Managers of each of the LPIs.  The remaining allegations in Paragraph 53(f) state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the remaining allegations in Paragraph 53(f).

g.  Fox and Collier admit that on November 1, 2021, 100% of the equity interests of NEC were acquired by Victory, NEC became a Victory franchise thereafter, and Fox and Collier became Victory employees.  Fox and Collier deny the remaining allegations in Paragraph 53(g).

54.  Fox and Collier respond as follows:

a.  Fox and Collier deny the allegations of Paragraph 54(a).

b.  Fox and Collier admit that Scott Brown is listed as a "Partner" on NEC's website, and that Whittaker is listed as "External Legal Advisor" on NEC's website.  Fox and Collier deny the remaining allegations Paragraph 54(b).

11

c.  Fox and Collier deny the allegations in Paragraph 54(c).

d.  Fox and Collier deny the allegations in Paragraph 54(d).

e.  Fox and Collier deny the allegations in Paragraph 54(e).

f.  The allegations in Paragraph 54(f) state legal conclusions to which no response is required.  To the extent any additional response is required, Fox and Collier deny the allegations in Paragraph 54(f).

55.  Fox and Collier deny the allegations in Paragraph 55.

56.  Fox and Collier deny the allegations in Paragraph 56.

57.  Fox and Collier lack knowledge or information sufficient to admit or deny allegations concerning Victory in the first sentence of Paragraph 57, and on that basis deny them.  Certain of the allegations in Paragraph 57 purport to characterize, summarize, or quote disclosures from an Investment Advisor Brochure Form ADV Part 2A for Victory.  Fox and Collier respectfully refer the Court to that document for a true and complete statement of its contents and deny any allegations inconsistent with those contents.  To the extent any further response is required, Fox and Collier deny the allegations in Paragraph 57.

58.  Fox and Collier lack knowledge or information sufficient to admit or deny allegations concerning Victory, and on that basis deny the allegations in the first and second sentences of the allegations in Paragraph 58.  Further, certain of the allegations in Paragraph 58 purport to characterize, summarize, or quote from selected portions of an unidentified transcript of David Brown.  To the extent such document and/or transcript is identified, Fox and Collier respectfully refer the Court to such document and/or transcript for a true and complete statement of its contents and deny any allegations inconsistent with its contents.  To the extent such document and/or transcript is unidentified, Fox and Collier lack knowledge or information sufficient to admit or deny those allegations, and on that basis deny them.  The fourth sentence of Paragraph 58 states legal conclusions, to which no response is required.  Fox and Collier deny the remaining allegations in Paragraph 58.

59.  Fox and Collier lack knowledge or information sufficient to admit or deny the allegations regarding Victory in the first, second, and third sentences of the allegations in Paragraph 59, and on that basis deny those allegations.  Additionally, certain of the allegations purport to

characterize or summarize public statements, offered without attribution or context.  To the extent such unidentified public statement is identified, Fox and Collier respectfully refer the Court to such document and/or transcript for a true and complete statement of its contents and deny any allegations inconsistent with its contents.  To the extent such document and/or transcript is unidentified, Fox and Collier lack knowledge or information sufficient to admit or deny those allegations, and on that basis deny them.  Additionally, the allegations in Paragraph 59 state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 59.

60.    Fox and Collier admit that they are now employees of Victory, but otherwise deny the allegations in Paragraph 60.

61.    Fox and Collier admit that on August 8, 2024, the LPIs' Management Committee sent a written notice of termination of the GSAs.  Fox and Collier otherwise deny the allegations in Paragraph 61.

62.    Fox and Collier deny the allegations in Paragraph 62.

63.    Fox and Collier deny the allegations in Paragraph 63.

## GENERAL ALLEGATIONS OF INTENT, CONFLICTS OF INTEREST, NEGLIGENCE AND OTHER WRONGDOING

64.    Fox and Collier deny the allegations in Paragraph 64.

65.    Fox and Collier admit that Whittaker assisted in the negotiation of legal documentation relating to the LPIs.  Fox and Collier deny the remaining allegations in the first and second sentences of Paragraph 65.  The allegations in Paragraph 65 otherwise constitute legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the remaining allegations in Paragraph 65.

66.    The allegations in Paragraph 66 purport to characterize or summarize the LPI LLC Agreement, the LPI GSA, and the LSI "OA," which Fox and Collier will construe to mean the Amended and Restated Limited Liability Company Agreement of LSI dated October 22, 2021.  Fox and Collier respectfully refer the Court to the referenced agreements for a true and complete statement of their contents and deny any allegations inconsistent with their terms.  Fox and Collier otherwise

deny the allegations in the first, second, and third sentences of Paragraph 66. The allegations in the fourth sentence of Paragraph 66 state legal conclusions to which no response is required. To the extent a response is required, Fox and Collier deny the allegations in Paragraph 66.

67.    Fox and Collier deny the allegations in Paragraph 67.

68.    The allegations in Paragraph 68 state legal conclusions to which no response is required. To the extent a response is required, Fox and Collier deny the allegations in Paragraph 68.

69.    Fox and Collier deny the allegations in Paragraph 69, and respectfully refer the Court to the referenced GSAs, the LSI limited liability company agreement, and the Key Person Agreements for a true and complete statement of their contents.

70.    Fox and Collier deny the allegations in Paragraph 70.

## SPECIFIC ALLEGATIONS REGARDING DEFENDANTS' CONDUCT

71.    The allegations in Paragraph 71 constitute legal conclusions to which no response is required. To the extent a response is required, Fox and Collier deny the allegations in Paragraph 71.

72.    Fox and Collier deny the allegations in Paragraph 72.

73.    Fox and Collier deny the allegations in Paragraph 73, except they admit that LSI engaged Lerdal as a consultant.

74.    Fox and Collier deny the allegations in Paragraph 74.

75.    Fox and Collier admit that on or about November 22, 2022, McConnell emailed a letter to Bauer. Fox and Collier respectfully refer the Court to that letter and deny any allegations inconsistent with its contents. Fox and Collier deny the second sentence in Paragraph 75. Fox and Collier lack knowledge or information sufficient to admit or deny the allegations in the third sentence of Paragraph 75, and on that basis deny them.

76.    Fox and Collier admit that on or about December 29, 2022, Bauer sent a draft response to McConnell's November 22, 2022 letter. Fox and Collier deny that the letter was properly sent on behalf of LSI. Fox and Collier respectfully refer the Court to the referenced December 29, 2022 letter and deny any allegations inconsistent with its contents.

77.    Fox and Collier deny the allegations in Paragraph 77.

78.    The allegations in the first, second, third, and fourth sentences of Paragraph 78 purport

to characterize, summarize, or quote from selected portions of unidentified documents. To the extent such documents are later identified, Fox and Collier respectfully refer the Court to those documents for a true and complete statement of their contents and deny any allegations inconsistent with their contents. To the extent such documents remain unidentified, Fox and Collier lack knowledge or information sufficient to admit or deny those allegations, and on that basis deny those allegations. Fox and Collier deny the remaining allegations in this paragraph.

79.     The allegations in Paragraph 79 purport to characterize or summarize from selected portions of an email dated March 7, 2023. Fox and Collier respectfully refer the Court to that email and deny any allegations inconsistent with its contents. Fox and Collier deny the remaining allegations in Paragraph 79.

80.     The allegations in the first and second sentences in Paragraph 80 purport to characterize or summarize from selected portions of an unidentified communication on or about March 12, 2023. To the extent such communication is later identified, Fox and Collier respectfully refer the Court to that communication for a true and complete statement of its contents and deny any allegations inconsistent with its contents. To the extent such communication remains unidentified, Fox and Collier lack knowledge or information sufficient to admit or deny those allegations, and Fox and Collier deny those allegations on that basis. Fox and Collier deny the remaining allegations in Paragraph 80.

81.     Fox and Collier deny that the email referenced in Paragraph 81 was sent on March 24, 2023. Fox and Collier admit that on March 27, 2023, McConnell emailed both the November 22, 2022 letter and the December 29, 2022 letter response to Fox, Collier, and Whittaker, among others. Fox and Collier respectfully refer the Court to the referenced email and deny any allegations inconsistent with its contents.

82.     The allegations in Paragraph 82 purport to characterize or summarize a March 28, 2023 email. Fox and Collier respectfully refer the Court to the referenced email and deny any allegations inconsistent with its contents. Fox and Collier deny the remaining allegations in Paragraph 82, including Plaintiffs' characterizations of the March 28, 2023 email.

83.     The allegations in Paragraph 83 purport to characterize or summarize an April 4, 2023

1    email.  Fox and Collier respectfully refer the Court to the referenced email and deny any allegations

2    inconsistent with its contents.  Fox and Collier deny the remaining allegations in Paragraph 83.

3         84.     Fox and Collier deny the allegations in Paragraph 84.

4         85.     The allegations in the first sentence of Paragraph 85 purport to purport to quote certain

5    statements of co-defendant Whittaker.  Fox and Collier lack information or knowledge sufficient to

6    admit or deny allegations concerning co-defendant Whittaker's statements, and on that basis deny the

7    allegations in the first sentence of the allegations in Paragraph 85.  Fox and Collier deny that NEC

8    Fund II ever distributed proceeds from the LPIs to other investments.  The remaining allegations in

9    Paragraph 85 constitute legal conclusions to which no response is required.  To the extent a response

10   is required, Fox and Collier deny the remaining allegations in Paragraph 85.

11        86.     The allegations in the first two sentences of Paragraph 86 purport to characterize,

12   summarize, or quote from an April 17, 2023 email.  Fox and Collier respectfully refer the Court to

13   that April 17, 2023 email for a true and complete statement of its contents and deny any allegations

14   inconsistent with those contents.  Fox and Collier deny the allegations in the third and sixth sentences

15   of Paragraph 86.  The remaining allegations in Paragraph 86 constitute legal conclusions to which no

16   response is required.  To the extent a response is required, Fox and Collier deny the remaining

17   allegations in Paragraph 86.

18        87.     Fox and Collier deny the allegations in Paragraph 87.

19        88.     Fox and Collier lack knowledge or information sufficient to admit or deny allegations

20   regarding co-defendant Whittaker and LPI Counsel A, and on that basis deny the allegations in

21   Paragraph 88.

22        89.     Fox and Collier admit that on or about May 2, 2023, Fox and Collier received a

23   document entitled "Transition Plan" from Brad Bauer.  Fox and Collier respectfully refer the Court

24   to the referenced email and transition plan and deny any allegations inconsistent with their terms.  Fox

25   and Collier deny the remaining allegations in Paragraph 89.

26        90.     Fox and Collier deny the allegations in Paragraph 90, except admit that the LPIs paid

27   nearly $17 million in base fees to LSI while the GSAs were in place.

28        91.     Fox and Collier lack sufficient knowledge or information to admit or deny the

allegations in the first sentence of Paragraph 91 concerning a conversation with Whittaker, and on that basis deny them.  The allegations in the second sentence of Paragraph 91 constitute legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 91.

92.     Fox and Collier deny the allegations in Paragraph 92, except admit that during the Summer of 2023, certain of the Parties engaged in a confidential negotiation process relating to Bauer's dispute with McConnell.

93.     The allegations in the first sentence of Paragraph 93 purport to characterize the GSAs and the LPIs' operating agreements.  Fox and Collier respectfully refer the Court to the referenced documents for a true and complete statement of their contents and deny any allegations inconsistent with their terms.  Fox and Collier deny the remaining allegations in Paragraph 93.

94.     Fox and Collier deny the allegations in Paragraph 94.

95.     Fox and Collier deny the allegations in Paragraph 95

96.     Fox and Collier deny the allegations in Paragraph 96.

97.     The allegations in the first, second, and third sentences of Paragraph 97 purport to characterize or quote from unidentified August 2023 emails exchanged between LPI Counsel A and co-defendant Whittaker.  To the extent these emails are later identified, Fox and Collier respectfully refer the Court to the referenced emails for a true and complete statement of their contents and deny any allegations inconsistent with their terms.   The remaining allegations in Paragraph 97 constitute legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 97.

98.     Fox and Collier admit that on September 29, 2023, Whittaker sent an email and attachment to LSI and Connor McNellis of Sunridge Legal.  Fox and Collier respectfully refer the Court to the referenced email and attachment and deny any allegations inconsistent with its contents. To the extent any additional response is required, Fox and Collier deny the allegations in Paragraph 98.

99.     Fox and Collier lack knowledge or information sufficient to admit or deny the allegations in the first sentence of Paragraph 99 and on that basis deny them.  Fox and Collier deny

the allegations in the second, third, and fourth sentences of Paragraph 99. The remaining allegations in Paragraph 99 state legal conclusions to which no response is required. To the extent a response is required, Fox and Collier deny the allegations in Paragraph 99.

100. Fox and Collier deny the allegations in Paragraph 100, except admit that LSI, without legal authority or the LPIs' or NECLPI's knowledge, attempted to sell the assets of the LPIs' portfolio.

101. Certain of the allegations in the Paragraph 101 purport to characterize an LSI Investment Committee memorandum concerning an unidentified investment. Fox and Collier respectfully refer the Court to the referenced document for a true and complete statement of its contents and deny any allegations inconsistent with its terms. Fox and Collier deny the remaining allegations in Paragraph 101.

102. The allegations in Paragraph 102 purport to characterize, summarize, or quote from three documents: an October 13, 2023 email, an October 16, 2023 email, and an undated resolution emailed by Bauer on October 19, 2023. Fox and Collier respectfully refer the Court to the referenced documents for their complete contents and deny allegations inconsistent with those contents. Fox and Collier deny the remaining allegations in Paragraph 102.

103. Fox and Collier deny the allegations in Paragraph 103, except admit that Fox and Collier requested an in-person meeting with Bauer and McConnell and offered to meet in California on eight different dates in November 2023, which Bauer refused to attend.

104. Fox and Collier deny the allegations in Paragraph 104.

105. Fox and Collier admit that on November 29, 2023, Fox and Collier, in their capacities as managers of the LPIs, sent an email noticing breaches of the GSAs. Fox and Collier respectfully refer the Court to the referenced November 29, 2023 email for a true and complete statement of its contents and deny any allegations inconsistent with its contents. Fox and Collier admit they, as managers of the LPIs, signed written consents for each of the LPIs dated November 30, 2023. Fox and Collier respectfully refer the Court to the referenced written consents for a true and complete statement of their contents and deny any allegations inconsistent with their contents. Fox and Collier otherwise deny the allegations in Paragraph 105.

106. Fox and Collier admit that on December 13, 2023, LSI executed a non-binding offer

18

with a purchaser of all investments of the LPIs. Fox and Collier deny that LSI timely informed the LPIs of this transaction. Fox and Collier respectfully refer the Court to the referenced document that LSI executed on or about December 13, 2023, which LSI purported to execute on behalf of the LPIs despite lacking authority to do so, and deny any allegations in Paragraph 106 inconsistent with its contents. Fox and Collier deny the remaining allegations in Paragraph 106.

107.    The allegations in Paragraph 107 purports to characterize an email dated December 15, 2023. Fox and Collier respectfully refer the Court to the December 15, 2023 email for its complete contents and deny any allegations inconsistent with its contents. Fox and Collier deny the remaining allegations in Paragraph 107, including that the Management Committee was informed of the defined Sale Transaction in real time.

108.    Fox and Collier deny the allegations in Paragraph 108. Additionally, certain of the allegations in the second and fourth sentences of Paragraph 108 state legal conclusions to which no response is required.

109.    The allegations in the first and third sentences of Paragraph 109 purport to characterize a written consent dated December 31, 2023. Fox and Collier respectfully refer the Court to the referenced document and deny any allegations inconsistent with its terms. Fox and Collier deny the remaining allegations in Paragraph 109.

110.    Certain of the allegations purport to characterize or summarize the terms of the GSAs. Fox and Collier respectfully refer the Court to the referenced GSAs for a true and complete statement of their contents and deny any allegations inconsistent with those contents. Fox and Collier deny the remaining allegations in Paragraph 110, except admit that in January 2024, the Management Committee engaged Greenberg Traurig on behalf of the LPIs.

111.    Fox and Collier deny the allegations in Paragraph 111.

112.    Fox and Collier admit that on March 28, 2024, LSI invoiced LPI-II for payment of the Base Fee, as defined in the LPI-II GSA, in the amount of $2,750,000.00. Fox and Collier deny the remaining allegations in Paragraph 112.

113.    Certain of the allegations in Paragraph 113 purport to characterize or summarize an email dated April 15, 2024. Fox and Collier respectfully refer the Court to the referenced email for a

true and complete statement of its contents and deny any allegations inconsistent with its contents. Fox and Collier otherwise deny the allegations in Paragraph 113.

114.    Certain of the allegations in Paragraph 114 purport to characterize or summarize an April 17, 2024 communication.  Fox and Collier respectfully refer the Court to the referenced email for a true and complete statement of its contents and deny any allegations inconsistent with its contents.  Fox and Collier otherwise deny the allegations in Paragraph 114.

115.    Certain of the allegations in Paragraph 115 purport to characterize or summarize communications of April 22-25, 2024.  Fox and Collier respectfully refer the Court to the referenced communications for a true and complete statement of their contents and deny any allegations inconsistent with their terms.  The remaining allegations of Paragraph 115 are denied, except Fox and Collier admit that on April 22-25, 2024, Fox and Collier, in their capacities as managers, formally disputed LSI's March 28, 2024 Base Fee invoice.

116.    Certain of the allegations purport to characterize and quote an undated email from Fox. Fox and Collier respectfully refer the Court to the referenced email for a true and complete statement of its contents and deny any allegations inconsistent with its contents.  Additionally, the allegations in Paragraph 116 state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 116.

117.    Fox and Collier admit that on May 1, 2024, a teleconference meeting occurred with Fox, Collier, Whittaker, Bauer, and LPI Counsel A, among others, during which the defined Sale Transaction was discussed.  Fox and Collier deny the remaining allegations in Paragraph 117, including Plaintiffs' characterization of the discussion on that call.

118.    Fox and Collier deny the allegations in Paragraph 118.

119.    Fox and Collier deny the allegations in Paragraph 119.

120.    Fox and Collier deny the allegations in Paragraph 120.

121.    Certain of the allegations in Paragraph 121 purport to characterize, summarize, or quote from selected portions of a May 24, 2024 email.  Fox and Collier respectfully refer the Court to the referenced May 24, 2024 email and deny any allegations inconsistent with its contents.  Fox and Collier otherwise deny the allegations in the first, second, and third sentences of Paragraph 121.

The allegations in the fourth sentence of Paragraph 121 state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny all allegations in Paragraph 121.

122.    Fox and Collier deny the allegations in the first and second sentences of Paragraph 122.  Fox and Collier lack sufficient information or knowledge to admit or deny the allegations concerning the conversation between LPI Counsel A and Greenberg Traurig, and on that basis deny the allegations in the third sentence of Paragraph 122.

123.    The allegations in Paragraph 123 purport to characterize or summarize a response to a May 24, 2024 email.  Fox and Collier respectfully refer the Court to the referenced email for a true and complete statement of its contents and deny any allegations inconsistent with its contents.

124.    The allegations in Paragraph 124 purport to characterize or summarize a June 18, 2024 email.  Fox and Collier respectfully refer the Court to the referenced email for a true and complete statement of its contents and deny any allegations inconsistent with its contents.

125.    The allegations in Paragraph 125 purport to characterize or summarize a June 25, 2024 email.  Fox and Collier respectfully refer the Court to the referenced email for a true and complete statement of its contents and deny any allegations inconsistent with its contents.

126.    The allegations in Paragraph 126 purport to characterize or summarize a June 28, 2024 email from Gregg Daddario of Greenberg Traurig to LPI Counsel A.  Fox and Collier respectfully refer the Court to the referenced email for a true and complete statement of its contents and deny any allegations inconsistent with its contents.

127.    The allegations in Paragraph 127 purport to characterize, summarize, or quote from selected portions of a June 28, 2024 email from Fox to the buyer in the defined Sale Transaction.  Fox and Collier respectfully refer the Court to that email for a true and complete statement of its contents and deny any allegations inconsistent with its contents.

128.    Fox and Collier deny the allegations in Paragraph 128.

129.    Fox and Collier admit that Defendant Fox received the updated term sheet for the Sale Transaction in advance of June 28, 2024.  Fox and Collier deny the remaining allegations in the first and second sentences of Paragraph 129.  Fox and Collier lack information or knowledge sufficient to

admit or deny the allegations regarding the referenced email communications between Greenberg Traurig and LPI Counsel A and on that basis deny them.

130. Fox and Collier deny the allegations in Paragraph 130.

131. Certain of the allegations in Paragraph 131 purport to summarize or characterize a July 3, 2024 email. Fox and Collier respectfully refer the Court to that email and attachments for a true and complete statement of its contents and deny any allegations inconsistent with its contents. Fox and Collier lack information or knowledge sufficient to admit or deny the allegations regarding LPI Counsel B and on that basis deny them. Additionally, the allegations in Paragraph 131 state legal conclusions to which no response is required, except Fox and Collier admit that LPI-II commenced an arbitration against LSI on July 9, 2024.

132. Fox and Collier admit that Ropes was engaged to represent LPI-II in the arbitration in July 2024, and that LSI and LSP filed counterclaims in the arbitration on July 31, 2024. Additionally, certain of the allegations purport to summarize or characterize counterclaims in the arbitration. Fox and Collier respectfully refer the Court to the July 31, 2024 counterclaims for a true and complete statement of their contents, and deny any allegations in Paragraph 132 inconsistent with those contents.

133. The allegations in the first, second, and third sentences of Paragraph 133 purport to characterize the August 8, 2024 notice to LSI of termination of the GSAs. Fox and Collier respectfully refer the Court to the referenced termination notice for a true and complete statement of its contents and deny any allegations inconsistent with its contents. Fox and Collier deny the remaining allegations in Paragraph 133, including that Ropes has any conflict of interest in representing LPI-II in the referenced arbitration.

134. Fox and Collier deny the allegations in Paragraph 134.

135. Fox and Collier deny the allegations in Paragraph 135.

136. Fox and Collier admit that following LPI-II's termination of its service contract with LSI, LPI-II took actions to end LSI's access to LPI-II's bank account. Fox and Collier deny the remaining allegations in Paragraph 136.

137. Fox and Collier admit that since August 8, 2024, Fox and Collier have communicated

with a potential buyer of the LPIs' assets. Fox and Collier deny the remaining allegations in Paragraph 137.

138.    Fox and Collier admit that on September 9, 2024, the LPIs' Management Committees received a letter from their former counsel. Fox and Collier respectfully refer the Court to the referenced September 9, 2024 letter and deny any allegations inconsistent with its contents. Fox and Collier deny the remaining allegations in Paragraph 138.

139.    Fox and Collier deny the allegations in the first and fourth sentence of Paragraph 139. The allegations in the second sentence purports to summarize or characterize unidentified communications between the LPIs' former purported counsel and Scott Brown, David Brown, and Wilkie Farr from in or around September 2024. To the extent these communications are later identified, Fox and Collier respectfully refer the Court to those communications and deny any allegations inconsistent with their contents. Fox and Collier otherwise lack information or knowledge sufficient to admit or deny the allegations in the second sentence of Paragraph 139 and deny them on that basis. The allegations in the third sentence of Paragraph 139 constitute a legal conclusion, to which no response is required. To the extent a response is required, Fox and Collier deny the allegations in Paragraph 139.

140.    Fox and Collier admit that the LPIs' Management Committees formally discharged LPI Counsel A on September 13, 2024. Fox and Collier otherwise deny the allegations in Paragraph 140.

141.    Fox and Collier admit that in August and September 2024, the LPIs' Management Committees directed LSI to cease communicating with the utility holding an interconnection deposit for LPI Investment B. Fox and Collier deny the allegations in the second and third sentences of Paragraph 141. The allegations in the fourth sentence of Paragraph 141 state a legal conclusion to which no response is required. To the extent a response is required, Fox and Collier deny the allegations in the fourth sentence of Paragraph 141.

142.    Fox and Collier admit that in October 2024, LPI-II provided an additional capital contribution to Investment A. Fox and Collier otherwise deny the allegations in the first and third sentences of Paragraph 142. The second sentence of Paragraph 142 states legal conclusions to which

no response is required.  To the extent a response is required, Fox and Collier deny the allegations in the second sentence of Paragraph 142.

143.    Fox and Collier deny the allegations in Paragraph 143.

## CIVIL CONSPIRACY

144.    The allegations in Paragraph 144 state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 144.

## RESPONDEAT SUPERIOR

145.    The allegations in Paragraph 145 state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 145.

## DERIVATIVE CLAIMS

146.    Fox and Collier deny the allegations in the first, second, third, and fourth sentences of Paragraph 146.  The allegations in the fifth and sixth sentences of Paragraph 146 state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 146.

## FIRST CAUSE OF ACTION

### Breach of Fiduciary Duty

### (Plaintiffs vs Fox and Collier)

147.    Fox and Collier repeat, incorporate, and reallege their answers to the allegations in the preceding referenced Paragraphs as if fully set forth herein.

148.    The allegations in Paragraph 148 state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 148.

149.    The allegations in Paragraph 149 state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 149.

150.    Fox and Collier deny the allegations in Paragraph 150.

151.    Fox and Collier deny the allegations in Paragraph 151.

152.    The allegations in Paragraph 152 state legal conclusions to which no response is required.  To the extent any response is required, Fox and Collier deny the allegations in Paragraph 152.

153.    Fox and Collier deny the allegations in Paragraph 153.

154.    The allegations in Paragraph 154 state legal conclusions to which no response is required.  To the extent any response is required, Fox and Collier deny the allegations in Paragraph 154.

155.    The allegations in Paragraph 155 state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 155.

## SECOND CAUSE OF ACTION

### Aiding and Abetting Breach of Fiduciary Duty (LPIs)

### (Plaintiffs vs Victory, NEC Fund II GP, Rath, Whittaker, and Lerdal)

156.    Fox and Collier repeat, incorporate, and reallege their answers to the allegations in the preceding referenced Paragraphs as if fully set forth herein.

157.    The allegations in Paragraph 157 state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 157.

158.    The allegations in Paragraph 158 state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 158.

159.    Fox and Collier deny the allegations in Paragraph 159.

160.    Fox and Collier deny the allegations in Paragraph 160.

161.    The allegations in Paragraph 161 state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 161.

## THIRD CAUSE OF ACTION

### Aiding and Abetting Breach of Fiduciary Duty (LSI)

### (LSI vs Fox, Collier, Victory, NEC Fund II GP, Rath, Whittaker, and Lerdal)

162.    Fox and Collier repeat, incorporate, and reallege their answers to the allegations in the preceding referenced Paragraphs as if fully set forth herein.

163.    The allegations in Paragraph 163 state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 163.

164.    The allegations in Paragraph 164 state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 163.

165.    Fox and Collier deny the allegations in Paragraph 165.

166.    Fox and Collier deny the allegations in Paragraph 166.

167.    The allegations in Paragraph 167 state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 167.

<div align="center">

**FOURTH CAUSE OF ACTION**

**Conversion**

**(LSI and LSP vs Fox and Collier)**

</div>

168.    Fox and Collier repeat, incorporate, and reallege their answers to the allegations in the preceding referenced Paragraphs as if fully set forth herein.

169.    The allegations in Paragraph 169 state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 169.

170.    Fox and Collier deny the allegations in Paragraph 170.

171.    Fox and Collier deny the allegations in Paragraph 171.

172.    Fox and Collier deny the allegations in Paragraph 172.

173.    The allegations in Paragraph 173 state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 173.

<div align="center">

**FIFTH CAUSE OF ACTION**

**Aiding and Abetting Conversion**

**(LSI and LSP vs Whittaker, Rath, NEC Fund II GP, and Victory)**

</div>

174.    Fox and Collier repeat, incorporate, and reallege their answers to the allegations in the preceding referenced Paragraphs as if fully set forth herein.

175.    The allegations in Paragraph 175 state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 175.

176.    The allegations in Paragraph 176 do not concern Fox and Collier and thus no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 176.

177.    Fox and Collier deny the allegations in Paragraph 177.

178.    Fox and Collier deny the allegations in Paragraph 178.

179.    The allegations in Paragraph 179 state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 179.

**SIXTH CAUSE OF ACTION**

**Constructive Fraud**

**(Plaintiffs vs Fox and Collier)**

180.    Fox and Collier repeat, incorporate, and reallege their answers to the allegations in the preceding referenced Paragraphs as if fully set forth herein.

181.    The allegations in Paragraph 181 state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 181.

182.    The allegations in Paragraph 182 state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 182.

183.    The allegations in Paragraph 183 state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 183.

184.    The allegations in Paragraph 184 state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 184.

185.    Fox and Collier deny the allegations in Paragraph 185.

186.    The allegations in Paragraph 186 state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 186.

187.    The allegations in Paragraph 187 state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 187.

188.    The allegations in Paragraph 188 state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 188.

189.    The allegations in Paragraph 189 state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 189.

**SEVENTH CAUSE OF ACTION**

**Aiding and Abetting Constructive Fraud**

**(Plaintiffs vs Victory, Rath, Whittaker, and NEC Fund II GP)**

190.    Fox and Collier repeat, incorporate, and reallege their answers to the allegations in the

27

preceding referenced Paragraphs as if fully set forth herein.

191.    The allegations in Paragraph 191 state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 191.

192.    The allegations in Paragraph 192 state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 192.

193.    The allegations in Paragraph 193 state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 193.

<div align="center">

**EIGHTH CAUSE OF ACTION**

**Racketeering (18 U.S. §§ 1962(c) & 1964(c))**

**(Plaintiffs vs Fox, Collier, Whittaker, Rath, NEC Fund II GP, and Victory)**

</div>

194.    Fox and Collier repeat, incorporate, and reallege their answers to the allegations in the preceding referenced Paragraphs as if fully set forth herein.

195.    The allegations in Paragraph 195 state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 195.

196.    Fox and Collier deny the allegations in Paragraph 196.

197.    The allegations in Paragraph 197 state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 197.

198.    Fox and Collier deny the allegations in Paragraph 198.

199.    The allegations in Paragraph 199 state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 199.

200.    The allegations in Paragraph 200 state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 200.

<div align="center">

**NINTH CAUSE OF ACTION**

**Intentional Interference with Contractual Relations**

**(LSI, LPI and LPI-II vs Fox, Collier, NEC Fund II GP, and Lerdal)**

</div>

201.    Fox and Collier repeat, incorporate, and reallege their answers to the allegations in the preceding referenced Paragraphs as if fully set forth herein.

202.    The allegations in Paragraph 202 state legal conclusions to which no response is

<div align="center">28</div>

1   required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 202.

2       203.    Fox and Collier admit that they are aware of the GSAs, LPI and LPI-II operating

3   agreements, LSI operating agreement, and Key Person Agreements.  Fox and Collier otherwise deny

4   the allegations in Paragraph 203.

5       204.    Fox and Collier deny the allegations in Paragraph 204.

6       205.    Fox and Collier deny the allegations in Paragraph 205.

7       206.    Fox and Collier deny the allegations in Paragraph 206.

8       207.    Fox and Collier deny the allegations in Paragraph 207.

9       208.    The allegations in Paragraph 208 state legal conclusions to which no response is

10  required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 208.

11  <center>**TENTH CAUSE OF ACTION**</center>

12  <center>**Intentional Interference with Prospective Economic Advantage (LPI)**</center>

13  <center>**(Plaintiffs vs Victory, Rath, Whittaker, NEC Fund II GP)**</center>

14      209.    Fox and Collier repeat, incorporate, and reallege their answers to the allegations in the

15  preceding referenced Paragraphs as if fully set forth herein.

16      210.    Fox and Collier deny the allegations in Paragraph 210.

17      211.    The allegations in Paragraph 211 do not concern Fox and Collier and thus no response

18  is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph

19  211.

20      212.    The allegations in Paragraph 212 do not concern Fox and Collier and thus no response

21  is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph

22  212.

23      213.    The allegations in Paragraph 213 do not concern Fox and Collier and thus no response

24  is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph

25  213.

26      214.    Fox and Collier deny the allegations in Paragraph 214.

27      215.    Fox and Collier deny the allegations in Paragraph 215.

28      216.    The allegations in Paragraph 216 do not concern Fox and Collier and thus no response

is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 216.

217.    The allegations in Paragraph 217 do not concern Fox and Collier and thus no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 209

218.    The allegations in Paragraph 218 do not concern Fox and Collier and thus no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 218.

**ELEVENTH CAUSE OF ACTION**

**Intentional Interference with Prospective Economic Advantage (LSI)**

**(LSI vs Victory, Rath, Whittaker, NEC Fund II GP, Fox, Collier and Lerdal)**

219.    Fox and Collier repeat, incorporate, and reallege their answers to the allegations in the preceding referenced Paragraphs as if fully set forth herein.

220.    Fox and Collier deny the allegations in Paragraph 220.

221.    Fox and Collier deny the allegations in Paragraph 221.

222.    Fox and Collier deny the allegations in Paragraph 222.

223.    Fox and Collier deny the allegations in Paragraph 223.

224.    Fox and Collier deny the allegations in Paragraph 224.

225.    Fox and Collier deny the allegations in Paragraph 225.

226.    The allegations in Paragraph 226 state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 226.

227.    Fox and Collier deny the allegations in Paragraph 227.

228.    The allegations in Paragraph 228 state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 228.

**TWELFTH CAUSE OF ACTION**

**Negligent Interference with Prospective Economic Advantage (LPI)**

**(Plaintiffs vs Victory, Rath, Whittaker, NEC Fund II GP, Fox, Collier and Lerdal)**

229.    Fox and Collier repeat, incorporate, and reallege their answers to the allegations in the

30

preceding referenced Paragraphs as if fully set forth herein.

230. Fox and Collier deny the allegations in Paragraph 230.

231. Fox and Collier deny the allegations in Paragraph 231.

232. Fox and Collier deny the allegations in Paragraph 232.

233. The allegations in Paragraph 233 state legal conclusions to which no response is required. To the extent a response is required, Fox and Collier deny the allegations in Paragraph 233.

234. The allegations in Paragraph 234 state legal conclusions to which no response is required. To the extent a response is required, Fox and Collier deny the allegations in Paragraph 234.

235. Fox and Collier deny the allegations in Paragraph 235.

236. Fox and Collier deny the allegations in Paragraph 236.

237. The allegations in Paragraph 237 state legal conclusions to which no response is required. To the extent a response is required, Fox and Collier deny the allegations in Paragraph 237.

## THIRTEENTH CAUSE OF ACTION

### Negligent Interference with Prospective Economic Advantage (LSI)

### (LSI vs Victory, Rath, Whittaker, NEC Fund II GP, Fox, Collier and Lerdal)

238. Fox and Collier repeat, incorporate, and reallege their answers to the allegations in the preceding referenced Paragraphs as if fully set forth herein.

239. Fox and Collier deny the allegations in Paragraph 239.

240. Fox and Collier deny the allegations in Paragraph 240.

241. Fox and Collier deny the allegations in Paragraph 241.

242. The allegations in Paragraph 242 state legal conclusions to which no response is required. To the extent a response is required, Fox and Collier deny the allegations in Paragraph 242.

243. The allegations in Paragraph 243 state legal conclusions to which no response is required. To the extent a response is required, Fox and Collier deny the allegations in Paragraph 243.

244. Fox and Collier deny the allegations in Paragraph 244.

245. Fox and Collier deny the allegations in Paragraph 245.

246. The allegations in Paragraph 246 state legal conclusions to which no response is required. To the extent a response is required, Fox and Collier deny the allegations in Paragraph 246.

1

## FOURTEENTH CAUSE OF ACTION

2

### Negligence

3

### (Plaintiffs vs Victory, Rath, Whittaker, NEC Fund II GP, Fox, and Collier)

4       247.    Fox and Collier repeat, incorporate, and reallege their answers to the allegations in the

5   preceding referenced Paragraphs as if fully set forth herein.

6       248.    The allegations in Paragraph 248 state legal conclusions to which no response is

7   required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 248.

8       249.    Fox and Collier deny the allegations in Paragraph 249.

9       250.    The allegations in Paragraph 250 state legal conclusions to which no response is

10   required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 250.

11

## FIFTEENTH CAUSE OF ACTION

12

### Negligent Hiring, Supervision and Retention

13

### (Plaintiffs vs Victory)

14       251.    Fox and Collier repeat, incorporate, and reallege their answers to the allegations in the

15   preceding referenced Paragraphs as if fully set forth herein.

16       252.    Fox and Collier admit that they became employees of Victory at the time of the Victory

17   Acquisition.  The allegations in the second sentence of Paragraph 252 state legal conclusions to which

18   to no response is required.  To the extent a response is required, Fox and Collier deny the allegations

19   in the second sentence of Paragraph 252.

20       253.    Fox and Collier deny the allegations in Paragraph 253.

21       254.    The allegations in Paragraph 254 do not concern Fox and Collier and thus no response

22   is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph

23   254.

24       255.    Fox and Collier deny the allegations in Paragraph 255.

25       256.    The allegations in Paragraph 256 do not concern Fox and Collier and state legal

26   conclusions to which no response is required.  To the extent a response is required, Fox and Collier

27   deny the allegations in Paragraph 256.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SIXTEENTH CAUSE OF ACTION**

**Equitable Estoppel**

**(LSI and LSP vs Fox and Collier)**

257.    Fox and Collier repeat, incorporate, and reallege their answers to the allegations in the preceding referenced Paragraphs as if fully set forth herein.

258.    Fox and Collier deny the allegations in Paragraph 258.

259.    The allegations in Paragraph 259 state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 259.

260.    Fox and Collier deny the allegations in Paragraph 260.

261.    Fox and Collier deny the allegations in Paragraph 261.

262.    The allegations in Paragraph 262 state legal conclusions to which no response is required.  To the extent a response is required, Fox and Collier deny the allegations in Paragraph 262.

**PRAYER FOR RELIEF**

The allegations in Plaintiffs' "Prayer for Relief" contain legal conclusions to which no response is required.  To the extent that a response is required, Fox and Collier deny that Plaintiffs are entitled to the relief requested in paragraphs (1) through (6) of Plaintiffs' Prayer for Relief.

# AFFIRMATIVE DEFENSES

Fox and Collier assert the following defenses with respect to the causes of action asserted in the Amended Complaint, without assuming the burden of proof or persuasion where such burden rests on Plaintiffs. Fox and Collier have not knowingly or intentionally waived any applicable defenses and reserve their right to assert and rely upon other applicable defenses that may become available or apparent throughout the course of action. Fox and Collier reserve the right to amend, or seek to amend, their Answer, including their affirmative and other defenses.

## FIRST AFFIRMATIVE DEFENSE

### (Failure to State a Claim Upon Which Relief May Be Granted)

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs fail to state claims upon which relief may be granted.

## SECOND AFFIRMATIVE DEFENSE

### (*Res Judicata* and Claim Preclusion)

Plaintiffs' claims are barred, in whole or in part, by the doctrines of *res judicata* and/or claim preclusion.

## THIRD AFFIRMATIVE DEFENSE

### (Collateral Estoppel and Issue Preclusion)

Plaintiffs' claims are barred, in whole or in part, by the doctrine of collateral estoppel and/or issue preclusion.

## FOURTH AFFIRMATIVE DEFENSE

### (Arbitration)

Plaintiffs' claims should be dismissed or stayed because the subject matter and allegations underlying Plaintiffs' claims are the subject of an already pending arbitration commenced on July 9, 2024 before J.A.M.S.

## FIFTH AFFIRMATIVE DEFENSE

### (Lack of Standing)

Plaintiffs' claims are barred, in whole or in part, because they lack standing to assert their claims. Further, to the extent Plaintiffs' claims are derivative in nature and seek relief on the basis of

alleged harms caused to LPI and/or LPI-II, Plaintiffs lack standing to bring such claims derivatively because they were not members of LPI and/or LPI-II at the time the Amended Complaint was filed.

## SIXTH AFFIRMATIVE DEFENSE

### (Unauthorized Lawsuit)

Plaintiffs' claims are barred, in whole or in part, because Sections 5.1(b)(viii) and 5.1(c) of LSI's Amended and Restated Limited Liability Company Operating Agreement, dated October 22, 2021, requires the consent of both Brad Bauer and Patrick McConnell to "[c]ommence . . . any litigation," and only Brad Bauer consented to the initiation of this lawsuit.

## SEVENTH AFFIRMATIVE DEFENSE

### (Failure to Make Demand)

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs failed to make a pre-suit demand on the LPIs' Management Committees and because such demand would not have been futile.

## EIGHTH AFFIRMATIVE DEFENSE

### (Failure to Plead Demand Futility)

Plaintiffs' claims are barred, in whole or in part, because the Amended Complaint does not set forth with particularity the effort, if any, of Plaintiffs to secure initiation of the action by the LPIs' Management Committees or the reasons for not making the effort, consistent with the statutory requirements of § 18-1003 of the Delaware Limited Liability Company Act.

## NINTH AFFIRMATIVE DEFENSE

### (Performance Excused)

Plaintiffs failed to fully perform their obligations, and such failure relieves and excuses any alleged performance by Fox and Collier.

## TENTH AFFIRMATIVE DEFENSE

### (Fraud, Intentional Misrepresentation, or Embezzlement)

Plaintiffs' claims are barred, in whole or in part, because of Plaintiffs' gross misconduct or dishonesty in connection with the provision of the Services under the GSAs, including, without limitation, fraud, intentional misrepresentation, or embezzlement.

**ELEVENTH AFFIRMATIVE DEFENSE**

**(Inequitable Conduct and Unclean Hands)**

Plaintiffs' claims are barred, in whole or in part, by the doctrine of unclean hands, inequitable conduct, and/or other equitable defenses.

**TWELFTH AFFIRMATIVE DEFENSE**

**(No Breach of Duty)**

Plaintiffs' claims are barred, in whole or in part, because Fox and Collier did not breach the duties of care, loyalty, or any other duty imposed by Delaware law or by contract, including under the relevant contractual provisions in the LPI and LPI-II operating agreements and the GSAs.

**THIRTEENTH AFFIRMATIVE DEFENSE**

**(Good Faith)**

Plaintiffs' claims are barred, in whole or in part, because Fox and Collier's actions were at all times justified and in good faith and in accordance with their obligations.

**FOURTEENTH AFFIRMATIVE DEFENSE**

**(Business Judgment Rule)**

Plaintiffs' claims are barred, in whole or in part, because Fox and Collier's actions were at all times a valid exercise of business judgment.

**FIFTEENTH AFFIRMATIVE DEFENSE**

**(No Knowing Participation)**

Each cause of action in the Amended Complaint for aiding and abetting against Fox and Collier fails because Fox and Collier did not knowingly participate or otherwise offer substantial assistance with respect to any underlying wrong alleged in the Amended Complaint.

**SIXTEENTH AFFIRMATIVE DEFENSE**

**(Economic Interest)**

The causes of action in the Amended Complaint based on alleged tortious interference fail because Fox and Collier, as managers of the LPIs, have a legitimate interest in the alleged property and acted in furtherance of those interests.

1

2

**SEVENTEENTH AFFIRMATIVE DEFENSE**

**(No Prospective Economic Interest)**

3

4

5

6

The causes of action in the Amended Complaint based on alleged interference with a prospective economic advantage fail because LSI and LSP no longer had any prospective economic interest in any LPI or LPI-II investments following the forfeiture of LSI's Profits Interests by April 22, 2022 at the latest and the calling of LSP's membership interests in the LPIs on August 8, 2024.

7

8

**EIGHTEENTH AFFIRMATIVE DEFENSE**

**(No Rightful Possession)**

9

10

The conversion causes of action in the Amended Complaint are barred because Plaintiffs LSI and LSP did not rightfully possess their membership interests in LPI and LPI-II.

11

12

**NINETEENTH AFFIRMATIVE DEFENSE**

**(No Pattern of Racketeering)**

13

14

15

The cause of action in the Amended Complaint based on the Racketeer Influenced and Corrupt Organizations Act (the "RICO claim") is barred because Fox and Collier did not engage in a pattern of racketeering.

16

17

**TWENTIETH AFFIRMATIVE DEFENSE**

**(No Participation in RICO Enterprise)**

18

19

The RICO claim is barred because Fox and Collier did not participate in or conduct any RICO enterprise.

20

21

**TWENTY-FIRST AFFIRMATIVE DEFENSE**

**(No Predicate Acts)**

22

23

24

The RICO claim is barred because Fox and Collier did not commit any "predicate acts" sufficient to bring a claim under 18 U.S.C. §§ 1962(c) or 1964(c), including wire fraud in violation of 18 U.S.C. § 1343.

25

26

**TWENTY-SECOND AFFIRMATIVE DEFENSE**

**(Intervening/Superseding Cause)**

27

28

The RICO claim is barred because intervening and superseding causes broke the required chain of causation between the alleged actions of Fox and Collier and any alleged harm to Plaintiffs.

37

1

**TWENTY-THIRD AFFIRMATIVE DEFENSE**

2

**(No RICO Standing)**

3  The RICO claim is barred because Plaintiffs lack RICO standing, as they have not suffered

4  any cognizable injury to their business or property.  Claims of lost opportunities of expectancy

5  interests are not recoverable in a civil RICO action.

6

**TWENTY-FOURTH AFFIRMATIVE DEFENSE**

7

**(Waiver)**

8  Plaintiffs' claims are barred, in whole or in part, by the doctrine of waiver.

9

**TWENTY-FIFTH AFFIRMATIVE DEFENSE**

10

**(Estoppel)**

11  Plaintiffs' claims are barred, in whole or in part, by the doctrine of estoppel.

12

**TWENTY-SIXTH AFFIRMATIVE DEFENSE**

13

**(Laches)**

14  Each cause of action in the Amended Complaint is barred, in whole or in part, by reason of

15  Plaintiffs' laches and undue delay in pursuing that claim.

16

**TWENTY-SEVENTH AFFIRMATIVE DEFENSE**

17

**(Lack of Causation)**

18  Any damage, injury, or loss allegedly sustained by Plaintiffs was not directly or proximately

19  caused by any conduct, act, or omission of Fox or Collier, who at all times acted in good faith.

20

**TWENTY-EIGHTH AFFIRMATIVE DEFENSE**

21

**(Statute of Limitations)**

22  Plaintiffs' claims are barred, in whole or in part, by the applicable statute of limitations.

23

**TWENTY-NINTH AFFIRMATIVE DEFENSE**

24

**(Unjust Enrichment)**

25  Plaintiffs' claims are barred, in whole or in part, to the extent they result in an unjust

26  enrichment to Plaintiffs.

27

28

## THIRTIETH AFFIRMATIVE DEFENSE

### (Speculative Damages)

As to each cause of action, the alleged damages, if any, are speculative and impossible to ascertain or allocate.

## THIRTY-FIRST AFFIRMATIVE DEFENSE

### (No Damages)

Plaintiffs' claims are barred, in whole or in part, to the extent that Plaintiffs have not been damaged in the sums or manner alleged, or in any sum or manner at all.

## THIRTY-SECOND AFFIRMATIVE DEFENSE

### (Failure to Mitigate Damages)

Plaintiffs have failed or neglected to mitigate their alleged damages, injuries, and/or losses, and therefore, any recovery against Fox and Collier is barred and/or reduced accordingly.

## THIRTY-THIRD AFFIRMATIVE DEFENSE

### (No Entitlement to Attorneys' Fees)

Plaintiffs' claims are barred, in whole or in part, because the Amended Complaint fails to allege facts sufficient to establish a claim for attorneys' fees under applicable law.

## THIRTY-FOURTH AFFIRMATIVE DEFENSE

### (No Entitlement to Punitive Damages)

Plaintiffs' claims are barred, in whole or in part, because the Amended Complaint fails to allege facts sufficient to establish a claim for punitive damages under applicable law.

## THIRTY-FIFTH AFFIRMATIVE DEFENSE

### (Defenses Pleaded by Other Defendants)

Fox and Collier adopt by reference any defense pleaded by any other defendant not expressly set forth herein to the extent applicable to Fox and Collier.

## THIRTY-SIXTH AFFIRMATIVE DEFENSE

### (Further Affirmative Defenses)

Fox and Collier reserve the right to assert later additional affirmative defenses based on subsequent factual discoveries.

## COUNTERCLAIMS

This Countercomplaint arises from Counterclaim Defendants Lacuna Sustainable Investments, LLC's ("LSI") and Brad Bauer's ("Bauer") continued actions in (1) interfering with the contractual relationships among Counterclaim Plaintiffs Patrick Fox ("Fox"), Bennett Collier ("Collier"), Lacuna Project Investments, LLC ("LPI"), Lacuna Project Investments II, LLC ("LPI-II" and with LPI, the "LPIs"), and their current or prospective investees following the LPIs' justified termination of the General Services Agreements between the LPIs and LSI; (2) interfering with the contractual relationship between the LPIs and their former legal counsel, Connor McNellis (3) interfering with the prospective economic relationship between Fox, Collier, and the LPIs and a prospective buyer of the LPIs' asset portfolio; and (4) abusing the process of this Court by bringing this frivolous lawsuit litigating claims at issue in an underlying related arbitration without proper authority to do so, improperly boycotting that arbitration, and then moving for a preliminary injunction against Fox and Collier to force the Court to discharge the LPIs' counsel in that arbitration mere weeks before the hearing.

Counterclaim Plaintiffs Fox, Collier, and the LPIs hereby assert a claim for intentional interference with contractual relations, intentional interference with a prospective economic advantage, and abuse of process under California law against Counterclaim Defendants LSI and Bauer.

## INTRODUCTION

1.  The disputes in this Action are the product of a breakdown of the relationship among Counterclaim Plaintiffs the LPIs, the LPIs' majority member—non-party New Energy Capital Infrastructure Credit Fund II LPI Investor, LLC ("NECLPI")—and Counterclaim Defendant LSI.

2.  The LPIs were formed in March 2020 (LPI) and October 2021 (LPI-II) as investment vehicles for New Energy Capital ("NEC") to target investments in the renewable energy sector (specifically, the solar energy and energy storage space) that were smaller in size than NEC typically pursues. NECLPI—a special-purpose vehicle formed to deploy capital from NEC-managed funds into the LPIs—owned and funded *98% and 99%* of LPI and LPI-II, respectively.

3.  LSI was a service provider in connection with LPI's investments since 2020 (and later,

for LPI-II, since 2021), and it was managed by three (and then two) managers: Counterclaim Defendant Bauer, Claude Patrick McConnell ("McConnell"), and David Riester ("Riester"). The scope of LSI's services, governed by General Services Agreements ("GSAs"), was strictly delineated to include certain defined "Services," such as investment management and administrative services. So was LSI's compensation, which was limited to a base fee and profits interest in the LPIs. To ensure that LSI's managers had "skin in the game," so to speak, NECLPI also required that LSI's managers contribute 2% of the initial capital for LPI and 1% of the capital for LPI-II through a new entity, Plaintiff Lacuna Sustainable Partners, LLC ("LSP"). NECLPI's financial backing enabled the formation of LSI, and it remains a 20% owner of LSI today.

4.      Through the LPIs, NECLPI was entrusting LSI with important responsibilities for up to $150 million of capital, almost entirely drawn from the upstream funds managed by NEC. NECLPI was therefore taking on significant risk in backing LSI, a new partnership among the original three founders. It agreed to do so only on the condition that LSI would provide the Services under a multi-manager structure using a specified investment process with necessary checks and balances and transparent reporting. To guarantee this structure, NECLPI needed to ensure that LSI would be run jointly by a team of co-equal managers who were dedicating the bulk of their efforts to the objectives of the LPIs in an ethical and professional manner (and who were motivated to do so).

5.      NECLPI accomplished that goal through a series of interlocking, contractual incentive structures that it believed would keep the LSI team focused on providing the Services to the LPIs in the professional manner required by the ultimate investors in the NEC funds. Pursuant to these agreements, should any one of the LSI managers stop materially participating in the management of LSI or commit acts of gross misconduct or dishonesty, the LPIs had the right to terminate the GSAs for cause. Upon the accrual of this right to terminate or the commission of any such acts, LSI's profits interest in the LPIs would be automatically forfeited, and NECLPI would have the right to call LSP's membership interests in the LPIs for $1.00 each. NECLPI also required that any major decisions made by LSI be authorized by a majority (and, after Riester's departure, unanimous) vote of the LSI managers.

6.      Since 2020, LSI—largely through Bauer—has engaged in escalating misconduct

almost entirely unbeknownst to the LPIs' managers that impaired LSI's ability to provide investment and administrative services to the LPIs in a manner consistent with the terms of the GSAs, among other key contracts.  This misconduct included the undisclosed departure of one of LSI's key personnel, McConnell (Riester had already left LSI with the LPIs' conditional consent), which Bauer deliberately attempted to conceal from the LPIs' managers, Fox and Collier.  During its tenure as service provider, LSI, through Bauer, also committed many acts of gross misconduct and dishonesty, including, among other improper actions: (1) misappropriating LPI funds by issuing an undocumented loan to an investee without any notice or investment documentation to LPI as required under the GSA, fabricating investment documentation to conceal the loan, and making unauthorized banking transactions on LPI's behalf in connection with the loan; (2) fraudulently "creating" or directing the "creation" of a fake entity dubbed "Lacuna Administrative Agent, LLC" on various legal documents important to the LPIs; and (3) engaging in self-dealing by securing investee fees that were paid by LPI investees to LSI through a bank account associated with the fictitious "Lacuna Administrative Agent, LLC."

7.    Most astonishing, however, was LSI's and Bauer's completely unauthorized attempt to sell the entire asset portfolios of the LPIs—in which NECLPI held a 98-99% capital interest—to a prospective third-party buyer *without any notice whatsoever to the LPIs' managers or NECLPI.* The LPIs' managers learned of this transaction only when a *fully-executed* term sheet documenting months of secret negotiations was uploaded to a shared data room between the LPIs and LSI.  That term sheet conditioned any sale on Bauer joining the prospective purchaser on undisclosed terms— meaning that Bauer was negotiating both the sale of the LPIs' assets and his own future compensation for managing those assets for the buyer, all behind the LPIs' managers' backs.  In short, LSI, through Bauer, had gone rogue.  Called out on this conflict, LSI then repeatedly stonewalled the LPIs' managers and NECLPI from receiving pertinent information concerning the prospective sale transaction, hiding behind a non-disclosure agreement ("NDA") that LSI signed (ostensibly *on behalf of* the LPIs) and lying about the existence of a transactional data room.  To this day, the LPIs have not received sufficient information to assess the fairness of the prospective sale transaction, including any financial modeling or valuations of the LPIs' portfolios shared by LSI with the prospective buyer.

8.      Any one of these acts was more than sufficient to justify the termination of the GSAs, cause the automatic forfeiture of LSI's profits interest in the LPIs, and trigger NECLPI's right to call LSP's membership interests in the LPIs for $1.00 each.  And so, on November 29, 2023, with LSI's management team disintegrated and the GSA services in shambles, the LPIs formally noticed breaches of the GSAs.  When LSI failed to cure those breaches, the LPIs terminated the GSAs on August 8, 2024, at which time NECLPI exercised its contractual right to call LSP's membership interests in both LPIs for $2.00 total.  This termination also ended LSI's agency authority to hold itself out as a representative of the LPIs or to act on behalf the LPIs by, for example, executing wires for the LPIs' investments.  From early 2020 until the termination of the GSAs, LSI had been paid nearly $17 million in base fees by the LPIs under the GSAs.

9.      Following the termination, however, LSI and Bauer took concrete and deliberate steps to interfere with the LPIs' ability to conduct business as usual.  LSI instructed the LPIs' investee counterparties not to communicate with the LPIs' managers, making it exceptionally difficult for the LPIs' managers—who had stepped into LSI's shoes in providing investment and administrative services to the LPIs—to effectively manage the LPIs' investments.  LSI and Bauer also instructed the prospective buyer from the would-be sale transaction not to speak with the LPIs' managers or provide them with any information regarding the sale transaction, stalling any potential negotiations between the LPIs and the prospective buyer.  And even though LSI was aware that the LPIs had terminated the GSAs and their agency authority, LSI transferred funds from the LPIs' bank accounts, improperly executing wires without notice to the LPIs' managers (let alone their authorization).

10.      Perhaps most egregious, however, is LSI's and Bauer's attempt to use the process of this Court to interfere with the LPIs' contractual rights under the GSAs to pursue a related underlying arbitration, circumvent the arbitrator's orders to comply with the scheduling order and discovery processes in that arbitration, and to harm the reputations of Fox and Collier.

11.      In July 2024, LPI-II commenced arbitration against LSI under the LPI-II GSA—as required pursuant to the LPI-II GSA's mandatory arbitration clause—in connection with a dispute over what base fee was owed to LSI for the 2024 calendar year.  In response, Bauer unilaterally caused LSI to retaliate by filing the original complaint in this action just one week later (even though Bauer

was unauthorized to do so under LSI's operating agreement), alleging tort claims against the LPIs' upstream investors and legal counsel arising out of Fox and Collier's alleged breaches of fiduciary duties purportedly owed to LSI and LSP in connection with the GSAs and the LPIs' operating agreements.  On September 23, 2024, LPI-II filed an amended arbitration demand adding LPI as a claimant and requesting a declaration that the LPIs' properly terminated the GSAs on August 8, 2024, among other relief.

12.    LSI and Bauer initially participated in the arbitration, expressly acknowledging the arbitrability of the LPIs' claims.  However, on October 18, 2024, LSI—perhaps realizing the weakness of their contractual defenses—did a complete 180-degree turn.  On that date, LSI filed the Amended Complaint in this action naming Fox and Collier for the first time and alleging breaches of fiduciary duty arising out of the exact same conduct already at issue in the arbitration; namely, the LPIs' termination of the GSAs on August 8, 2024.

13.    Since then, LSI has completely (and improperly) boycotted the arbitration.  LSI refused to participate in discovery; never produced any documents in response to the LPIs' document requests; never responded to the LPIs' deposition notices; and stopped attending scheduled conferences with the arbitrator.  Even when the arbitrator ordered LSI to comply with the scheduling order and fulfill its discovery obligations, LSI refused to do so.  LSI declined to participate in pre-trial exchanges, did not attempt to offer any evidence at the arbitration hearing other than a self-serving prehearing "declaration," and declined multiple opportunities to cross examine the witnesses offered by the LPIs at that hearing—which took place on March 10 and 11, 2025.

14.    Rather than participate in the arbitration—the contractually mandated forum for the underlying contract claims—Bauer instead caused LSI to take the unprecedented step of filing a motion for preliminary injunction asking this Court to ***discharge the LPIs' counsel in that arbitration*** mere weeks before the arbitration hearing was set to commence based on a fabricated conflict of interest between the LPIs' counsel in that arbitration (Ropes & Gray LLP ("Ropes")) and NECLPI, despite LSI's and Bauer's knowledge that Ropes was representing the LPIs in that arbitration since, at the latest, August 2024.  LSI attached to the declarations in support of the motion for preliminary injunction a large volume of emails and documents that were responsive to the LPIs' document

requests and should have been produced in the confidential arbitration—but which LSI instead filed publicly to damage Fox's and Collier's reputations.  The motion for preliminary injunction was no more than an attempt to circumvent the arbitrator's orders that the LPIs' dispute in that matter is arbitrable, and an arbitration hearing would proceed regardless of whether LSI attended.  This is a textbook abuse of the judicial process for an improper purpose.  Bauer, a California attorney, used this Court in an attempt to avoid the consequences of LSI's noncompliance with the arbitrator's orders and the binding effects of an arbitration that LSI contractually agreed would be the mandatory forum for any dispute arising under the GSAs.

15.    In light of the foregoing, Counterclaim Plaintiffs Fox, Collier, and the LPIs have brought claims for intentional interference with contractual relations, intentional interference with a prospective economic relationship, and abuse of process against Counterclaim Defendants LSI and Bauer.

## PARTIES

16.    Counterclaimant Patrick Fox is an individual and resident of the State of New Hampshire.  Fox is a manager of each of the LPIs and a principal and partner at NEC, a franchise of Victory Capital Management, Inc. ("Victory").

17.    Counterclaimant Bennett Collier is an individual and resident of the State of Colorado. Collier is a manager of each of the LPIs and a principal and partner at NEC.  Collier, together with Fox, make up the "Management Committee" of each of the LPIs.

18.    Counterclaimant LPI is a limited liability company that was formed in Delaware in March 2020 by NEC.  LPI is in the business of investing in companies that are engaged in acquiring, developing, managing, and selling solar energy power plants and related energy storage facilities. LPI is governed by a limited liability company operating agreement and entered into a GSA with Counterclaim Defendant LSI, which was amended on June 3, 2021.  LPI is managed by Fox and Collier.

19.    Counterclaimant LPI-II is a limited liability company that was formed in Delaware in October 2021 by NEC.  Like LPI, LPI-II is in the business of investing in companies that are engaged in acquiring, developing, managing, and selling solar energy power plants and related energy storage

facilities.  Like LPI, LPI-II is governed by a limited liability company operating agreement and entered into a GSA with Counterclaim-Defendant LSI on October 22, 2021.  Also like LPI, LPI-II is managed by Fox and Collier.  LPI and LPI-II are referred to together herein as "the LPIs."

20.    Counterclaim Defendant LSI is a limited liability company formed in Delaware in 2019 and headquartered in Marin County, California.  LSI provided certain investment and administrative services in connection with investments made by the LPIs, pursuant to the GSAs, in exchange for certain compensation as determined under the agreements.  Pursuant to the LPIs' operating agreements and GSAs, LSI forfeited its profits interest in LPI by April 22, 2022 at the latest and in LPI-II by September 2023 at the latest, upon the commission of Key Person Moral Turpitude Events, as defined in the Key Person Agreements referenced below.  A separate basis for the forfeiture of LSI's profits interest in the LPIs occurred no later than September 2023, when LSI manager McConnell took a full-time executive-level position at another company.  LSI is effectively managed solely by Brad Bauer at the present time.  Although, upon information and belief, McConnell remains a member of LSI, he does not materially participate in LSI's management.  NECLPI has a 20 percent membership interest in LSI.

21.    Counterclaim Defendant Brad Alan Bauer is an individual and resident of Marin County, California.  Bauer was one of the three founding managers of LSI and LSP, along with McConnell and Riester.  Bauer is a member and officer of LSI, of which he is effectively the sole remaining manager at the present time.  Bauer is also a member of LSP.  Counterclaim Plaintiffs Fox, Collier, and the LPIs assert counterclaims against Bauer pursuant to Fed. R. Civ. P. 13(h) and Fed. R. Civ. P. 19(a)(1)(A) or 20(a)(2)(A)-(B), as the Court cannot accord complete relief among existing parties in Bauer's absence; Fox, Collier, and the LPIs are seeking a right to relief against Bauer and LSI arising out of the same transaction or occurrence; and questions of law or fact common to Bauer and LSI will arise in this action.

## OTHER RELEVANT ENTITIES AND INDIVIDUALS

22.    LSP is a Delaware limited liability company headquartered in Marin County, California, and is owned by Bauer and McConnell (and previously also by Riester).  LSP made nominal investments of 2% and 1% of the investment capital into LPI and LPI-II, respectively.  In

exchange for a nominal percentage of the capital provided in each of the LPIs, LSP received a non-managing capital interest in the LPIs and received a proportionate share of distributions.  On August 8, 2024, NECLPI called and paid for LSP's membership interests in the LPIs.

23.    NECLPI is a limited liability company formed in Delaware in 2020 as a wholly owned subsidiary of a related group of investment funds managed by NEC (and later by Victory after Victory's November 2021 acquisition of NEC).  NECLPI was the 98% owner of LPI and the 99% owner of LPI-II, and it is currently the 100% owner of the LPIs after LSI forfeited its profits interests in the LPIs and NECLPI called LSP's membership interests in the LPIs.  Pursuant to the LPI and LPI-II limited liability company agreements, NECLPI appoints members to the Management Committees of the LPIs.

24.    NEC is a leading alternative asset manager focused on debt and equity investments in clean energy infrastructure projects and companies that was founded in 2004 and is headquartered in Hanover, New Hampshire.  NEC was previously a standalone Delaware Limited Liability Company known as New Energy Capital Partners LLC.  On November 1, 2021, NEC was fully acquired and became a franchise of Victory.

25.    Claude Patrick McConnell, who goes by Patrick, resides in Houston, Texas (previously residing in California), and was one of the three founding managers of LSI and LSP, along with Bauer and Riester.  Once one of three, and then one of two, active managers at LSI, McConnell no longer materially participates in LSI's management, which has left Bauer as the sole remaining engaged manager of LSI.  McConnell joined BayWa r.e. Solar Projects LLC ("BayWa") as Chief Financial Officer in September 2023, a job he retains today.

26.    Connor McNellis ("McNellis") is an attorney at the law firm Sunridge Legal LLP, located in San Diego, California.  He was formerly employed by the law firm Clean Energy Counsel, among other law firms.  Upon information and belief, Bauer, on behalf of the LPIs, LSI, and LSP, engaged McNellis to represent all four entities in a joint representation from 2020 through September 13, 2024, when the LPIs terminated his representation.  McNellis purported to represent the LPIs as investment counsel and assisted LSI in the provision of Services under the GSAs.  In that role, McNellis negotiated and drafted investment documentation, executed the LPIs' investments, assisted

in the administration and oversight of those investments, and communicated directly with investee entities and their counsel.

## JURISDICTION AND VENUE

27.    This Court has subject matter jurisdiction over Counterclaim Defendant LSI's claim brought under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S. §§ 1962(c) & 1964(c), pursuant to 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over Counterclaim Plaintiffs' state law claims pursuant to 28 U.S.C § 1367 because they are so related to the Racketeering claim that they form part of the same case or controversy.

28.    This Court has personal jurisdiction over Counterclaim Defendants LSI and Bauer because they either reside in this District (Bauer) or are headquartered in this District (LSI). Counterclaim Defendants LSI and Bauer further have significant contacts with this District and routinely conduct business in this District.

29.    Venue is proper within this District because one or more of the Counterclaim Defendants reside or are headquartered in this District.  In addition, a substantial part of the events or omissions giving rise to the claims alleged in this Countercomplaint occurred in this District.  Venue is therefore proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2).

## THE RELEVANT CONTRACTS

30.    LPI is governed by a limited liability operating agreement, the Amended and Restated Limited Liability Company Agreement of Lacuna Project Investments, LLC, dated March 12, 2020 (the "LPI LLC Agreement").  Section 8.2(i) of LPI LLC Agreement gives LPI's Management Committee (Fox and Collier) the sole authority to "institute, prosecute, defend, settle, compromise, and dismiss lawsuits or other judicial or administrative proceedings brought on or in behalf of, or against, the Company or the Members in connection with activities arising out of, connected with, or incidental to this Agreement, and to engage counsel or other advisors in connection therewith."

31.    LPI-II is governed by a substantially similar limited liability operating agreement, the Amended and Restated Limited Liability Company Agreement of Lacuna Project Investments II, LLC, dated October 22, 2021 (the "LPI-II LLC Agreement," and together with the LPI LLC Agreement, the "LPI LLC Agreements").  Section 8.2(i) of LPI-II LLC Agreement gives LPI-II's

Management Committee (Fox and Collier) the sole authority to "institute, prosecute, defend, settle, compromise, and dismiss lawsuits or other judicial or administrative proceedings brought on or in behalf of, or against, the Company or the Members in connection with activities arising out of, connected with, or incidental to this Agreement, and to engage counsel or other advisors in connection therewith."

32.    LSI is governed by a limited liability operating agreement, the Amended and Restated Limited Liability Company Operating Agreement of Lacuna Sustainable Investments, LLC, dated October 22, 2021 (the "LSI LLC Agreement").

33.    LPI and LSI entered into the Amended General Services Agreement By and Between Lacuna Project Investments, LLC and Lacuna Sustainable Investments, LLC, dated June 3, 2021 ("the LPI GSA").

34.    LPI-II and LSI entered into the substantially similar General Services Agreement By and Between Lacuna Project Investments II, LLC and Lacuna Sustainable Investments, LLC, dated October 22, 2021 (the "LPI-II GSA," and together with the LPI GSA, the "LPI GSAs").

35.    The LPI GSAs contemplate that LSI will provide Services, which encompass certain delineated Administrative Services and Investment Services, to the LPIs in exchange for a base fee and a profits interest in excess profits of the LPIs.  The provisions of the LPI LLC Agreements and the LPI GSAs relevant to this dispute are highlighted in the respective sections of factual allegations where they are specifically relevant.

36.    Bauer and McConnell also each signed the operative Key Person Agreements for LPI and LPI-II (the "Key Person Agreements"), each being a "Key Person" at LSI.  The Key Person Agreements function by tying the Key Persons to the management of LSI as well as by defining certain instances where gross misconduct or dishonesty would give rise to a scenario of default, under which termination would be permissible under the related GSAs.

37.    Although not individually defined herein, the LPIs have entered into a number of agreements with companies in which they have invested that outline the terms of the LPIs' investments.  These agreements include loans and limited liability company operating agreements to

1  which the LPIs and the investee entities are parties, and through which the LPIs contribute capital to

2  the investment entities (who contribute assets pursuant to the operating agreements).

3      38.    For example, in connection with Investment A referenced in the Amended Complaint,

4  LPI and LPI-II have entered into multiple limited liability agreements with Investment A's corporate

5  parent or its subsidiaries.  The LPIs and Investment A are the only two parties to these operating

6  agreements and are the only two members of the related limited liability companies.  Investment A

7  contributes assets to the limited liability companies, while the LPIs contribute the capital.  The LPIs

8  have also entered into loans (as described below) and corporate equity investments with Investment

9  A, which are—or, at least, should be—governed by contracts.  LPI and LPI-II use similar structures

10  with their respective investees, and have entered into similar investment structures with seventeen

11  investees.

12      39.    Counterclaim Defendants LSI and Bauer are aware of these agreements.  LSI

13  negotiated these agreements before the LPIs terminated the GSAs, while LSI was still a service

14  provider to the LPIs.  In his capacity as a manager for LSI and a then-authorized signatory for the

15  LPIs, Bauer signed some of these agreements on behalf of the LPIs.  The rest were signed by

16  McConnell while he was still actively participating in LSI's management.

17  **FACTUAL ALLEGATIONS**

18  **A.    Formation and Structure of the LPIs and NECLPI's Backing of LSI**

19      40.    NEC is an alternative asset manager focused on debt and equity investments in clean

20  energy infrastructure projects and companies.  Founded in 2004 and headquartered in Hanover, New

21  Hampshire, NEC was one of the first investors to focus on clean energy and infrastructure assets.

22  NEC is a leader in all aspects of clean infrastructure investing, including evaluating energy markets,

23  projects, and technologies; developing and financing domestic and international power generation,

24  fuels, wastewater management, and distributed generation facilities; founding and managing

25  renewable energy companies; and understanding the public policies that shape the landscape for the

26  energy and infrastructure markets.  In November 2021, the parent company of NEC was wholly

27  acquired by Victory, and since then, NEC has operated as an investment franchise of Victory.

28      41.    In or around August 2019, three former Cypress Creek Renewables executives—Brad

Bauer, Patrick McConnell, and David Riester—approached NEC, seeking capital from NEC to deploy in renewable energy investments. They had originally sought a loan from NEC, but NEC was not prepared to loan money to LSI because LSI had no assets.

42.     However, NEC saw an opportunity to work with Bauer, McConnell, and Riester, as NEC was familiar with them from their work at Cypress Creek Renewables. NEC traditionally focused on larger renewable energy investments, but in early 2020 NEC was interested in targeting smaller-size investments in the renewable energy sector (specifically, the solar energy and energy storage space). Such investments came with higher potential returns, but also with higher average administrative costs per investment dollar. NEC was interested in working with Bauer, McConnell, and Riester to provide specific investment and administrative services to those smaller investments for NEC, allowing NEC to make a larger single investment to be serviced by this team. They had filed a certificate of formation for LSI in late 2019, but had no formal operating agreement for their entity, or even advanced ideas on how they would manage it.

43.     "Lacuna" means a "gap" or an "unfilled space," and NEC negotiated with the LSI team to enter that space of smaller investments. Specifically, primarily using funds provided by NECLPI, LPI would be making sub-$8 million investments, and LPI-II would later be organized to make sub-$20 million investments, thus filling the "gap" in NEC's investment portfolio, which traditionally focused on larger scale investments.

44.     The initial LSI/LPI structure was negotiated in early 2020, with LPI-II negotiated in late 2021. The LPIs' majority member is NECLPI. NECLPI was formed by NEC in 2020 as a special purpose vehicle to deploy capital from upstream NEC funds into LPI, and later into LPI-II. The LPIs were 98% (in the case of LPI) and 99% (in the case of LPI-II) funded by NECLPI.

45.     LSI was formed to be a service provider to the LPIs. NECLPI agreed that LSI would provide investment and administrative services to LPI by sourcing and administering sub-$8 million investments in the renewables sector, and later that its investment services for LPI-II would involve sub-$20 million investments in the same sector. LSI had no operating agreement, business, revenues, or employees prior to the initial NECLPI investment in 2020. In fact, LSI's operating agreement was negotiated simultaneously with the other LPI agreements, reflecting its lack of business or operations

prior to its work for the LPIs.

46.    In consideration for NECLPI's funding of LPI, and to ensure that NECLPI would realize returns for taking on the risk of backing the LSI team, NECLPI was granted a 20% profits interest in LSI.  That interest was later converted into a 20% common membership interest when LPI-II was formed in October 2021.  Critically, however, NECLPI did not share in LSI's proceeds from the LPIs, but would share 20% of LSI's proceeds from any other sources.  Thus, NECLPI was hoping that LSI would continue to grow and expand beyond its work for the LPIs.

47.    LSI, as compensation for its services, would receive an annual base fee and a negotiated share of the LPIs' profits in excess of certain return thresholds to NECLPI and a third entity, LSP.  LSI's base fee was paid under the GSAs, while its profits interest was derived by granting LSI a non-capital (or profits-only) interest in the LPIs (hereinafter, the "Profits Interest," which is distinct from NECLPI's profits interest in LSI).  From its inception through the GSAs' termination, LSI (and its founders) received base fees totaling nearly $17 million.

48.    NECLPI also wanted to ensure that LSI's founders had "skin in the game," so to speak. While NECLPI would fund 98% of the initial capital for LPI, the other 2% would be funded by Bauer, McConnell, and Riester via the new entity that they owned, LSP.  Similarly, NECLPI funded 99% of the capital for LPI-II, and Bauer and McConnell were required to fund the remaining 1% through LSP.  That way, the incentives of LSI's founders would be fully aligned with those of NECLPI and the LPIs.  If the LSI partnership fell apart, or if LSI did not perform the Services ethically and professionally, then the founders stood to potentially lose their personal investment.

49.    This is not an unusual arrangement—NEC also requires that its own principals have "skin in the game" in all of NEC's investments.  In fact, Fox and Collier each were required to invest their own money in the funds that capitalized NECLPI (and thus the LPIs).

50.    As such, the LPIs were created with the following high-level vision: (i) the LPIs' investments would be 98-99% funded by NECLPI, which in turn received funding from upstream NEC funds, and 1-2% funded by LSP; and (ii) LSI, managed by Bauer, McConnell, and Riester, would not be a co-equal partner with NECLPI, which held a 98-99% interest in the LPIs, but rather a service provider that would be paid a base fee and hold a contingent Profits Interest in the LPIs to

incentivize good performance.

51.    LSI never managed, nor was LSI ever a manager of, the LPIs.  Rather, LSI was a service provider to the LPIs.

52.    NECLPI did not give LSI free rein to source and dispose of investments for the LPIs. NECLPI was taking on significant risk in backing LSI, a brand-new partnership among its three founders with no existing business or operations.  Instead, LSI's provision of services to the LPIs (and its broader relationship with the LPIs) would be governed by a series of interlocking contracts.  Those agreements would strictly delineate the nature of services that LSI could provide to the LPIs, delegate management of the LPIs to individuals affiliated with NECLPI in the first instance, and provide the LPIs with recourse to terminate with cause the contractual relationship with LSI in the event that the LSI partnership broke down or LSI provided unsatisfactory services to the LPIs.

53.    NECLPI intentionally structured the underlying contractual agreements in a way that would incentivize LSI to devote its time and resources to the LPIs, and such that a breakdown of the LSI partnership and/or departure of any one LSI founder would unravel the arrangement.  NECLPI also insisted that all material LSI actions be authorized by a majority of its managers (and after Riester's departure, all of its managers), so that no one LSI manager could turn LSI into his personal investment platform.  In particular, NECLPI felt that only a team of co-equal managers could provide the necessary checks and balances that would ensure that the LPIs' investments would be managed efficiently and productively.  LSI's structure reflected this vision—it was formed as a three-manager company, with Bauer, McConnell, and Riester as co-equal managers.

54.    The importance of that three-manager team was reflected in the relevant contracts, and in particular, the LPI LLC Agreements, the LPI GSAs, the Key Person Agreements, and the LSI LLC Agreement.  Each LSI manager was defined as a "Key Person" in the LPI LLC Agreements and LPI GSAs, and each signed a Key Person Agreement.

55.    The founders' "Key Person" status is particularly important with respect to the termination of the GSAs.   Section 7 of the GSAs permits the Managers of the LPIs to terminate the GSAs under certain circumstances that give rise to defaults under the agreements.  Two provisions of that section are relevant here.

56.    *First*, Section 7.2—specifically, Section 7.2(c) in the LPI GSA and Section 7.2(a) in the LPI-II GSA—explicitly provides that the Managers may terminate the GSAs "upon [30] days' written notice to LSI" when "any Key Person," *i.e.*, Bauer, McConnell, or Riester, "no longer materially participates in LSI management."  That language is very clear and was meant to reflect NECLPI's central priority regarding the continued functioning of a multi-person management team at LSI.  If *any* one of LSI's founders was not meaningfully engaged in LSI's work for the LPIs, then the LPIs' managers (Fox and Collier) would have the right to terminate the GSAs.  That is the central mechanism through which the LPIs' managers could enforce the intention that LSI be run by a true team of senior investment professionals, rather than just one manager.

57.    *Second*, under the same Section 7.2 of the GSAs, "if a Key Person . . . commits a Key Person Default," then the LPIs' Managers would be entitled to terminate the GSAs "upon [30] days' written notice to LSI."   The GSAs explain that a "Key Person Default" means that "a Key Person [has] committed a Key Person Moral Turpitude Event, as defined in the Key Person Agreement."  In relevant part, each Key Person Agreement defines a "Key Person Moral Turpitude Event" as the Key Person engaging in "gross misconduct or dishonesty in connection with the provision of the Services (including, without limitation, fraud, intentional misrepresentation or embezzlement)."  Thus, the Key Person Agreements define certain instances where gross misconduct or dishonesty would give rise to a default under the GSAs, which would in turn permit termination of the GSAs.

58.    The Key Person-related grounds for termination referenced in Section 7.2 of the GSAs are incorporated, in turn, in the LPI LLC Agreements.  Under Section 9.1 of the LPI LLC Agreements, "LSI's Membership Interests will be terminated in all respects" if any "LSI Forfeiture Event" occurs. The termination of membership interests is automatic; it happens as of the date of the "LSI Forfeiture Event" without any further action by the LPIs.

59.    The LPI LLC Agreements define an "LSI Forfeiture Event," in relevant part, as any "LSI Key Person Event" that "has occurred before the Return Date."[1]  An "LSI Key Person Event," in turn, "means that the [LPIs have] the right to suspend or terminate the [GSAs]" on account of "Key

---

[1] The Return Date has not yet passed for either of LPI or LPI-II, meaning that, if any LSI Key Person Event has taken place, it "occurred before the Return Date" under the LPI LLC Agreements.

Person Defaults or departures."  The term "Key Person Default" in that definition refers back to the GSAs' definition of the same term, which includes "Key Person Moral Turpitude Event[s]" under the Key Person Agreement.  The reference to "Key Person . . . departures" also refers back to the GSAs, particularly those instances where a Key Person no longer "materially participates" in LSI's management per Section 7.2 of the GSAs.  Both of those scenarios trigger the LPIs' managers' right to terminate the GSAs on the LPIs' behalf.  And, where the LPIs would have the *right* to terminate the GSAs on account of the Key Person-relevant termination provisions discussed above, then LSI's membership interests in the LPIs terminate automatically as of that date, even if the LPIs have not yet formally terminated the agreements.

60.    Likewise, under Section 9.1 of the LPI LLC agreements, an LSI Forfeiture Event also means that NECLPI, as the super-majority member of the LPIs, could call LSP's membership interests.  Where the LSI Forfeiture Event was based on an LSI Key Person Event, the call purchase price for LSP's interests would be only $1.00 for each of the LPIs.  This was a significant incentive for LSI's founders to work well with one another: if the partnership fell apart and caused an LSI Forfeiture Event, then NECLPI could buy out the founders' stake for $2.00 total.

**B.**    **LSI's Breaches and the LPIs' Termination of the GSAs**

61.    In May 2021, Riester had a contentious departure from LSI and, as part of that separation, resigned his interest in LSI and LSP.  The management of LSI therefore dropped from three managers to two: Bauer and McConnell.  NECLPI was troubled by Riester's departure given the importance of the three-manager structure, but subsequently agreed to a team of two co-equal managers with a carefully conditioned consent that took into account certain managerial and investment checks and balances that remained important to NECLPI and that were reflected in the LPI LLC Agreements, the LPI GSAs, and the Key Person Agreements—and critically, the LSI LLC Agreement—as described above.  But what NECLPI never envisioned was a structure of a single LSI manager ruling by fiat, with no internal checks whatsoever.

62.    Beginning in November 2022, Fox and Collier became aware of issues within LSI's management between McConnell and Bauer, which continued over the next several months.  Ultimately, despite Bauer's repeated misrepresentations to the contrary, it became clear to Fox and

Collier that Bauer had forced McConnell out, and that McConnell was no longer materially participating as a manager of LSI as contemplated by the relevant agreements.

63.    On September 12, 2023, McConnell told Fox that he had taken a new position as Chief Financial Officer at BayWa, another company in the solar energy space.  McConnell shared that this was a full-time job and that he had let Bauer know already about his new job.  This was the first time that anyone at the LPIs or NECLPI had heard that McConnell had taken a new full-time job.  During the meeting, McConnell stated to Fox: "I just need to move on."

64.    Nonetheless, following this meeting, Bauer and attorney McNellis—the latter taking a position on behalf of LSI that was directly adverse to that of his other purported clients, the LPIs— took deliberate steps to conceal McConnell's departure from the LPIs' managers.  On October 16, 2023, in an e-mail to Fox, Collier, and others regarding an improper investment of LPI-II funds that LSI had directed into Investment A, McNellis stated "that Patrick [McConnell] is properly at LSI, properly acting as a Manager of LSI, and, therefore, there are no 'issues between' the Managers of LSI."  This email was a deliberate attempt to make Fox and Collier believe that McConnell was still meaningfully participating in LSI's management, which he was not.

65.    Three days later, on October 19, 2023, Bauer similarly wrote to Fox and Collier: "NEC has been told multiple times that Patrick remains with, acting as a manager, and is a Key Person of LSI."

66.    This was a lie.  As McConnell testified via sworn affidavit in the March 2025 arbitration concerning these factual allegations, starting in around December 2022, "Bauer purposefully cut [him] out of the majority of the decision-making at LSI."  McConnell further testified that his Chief Financial Officer role at BayWa, which he joined in September 2023, "consumes the vast majority of [his] professional time." By the point that he accepted his position at BayWa in September 2023, he had "largely be[en] cut out of LSI's operations," and thus had very limited involvement with LSI's business and only occasionally monitored certain of LSI's investments.

67.    Because McConnell was no longer materially participating in LSI's management no later than September 2023—if not earlier, as alleged by LSI and LSP in the Amended Complaint— the LPIs had the right to terminate the GSAs under Section 7.2 as of that date.  The accrual of the

right to terminate under Section 7.2 further caused the automatic forfeiture of LSI's Profits Interests in the LPIs and gave NECLPI the right to call LSP's membership interests in the LPIs for $1.00 each.

68.     What is more, the LPIs' managers learned over time that Bauer and McConnell committed multiple Key Person Moral Turpitude Events, each of which caused the automatic forfeiture of LSI's Profits Interests in the LPIs even earlier than September 2023.

69.     For instance, the LPIs' managers learned that on December 18, 2020, LSI contracted to pay itself a $50,000 annual management fee in connection with one of LPI's investments, without notice to LPI's Management Committee.  This unauthorized management fee was outside and in excess of the compensation that LSI contracted with LPI to receive pursuant to the LPI GSA (*i.e.*, the base fee and Profits Interest).  LSI directed this fee and other similar fees charged to LPI and LPI-II investments for years to a bank account associated with "Lacuna Administrative Agent, LLC," a fictitious entity that LSI included in legal investment documentation as an administrative agent.  The Lacuna Administrative Agent bank account was entirely within LSI's control—the LPIs, which were the rightful recipients of these fees, were not able to distribute funds to and from the Lacuna Administrative Agent account.

70.     When confronted regarding the use of "Lacuna Administrative Agent, LLC" in investment legal documentation on March 8, 2023, former LSI employee Kevin Rolston readily admitted that "Lacuna Administrative Agent, LLC" had no formation documents and was not "even really an 'entity.'"  LSI's payment of a management fee to itself through a bank account outside of the LPIs' control, as well as LSI's use of the fictitious "Lacuna Administrative Agent, LLC" in investment legal documentation relating to the LPIs, constitute acts of gross misconduct and dishonesty, and thus amount to Key Person Moral Turpitude Events triggering the automatic forfeiture of LSI's Profits Interests in the LPIs pursuant to Section 9.1 of the LPI LLC Agreements in as early as December 2020 for LPI.

71.     In addition, on April 22, 2022, LSI caused LPI to issue an undocumented $500,000 loan to the entity referred to in the Amended Complaint as Investment A without providing the LPIs' managers any notice, any initial summary of the loan, any diligence materials regarding the loan, or any "Final Investment Memorandum," all of which LSI was required to provide LPI pursuant to the

LPI GSA's Investment Process, set out in Attachment C of the LPI GSA. LSI also did not provide LPI or NECLPI a flow of funds memorandum in connection with the April 22, 2022 loan, which serves as wire transfer instructions and generally must be signed by a representative from LSI, LPI, and NECLPI.

72.     Even more egregiously, LSI and Bauer covered up this $500,000 loan by doctoring an August 15, 2022 flow of funds memorandum for a *separate* investment in Investment A to make it seem as though this April 2022 loan was a part of the August 2022 investment. Per the August 15, 2022 flow of funds memorandum, this August 2022 investment in Investment A was intended to be LPI's first investment directly in the corporate parent of Investment A, for ████████ (or approximately ██████, minus legal and transaction fees). However, wire transfer records from this time period show that only approximately ███████ was transferred—almost exactly $500,000 less than what was portrayed on the flow of funds memorandum, with interest on the undocumented loan presumably comprising the remaining amount of the discrepancy.  Despite repeated requests to LSI and to Investment A's Chief Executive Officer, the LPIs have not yet been able to locate any executed documentation for this loan.

73.     Bauer signed the August 15, 2022 flow of funds memorandum on behalf of LSI. Then, upon information and belief, he instructed the wiring bank to send funds in amounts and to accounts that did not match the executed flow of funds memorandum. The issuance of a loan without any notice to or authorization from the LPIs' managers, and Bauer's subsequent fabrication of investment paperwork, were acts of gross misconduct and dishonesty amounting to Key Person Moral Turpitude Events, which caused the automatic forfeiture of LSI's Profits Interest in LPI as of April 22, 2022 at the latest.

74.     In addition to these aforementioned Key Person Moral Turpitude Events, Bauer's October 2023 concealment of McConnell's departure from LSI constitutes a gross act of misconduct and dishonesty, creating a separate basis for termination of the GSAs under Section 7.2.

75.     Fox and Collier, in their capacities as managers for the LPIs, gave LSI formal written notice of various breaches of the GSAs on November 29, 2023, before many of the Key Person Moral Turpitude Events had even come to light. In addition to breaches relating to McConnell's concealed

departure from LSI, the noticed matters included breaches under Section 7.1(a) of the GSAs, including LSI's failure to hold quarterly meetings with the LPIs, failure to follow Good Industry Practice as required by Section 8 of the GSAs, and the failure to provide the LPIs' managers with full and complete information regarding the LPIs' investments, as required by the Investment Process included in Attachments B (LPI) and C (LPI-II) of the LPIs' GSAs.  Fox and Collier signed written consents on November 30, 2023 ratifying the November 29, 2023 communication as a formal notice of breach of the GSAs.  LSI failed to cure its breaches and continued to breach those agreements, and the LPIs accordingly terminated the agreements on August 8, 2024.

76.    The August 8, 2024 notice of termination (the "Notice") explained that "McConnell's departure from LSI provides ample basis for termination of the GSAs under both the LPI LLC Agreements and under the GSAs" as an "LSI Key Person Event," and further enumerated a number of additional breaches that had, by then, ripened into Events of Default under Section 7.1(a) of the GSAs.

77.    The Notice, in light of terminating the GSAs, further terminated LSI's agency authorization to act for the LPIs under Section 2.2 of the GSAs.  It also terminated the role of Bauer in providing Services under each GSAs, in accordance with Attachment B of the LPI GSA and Attachment A of the LPI-II GSA.  Finally, through the Notice and due to the commission of an "LSI Key Person Event," NECLPI called LSP's membership interests in each of the LPIs for $1.00 each.

**C.    LSI Unlawfully Files This Lawsuit in Response to LPI-II's Arbitration Demand**

78.    The questions of whether the LPIs validly terminated the GSAs and LSI's agency authority, and when LSI's Profits Interests in the LPIs were automatically forfeited, are currently being decided by an arbitrator in a related arbitration proceeding.  All of the aforementioned facts concerning the LPI GSAs, the LPI LLC Agreements, the Key Person Agreements, McConnell's departure from LSI, the Key Person Moral Turpitude Events, and the Notice were heard by the arbitrator at an evidentiary arbitration hearing on March 10 and 11, 2025.

79.    Section 9 of the LPI GSAs contains a mandatory dispute resolution provision that states: "Except as specifically provided herein, ***any dispute arising out of or relating to this Agreement shall be finally settled by binding arbitration*** conducted expeditiously in accordance with

1    the J.A.M.S./Endispute Comprehensive Arbitration Rules and Procedures (the '<u>J.A.M.S. Rules</u>')."

2    (emphasis added).  Pursuant to Section 9(b) of the LPI GSAs, "[e]ach Party covenants and agrees that

3    such Party will participate in the arbitration in good faith."

4           80.    Section 11.12 of the LPI LLC Agreements contains a similar mandatory arbitration

5    clause stating: "Except as specifically provided herein, ***any dispute arising out of or relating to this***

6    ***Agreement or any other Operative Agreement shall be finally settled by binding arbitration***

7    conducted expeditiously in accordance with the J.A.M.S./Endispute Comprehensive Arbitration

8    Rules and Procedures (the '<u>J.A.M.S. Rules</u>')."  (emphasis added).  Like with the corresponding

9    section of the LPI GSAs, Section 11.12(b) of the LPI LLC Agreements requires each Party to

10   "participate in the arbitration in good faith."

11          81.    On July 9, 2024, Fox and Collier, in their capacities as managers to LPI-II, initiated a

12   J.A.M.S. ("JAMS") arbitration against LSI seeking declaratory relief regarding the amount of the base

13   fee owed to LSI for 2024 (the "Original Demand").

14          82.    Just one week later, on July 16, 2024, LSI filed the original Complaint in this Action

15   in the Superior Court of California, County of San Francisco, against NEC, Victory, Whittaker, Rath,

16   NEC Fund II GP, Lerdal, Greenberg Traurig, P.A., and Does 1–10 (the "Original Complaint"),

17   alleging various tort claims premised on the existence of the GSAs and Fox and Collier's fiduciary

18   duties owed pursuant to the LPI LLC Agreements, and alleging that the GSAs create an economic

19   relationship between the LPIs and LSI.

20          83.    All of these claims would have been subject to the LPI GSAs and LLC Agreements'

21   arbitration provisions if brought against the LPIs; instead, LSI sued the LPIs' upstream investors and

22   advisors specifically to avoid the arbitration clauses.  Upon information and belief, Bauer caused LSI

23   to file the Original Complaint to retaliate against Fox and Collier by trying to pressure them into

24   complying with LSI's unwarranted base fee demands and publicly tarnishing their reputations.

25          84.    And Bauer took this action without the proper authorization under the LSI LLC

26   Agreement.  Section 5.1(b)(viii) of the LSI LLC Agreement provides that LSI's managers are

27   authorized to "[c]ommence or settle any litigation, arbitration, or other legal proceedings."  However,

28   when Riester left LSI in 2021, Section 5.1(c) of the LSI LLC Agreement was amended to require

"approval by all Managers" to "take any action" if there are two or fewer managers of LSI.  NECLPI negotiated specifically for this feature of the LSI LLC Agreement—that the vote of **both** LSI managers would be needed—consistent with NECLPI's overarching emphasis on requiring that LSI be managed by an investment team of co-equals.

85.    As of July 16, 2024, when LSI filed the Original Complaint, Bauer and McConnell were the only managers of LSI.  Although McConnell was a manager of LSI in name only at that time, pursuant to Section 5.1(c) of the LSI LLC Agreement, his consent was required to file the Original Complaint.  Upon information and belief, Bauer did not obtain McConnell's consent to file the Original Complaint.  Accordingly, the Original Complaint was not only an inappropriate retaliatory act for pursuing arbitration regarding the amount of base fee owed to LSI—the contractually agreed to forum for dispute resolution in the LPI GSAs—it was also a completely unauthorized and invalid action taken by Bauer for purely personal purposes.

### D.    LSI Boycotts the Arbitration and Repeatedly Flouts the Arbitrator's Orders

86.    LSI initially participated in the arbitration with LPI-II over the base fee.  On July 31, 2024, LSI submitted its Responses and Counterclaims to the Original Demand in the arbitration.  LSI's counterclaims named NECLPI, Fox, and Collier as arbitration counterclaim defendants.

87.    On September 23, 2024, the LPIs requested leave in the arbitration to file an amended demand (the "Amended Demand"), which leave was subsequently granted with LSI's express acquiescence (as it was then still participating in the arbitration).  The Amended Demand included allegations beyond the base fee dispute asserted in the Original Demand; these allegations related to McConnell's departure from LSI, LSI's breaches of the LPI GSAs and the LPI LLC Agreements, and other Key Person Moral Turpitude Events committed by LSI and Bauer.  Regarding McConnell, the LPIs asserted that Bauer deliberately concealed that McConnell had left LSI to avoid a Key Person Default under the GSAs and avoid forfeiture of LSI's Profits Interest in the LPIs.  In other words— the LPIs brought claims stemming from the exact same facts at issue in this Amended Complaint.

88.    On October 1, 2024, LSI's counsel Matthew Dart (who is also LSI's attorney of record in this case) participated in a scheduling conference call with the arbitrator during which Dart affirmatively agreed that LSI and the LPIs are proper parties to the arbitration and that the LPIs'

claims are arbitrable pursuant to the LPI GSAs and LPI LLC Agreements. LSI's counsel further agreed to a scheduling order governing discovery and setting a hearing date of March 10-14, 2025 (the "Scheduling Order").

89.    But LSI then made an abrupt about-face. On October 18, 2024, LSI and LSP amended their complaint in this Action to include putative derivative claims brought on behalf of the LPIs and claims against Fox and Collier concerning the *exact same conduct* outlined in the LPIs' Amended Demand. In the arbitration, the LPIs seek a declaratory judgment that they had the contractual right to terminate the GSAs, among other relief. In the Amended Complaint, LSI and LSP attempt to convert their defenses to that declaratory judgment claim into tort claims, alleging that Fox and Collier, as managers to the LPIs, breached their fiduciary duties in connection with the termination of the GSAs, among other causes of action. The attempt to bring such claims ignores the clear language in Section 8.5 of the LPI LLC Agreements that Fox and Collier, as "the Management Committee [of LPI or LPI-II,] will not be in breach of [their] duties to the Company [*i.e.*, LPI or LPI-II] by causing the Company to enter into, perform, and *enforce its rights and remedies* under the General Services Agreement" (emphasis added). Further, upon information and belief, Bauer did not obtain McConnell's consent to file the Amended Complaint as required under Section 5.1 of the LSI LLC Agreement given that McConnell was still a nominal "manager" in LSI at that time.

90.    LSI also amended its Responses and Counterclaims in the arbitration (the "LSI Amended Response") to assert that the LPIs' claims were suddenly not arbitrable because the LPIs are supposedly not the proper parties to the dispute (despite LSI's counsel having agreed that they were proper parties just two weeks earlier), and thus there is "no real and present case or controversy" between the LPIs and LSI. The LSI Amended Response dropped the counterclaims against NECLPI and Fox and Collier.

91.    Since October 18, 2024, LSI has repeatedly and flagrantly flouted the arbitrator's orders and boycotted the arbitration altogether.

92.    For instance, the LPIs timely propounded requests for production on LSI in the arbitration pursuant to the Scheduling Order. LSI, in contrast, filed a letter with the arbitrator claiming the arbitration is "moot" and stating that it would not serve any document requests on the LPIs, thus

1    waiving LSI's right to obtain document discovery from the LPIs.

2       93.    LSI has not produced any documents in response to the LPIs' requests for production

3    in the arbitration.  This is despite repeated admonitions from the arbitrator to follow the discovery

4    schedule in the arbitration.  For instance, following a status conference on November 14, 2024, the

5    arbitrator stated that the Scheduling Order would remain in effect.

6       94.    Instead of responding to the LPIs' requests for production, LSI insisted on attempting

7    to file a motion to dismiss.  On November 29, 2024, the day before the deadline for LSI to respond to

8    the LPIs' requests for production in the arbitration pursuant to the Scheduling Order, LSI's counsel

9    requested a briefing schedule on a motion to dismiss.  The LPIs opposed this request in light of the

10   number of key alleged facts in the Amended Demand that remained in dispute.  On December 2, 2024,

11   the arbitrator reiterated that the "scheduling order remains in effect, ***and both sides are obligated to***

12   ***comply with it fully, including with respect to discovery requests***.  The hearing date remains as

13   scheduled" (emphasis added).  The arbitrator also allowed LSI to submit a letter request explaining

14   why the arbitrator should consider a motion to dismiss, and provided time for the LPIs to oppose that

15   request.

16      95.    On December 6, 2024, LSI submitted a letter to the arbitrator in support of its request

17   to file a motion to dismiss the Amended Demand.  LSI argued that it should be permitted to file a

18   motion to dismiss because the LPIs' claims are not based on "any actual controversy."  In making this

19   argument, LSI relied on representations it had made in a November 27, 2024 letter to the LPIs' counsel.

20   That letter included, among other concessions, that LSI: (1) does not contest that the GSAs were

21   terminated on August 8, 2024, and that LSI's personnel do not have authority to access any bank

22   accounts or other property of the LPIs; (2) does not contest that its agency authority was terminated

23   when the GSAs were terminated by the LPIs; (3) does not contest that its Profits Interests were

24   terminated when the GSAs were terminated; and (4) does not seek any further base fee payment in

25   light of the termination of the GSAs.

26      96.    On December 9, 2024, the arbitrator denied LSI's request to file a motion to dismiss

27   and reiterated that the Scheduling Order "remains fully in effect, ***and the parties are required to***

28   ***comply with it***."

97. In a last-ditch effort to avoid the arbitration, on December 23, 2024, LSI's counsel sent a letter to the arbitrator purporting to unilaterally "withdraw" from the arbitration. In the letter, LSI *again* reiterated its legally incorrect position that there is no actual case or controversy at issue in the arbitration—even though the arbitrator had just rejected LSI's attempt to file a motion to dismiss premised on that argument—and took issue with what LSI perceived to be the arbitrator's insufficient explanation for her denial of LSI's request to file a motion to dismiss. LSI stated it would not attend any further discovery conferences, events, or hearings, and "will not participate in discovery matters."

98. On January 3, 2025, the arbitrator issued an order affirming that the claims set forth in the Amended Demand present disputes under the GSAs, and that arbitration is the contractually required forum for resolution of those disputes. The arbitrator also noted that "***LPI is entitled to discovery, and LSI is obligated to respond***," and that if LSI fails to do so, ***"LPI may move for such sanctions as may be warranted by whatever effects such failure may have on LPI's ability to prove its claims"*** (emphasis added). The arbitrator further held that the hearing would "proceed as scheduled, whether LSI appears or not."

99. On January 13, 2025, the LPIs served deposition notices on LSI's counsel noticing the depositions of Bauer and LSI employee Sukhraj Sandhu. LSI never responded.

**E.    LSI Files a Motion for Preliminary Injunction to Circumvent the Arbitrator's Orders**

100. Then incredibly, on February 5, 2025, just four weeks before the arbitration hearing (and four months after filing the Amended Complaint), Bauer unilaterally caused LSI and LSP to file a motion for preliminary injunction against Fox and Collier in this Action. LSI and LSP seek three forms of injunctive relief: (1) restraining the forfeiture of their profits and membership interests in the LPIs, which had already occurred at the absolute latest by August 8, 2024 (six months before LSI filed the motion for preliminary injunction); (2) restraining Fox and Collier from furthering an unidentified "fraudulent scheme"—presumably, the arbitration (the motion does not specify); and (3) most egregiously, forcing Fox and Collier, as managers of the LPIs, to discharge Ropes from representing the ***LPIs generally*** based on a fabricated conflict of interest.

1    101.    Ropes has represented the LPIs in the arbitration since July 2024, as alleged in the

2    Amended Complaint.    Bauer and LSI were aware that Ropes was representing the LPIs in the

3    arbitration no later than August 2024.

4    102.    The last form of requested relief in particular gave LSI's and Bauer's game away.

5    Ropes has never represented LSI or Bauer and, outside of the underlying arbitration, a related

6    arbitration to obtain the LPIs' client files from Sunridge Legal (as described further herein), and

7    associated matters, has not represented the LPIs in any other capacity.    Thus, the **_only_** injury that LSI

8    and LSP would suffer from Ropes' continued representation of the LPIs was the occurrence of the

9    arbitration hearing.

10    103.    Because LSI had deliberately waived any discovery rights against the LPIs in the

11    arbitration and routinely failed to follow the arbitrator's orders, LSI would have little evidence to

12    present at the hearing and would be scrambling to review and respond to the LPIs' pre-trial

13    submissions and evidence.    Bauer and his counsel were also no doubt aware that the arbitrators'

14    findings of fact can have a preclusive effect on subsequent federal proceedings like this one.    The

15    motion for preliminary injunction was thus nothing more than a baldfaced attempt to have this Court

16    either (1) litigate the issues underlying the arbitration or (2) circumvent the arbitrator's order that the

17    hearing would occur on March 10 regardless of LSI's appearance by **_removing the LPIs' counsel in_**

18    **_that arbitration_** just **_weeks_** in advance of the arbitration hearing.

19    104.    Under JAMS Rule 26(a), JAMS arbitration proceedings are generally kept

20    confidential.    The motion for preliminary injunction attached numerous emails that were very clearly

21    responsive to the LPIs' discovery requests in the arbitration and should have been—but were not—

22    produced.    The filing of these unsealed emails on the public docket was designed to publicize what

23    should have been put to confidential arbitration in a public forum, using the tools of this Court's

24    process to intentionally drag Fox and Collier's names through the mud.

25    105.    What is more, upon information and belief, Bauer caused LSI's counsel to file this

26    Action and the motion for preliminary injunction without McConnell's consent.    LSI therefore did

27    not even have appropriate authorization to file its pleadings and motion for preliminary injunction

28    under Section 5.1(c) of the LSI LLC Agreement.

106.    On February 13, 2025, the LPIs filed a motion to preclude LSI from presenting any affirmative evidence at the arbitration hearing as a sanction for their failure to respond to any discovery requests under JAMS Rule 29.  The arbitrator ultimately granted the LPIs' motion, although the arbitrator allowed LSI the opportunity to cross-examine the LPIs' witnesses at the hearing either in person or via videoconference.

107.    On February 14, 2025, the LPIs exchanged pre-hearing witness and exhibit lists with LSI.  LSI never responded and did not propound its own witnesses or exhibits.

108.    On February 24, 2025, the LPIs submitted their witness and exhibit lists to the arbitrator.  LSI did not.

109.    On February 26, 2025, the case administrator in the arbitration posted a notice that LSI had never paid its arbitration fees.  Pursuant to Section 9(d) of the LPI GSAs, LSI and the LPIs were required to pay for the arbitrator's services "in equal measure."  The LPIs advanced LSI's portion of the arbitration fee—$26,100—so that the hearing would not be cancelled.

110.    After months of open refusal to adhere to the arbitrator's orders, respond to discovery requests, or attend conferences in the arbitration, Bauer submitted a "pre-hearing declaration" on February 28, 2025, in which he asked the arbitrator to consider his preliminary injunction filings as evidence in the arbitration.  In the preamble, Bauer announced for the first time that LSI lacked the resources to fully litigate the arbitration due to McConnell's rejection of a capital call of all LSI members.  Bauer did not explain how LSI was able to fund the filing of pleadings and an extensive motion for preliminary injunction in this Action but, just several weeks later, could not afford to litigate the underlying contractual claims concerning the validity of the termination of the LPI GSAs in the first-filed forum.  In addition, LSI's purported capital call to all of its members was never sent to NECLPI, who has a 20% ownership interest in LSI.

111.    In any event, the arbitrator rejected Bauer's eleventh-hour pre-hearing declaration as improper evidence.  Nonetheless, the arbitrator gave LSI's counsel the opportunity to participate in the hearing (held in person) via videoconference, even though he did not request such an accommodation, and provided him with the dial-in information.

112.    The arbitration hearing was held on March 10 and 11, 2025.  LSI did not attend any portion of it.  The LPIs informed LSI which witnesses would be testifying on which days so that LSI's counsel could attend for cross examination.  The LPIs' counsel even sent LSI's counsel an email to notify him precisely when McConnell's direct affidavit testimony was being admitted into evidence so that he could dial into the videoconference to object.  LSI's counsel did not take any of these opportunities to appear at the arbitration hearing.

113.    The LPIs anticipate the arbitrator's award will be forthcoming imminently.

**F.    Following Termination of the GSAs, LSI and Bauer Take Concrete and Deliberate Steps to Interfere with the LPIs' Contractual Relationships with Their Investees, a Prospective Buyer, and Former Counsel**

114.    While LSI completely abdicated its contractual duty to comply with the arbitration provisions of the LPI GSAs in good faith, LSI and Bauer have been extremely busy attempting to prevent the LPIs from successfully managing their investments, including by instructing investee entities not to speak with the LPIs' managers; executing wire transfers from the LPIs' bank accounts after the LPIs explicitly terminated LSI's agency authority; instructing a prospective buyer of the LPIs' entire asset portfolio not to provide the LPIs with any information regarding that sale; and instructing the LPIs' former legal counsel not to provide the LPIs with their client files.

**1.    LSI and Bauer Interfere with the LPIs' Relationships with Investees**

115.    The day after the LPIs sent the Notice of Termination, LSI and LSP responded to the detailed Notice by sending a half-page response from its counsel on August 9, 2024.

116.    The response simply stated, without explanation, that the Notice was "premised on false statements of fact and misinterpretation of contractual provisions."  As such, LSI represented that it would "reject said notice as factually unsupported and legally ineffective." (emphasis omitted). The response further noted, "We view your actions in connection with the purported Notice of Termination as further evidence of your breaches and wrongful conduct."  Again, the response did not explain how exercising clearly delineated termination rights under the relevant contracts was "evidence" of breach or wrongful conduct.

117.    LSI and Bauer have ignored the August 8, 2024 Notice and continued to hold themselves out to multiple third parties as representing the LPIs in connection with their investments. These third parties include the companies in which the LPIs have invested, a prospective buyer, the bank holding the LPIs' accounts, and the LPIs' former counsel.

118.    Following the termination of the GSAs, the LPIs stepped into the shoes of LSI for purposes of covering the Services previously provided under the GSAs.  The LPIs now perform the day-to-day investment and administrative services of the LPIs that LSI used to perform.

119.    When the LPIs terminated the GSAs on August 8, 2024, the LPIs' managers sent notices to investees to inform them that LSI would no longer be providing Services pursuant to the GSA and that the LPIs' had terminated LSI's agency authority.

120.    The LPIs' managers have since learned that Bauer and other LSI employees, acting on Bauer's instruction, contacted investees immediately thereafter and instructed investees not to communicate with the LPIs' managers.  Upon information and belief, Bauer and these LSI employees also told investees that the LPIs' managers did not have the authority to interact with or manage the LPIs' investments and threatened the investees by emphasizing their contractual confidentiality obligations.

121.    These misrepresentations by Bauer and LSI's employees to LPIs' investees were inaccurate and caused significant delays and disruption in the LPIs' ability to communicate with investees and adequately fund their capital needs.

122.    For instance, the LPIs' managers provided initial notice of the LPIs' termination of their relationship with LSI to an investee who develops solar, wind, and other energy storage solutions ("Investment C") in August 2024.  Due to the interference of Bauer and LSI's employees, the LPIs were not able to establish a channel of communication with Investment C until *November 2024*, three months later.

123.    Plaintiffs' filings in this litigation suggest that LSI and Bauer continue to be in contact with the LPIs' investees and hold themselves out as representing the LPIs in connection with their investments.  For example, the Amended Complaint admits that in August and September 2024, the LPIs' Management Committees had to "direct[] LSI to cease communicating with the utility holding

an interconnection deposit for another LPI investment."  Dkt. 4-9 ¶ 141.  It further alleges that "the Management Committee has also provided an additional capital contribution to Investment A in early October 2024."  *Id.* ¶ 142.  LSI could not have known of these events were it not in communication with representatives from these investee companies.

124.    Moreover, Bauer's own statements in this action suggest that he is still holding himself out as authorized to represent the LPIs in connection with their investments.  His fact declaration in support of LSI and LSP's February 5, 2025 motion for preliminary injunction repeatedly references information he has allegedly gathered from investee companies regarding investments in the LPIs.  *See, e.g.*, Dkt. 49-13 *id.* ¶ 57 ("The Managers have informed several companies in which the LPIs are investors that the LPIs want to sell their interests or be bought out by the companies.  These are small private companies for which there is no established trading market for their equity or debt."); ¶ 58 ("I have been told that the Managers have made statements to investee companies to the effect that they will be cheaper to buy out now that LSI is no longer involved . . . ."); *id.* ¶ 59 ("[T]he Managers' message to investee companies seems to be . . . .").  And, like LSI, Bauer contends that "[a]t no point pre- or post termination have the Managers reached out to LSI seeking information, context or advice on investments that LSI spent the last four years building," *id.* ¶ 56—ignoring the fact that the LPIs have terminated their relationship with LSI and with Bauer himself.

125.    Upon information and belief, and informed by these allegations, LSI and Bauer continue to hold themselves out as authorized to represent the LPIs in connection with their investments despite knowledge that their authority to do so has been terminated.  The apparent goal of this conduct has been to undermine the ability of the LPIs—and specifically of Fox and Collier, as managers of the LPIs—to manage their portfolio of investments without LSI operating as a service provider.

126.    LSI's and Bauer's actions in holding themselves out as authorized to represent the LPIs have directly harmed the LPIs' abilities to interface with their investees and obtain information necessary regarding their investments.  LSI and Bauer's interference has also harmed Fox and Collier, as managers of the LPIs, by causing them to expend additional time and expense to gather information from and coordinate with investees following the termination of the GSAs.

**2.    LSI and Bauer Execute Wires from the LPIs' Bank Accounts Without Authority or Permission**

127.    In addition to interfering with the LPIs' contractual relationships with investees, LSI and Bauer continued to initiate wire transfers from the LPIs' and their bank (the "Bank") after the LPIs terminated LSI's agency authority, and without authorization from the LPIs' managers.  In other words, LSI, as service provider, attempted to take over the LPIs' bank accounts and distribute funds from those accounts even when LSI *no longer had any relationship at all* with the LPIs.

128.    As part of the Services that LSI provided to the LPIs under the LPI GSAs, LSI was authorized to execute wire transfers on behalf of the LPIs.  The LPIs therefore shared access to their bank accounts at the Bank with Bauer and other specified LSI employees.

129.    On August 8, 2024, following the LPIs' termination of the GSAs, the LPIs' counsel sent notice of the termination to the Bank.  The notice stated that the GSAs were the sole basis for LSI's access to the LPIs' accounts, and that in light of the revocation of LSI's authority in connection with those accounts, the Bank must terminate LSI employees' access to the LPIs' accounts.

130.    The Bank, however, did not terminate the LSI employees' access immediately.  It took several weeks for the Bank to gather the necessary authorizations to terminate the LSI employees' access to the LPIs' accounts.  All the while, upon information and belief, LSI was claiming to the Bank that LSI was the rightful controller of the LPIs' bank accounts.

131.    While the Bank gathered the necessary authorizations to terminate LSI's access to the LPIs' bank accounts, on or around August 15, 2024, LSI initiated six wire transfers from LPI-II's bank account at the Bank.  On August 16, 2024, those wires were completed.

132.    LSI's commandeering of LPI-II's bank account was a deliberate act of interference.  In order to initiate the wires, an LSI employee began the wire transfer process electronically.  However, upon information and belief, an individual at the Bank then called or emailed Bauer for authorization to release the wires.  Bauer therefore intentionally caused LSI to initiate and execute wire transfers from LPI-II's bank accounts, knowing that LPI-II had already terminated his and LSI's agency authority and did not consent to Bauer or LSI authorizing those wires.

133.    Upon information and belief, LSI was able to continue initiating and authorizing wire

transfers from the LPIs' accounts because Bauer falsely told the Bank that LSI had control rights over the LPIs' bank accounts. Bauer's misrepresentations purposely created confusion as to which entity—LSI or the LPIs—had the authority to execute transactions under the GSAs and otherwise control the LPIs' bank accounts.

134. Because of Bauer's misrepresentations to the Bank, the LPIs' managers were effectively frozen out of their bank accounts as the Bank sorted through inconsistent claims with respect to which entity was entitled to distribute funds from those accounts. This interfered with the LPIs' ability to fund capital requirements of their investees. As a result, the LPIs were forced to fund capital requirements by distributing funds from NECLPIs' accounts, effectively forcing NECLPI to make additional capital contributions to the LPIs.

135. LSI's access to the LPIs' bank accounts at the Bank was not terminated until September 18, 2024, over one month after the GSAs were terminated. LSI's counsel has since admitted in a December 6, 2024 arbitration submission that the GSAs were terminated on August 8, 2024, at which time LSI's agency authority was terminated, and that LSI's personnel no longer have the authority to access any of the LPIs' bank accounts.

### 3. LSI and Bauer Interfere with the LPIs' Prospective Sale to a Third Party

136. Bauer has also intentionally interfered with the LPIs' potential transaction with a prospective buyer of the LPIs' asset portfolio.

137. On or around December 13, 2023, the LPIs' managers learned that a fully-executed term sheet was uploaded to the data room shared between the LPIs and LSI. The term sheet's purported signatories were the prospective buyer, LSI, LPI, and LPI-II, with Bauer improperly signing as an "Authorized Person on behalf of each of" LPI and LPI-II. However, Bauer could not have had the authorization he claimed because the Management Committee for each LPI was wholly unaware of such transaction or negotiations. The term sheet contemplated the buyer's purchase of all assets of the LPIs, yet it was negotiated without any involvement of or consent from the LPIs whatsoever. Likewise, NECLPI was a 98% and 99% owner of LPI and LPI-II, respectively, and yet was kept in the dark about the negotiations. The GSAs did not give LSI the authority to sell all or substantially

all of the LPIs' investments.

138.    The managers of LPIs (Fox and Collier) were shocked that LSI would negotiate the sale of the entirety of the LPIs' assets without any notice whatsoever to the LPIs or NECLPI. This is especially so because, under Section 8.6 of the LPI LLC Agreements, the LPIs' managers were required to obtain NECLPI's consent to sell all or substantially all of the LPIs' assets—which consent had not been obtained as the LPIs were not even aware of any potential sale.

139.    Immediately realizing the impropriety of the unauthorized sale negotiations, on December 15, 2023, Fox sent Bauer and McConnell an e-mail acknowledging that he had seen the executed term sheet and voicing displeasure with LSI's actions:

> Late Wednesday night (12/13/23) the attached [Buyer] term sheet was uploaded to the data room. To say we were surprised is to put it mildly. The term sheet references an NDA with [Buyer] going back to Aug. 14 – meaning that you've been in discussions with [Buyer] (and maybe others?) for several months with no disclosure to the LPIs regarding a possible bundled sale of both LPI portfolios. How could keeping that process secret from the LPIs be consistent with Good Industry Practice, or the obligation to make sure that all materials and information delivered as part of the Services are complete and not misleading? . . . Brad – you called me on November 2nd, why didn't you tell me about the [Buyer] discussions then, or any other time? NECLPI has over $125 million invested across the LPIs, LSI is a service provider to the LPIs, and if you were going to work on this kind of unexpected exit of both portfolios and present portfolio valuations and rationales to the marketplace – and then negotiate responses - why would you not give us a heads up?

140.    Although the term sheet stated that the Bauer (on behalf of LSI and the LPIs) and the buyer had entered into an NDA in August 2023, it was later discovered from Sunridge Legal's billing records that LSI had been in conversations with the prospective buyer since at least April 2023.

141.    Despite the LPI Management Committees' and NECLPI's frustration with LSI's secretive actions, the LPIs' managers did not reject the deal outright. Instead, the managers requested further information from LSI; they also stated that the "LPI management committees remain committed to acting in the best interest of" the LPIs and would carefully assess the potential sale transaction.

142.    Nonetheless, while LSI was still a service provider under the GSAs, LSI took every step in its power to block Fox and Collier, as managers of the LPIs, from obtaining any information about the prospective transaction. For approximately six months after the LPIs' discovered the

executed term sheet on December 13, 2023, LSI refused to share any transaction-related documentation with the LPIs or NECLPI.

143.    For example, on May 1, 2024, a call was arranged among NECLPI, the LPIs' managers, and LSI personnel and counsel regarding the sale transaction, among other topics.  During that call, Fox asked Bauer and attorney McNellis, who was purporting to represent LSI and the LPIs in the sale transaction, to share all information, communications, and work product shared with the prospective buyer.  Bauer and McNellis refused, stating that they could not share information concerning the transaction with the LPIs' managers because only LSI had signed an NDA with the prospective buyer.  Fox explained that NECLPI owned 20% of LSI and therefore LSI could share the NDA protected information with NECLPI.  Attorney McNellis then quickly pivoted and stated that Buyer had competitive concerns about sharing transaction information with NEC and NEC funds. Fox explained that point's absurdity, reminding Bauer and McNellis that the LPIs would be the *sellers* in any prospective transaction, not the buyer's competitors.

144.    In a May 6, 2024 email from attorney McNellis to Fox, McNellis reiterated this position in writing and stated that the prospective buyer had concerns with sharing information with NEC via the LPIs' managers (Fox and Collier) because the buyer viewed NEC as a competitor.  When Fox pointed out that NEC could not pursue an acquisition of the LPIs' assets for regulatory and practical reasons, McNellis walked his statement back, indicating that the prospective buyer was generally unwilling to share any information about potential transactions with institutional sellers. This is a nonsensical statement implying that the prospective buyer was unwilling to provide *any* institutional seller with *any* information about the sale of the institutional sellers' own assets as a general matter, which would require all institutional sellers doing business with the prospective buyer to enter the sale transaction blind.

145.    Bauer and attorney McNellis also lied about the existence of a transaction data room for the potential sale, representing on at least two phone calls in June 2024 that one did not exist when McNellis had been billing the LPIs for populating and reviewing a transaction data room since at least January 2024 (which invoices the LPIs paid).

146.    Following the termination of the GSAs, Bauer continued his campaign to prevent the

LPIs' managers from obtaining any information about the sale of the LPIs' assets to the prospective buyer—information including, for example, financial models and valuations used to derive the purchase price reflected in the term sheet, or drafts of the asset purchase agreement. Upon information and belief, Bauer contacted the lead negotiator at the prospective buyer and instructed him not to provide any information or documents to the LPIs' managers concerning the proposed sale.

147.    Indeed, it was not until October 2024 that the prospective buyer sent the LPIs' managers the draft asset purchase agreement previously provided to the prospective buyer by LSI.

148.    LSI's and Bauer's repeated refusal to provide the LPIs with pertinent information about the prospective sale transaction—including any financial modeling or valuations, or even the draft asset purchase agreement—interfered with the LPIs' ability to pursue the sale transaction. Without that information, the LPIs' managers and NECLPI could not make a determination regarding whether the sale transaction was for a fair price and in the best interests of the LPIs, nor could they or NECLPI ascertain the veracity of representations that they, as sellers, would be required to make in the transaction.

149.    To this day, the LPIs' managers do not have the necessary information to assess the fairness of the proposed sale of the LPIs' asset portfolio, and the sale transaction remains in limbo.

### 4.    LSI, LSP, and Bauer Interfere with the LPIs' Ability to Obtain Necessary Work Product from Their Former Counsel to Oversee Their Investments

150.    Further, LSI, LSP, and Bauer have intentionally interfered with the LPIs' ability to obtain their client files from the LPIs' former counsel, McNellis and Sunridge Legal.

151.    From some time in 2020 through September 13, 2024, LSI, LSP, and the LPIs engaged attorney McNellis and his successive law firms in a joint representation, involving McNellis performing legal work associated with the Services LSI provided to the LPIs pursuant to the GSAs. In that role, McNellis negotiated and structured investment documentation, and has communicated directly with investees. As discussed above, McNellis also purported to represent the LPIs in connection with the sale of the LPIs' entire portfolio. McNellis's work product and communications are thus critical to the day-to-day maintenance and administration of the LPIs' investment portfolio—

a role that the LPIs' managers now perform following the termination of the GSAs.

152.    The joint representation between LSI, LSP, and the LPIs was governed by successive engagement letters, the latest of which was dated May 22, 2023.

153.    Due to the nature of a joint representation, each party to the representation has no privilege or confidentiality claims over information in the files of the entities' joint lawyer.  *See Anten v. Superior Court*, 233 Cal. App. 4th 1254, 1259 (2015) ("[I]n a joint client situation, confidences are necessarily disclosed." (quoting *Zador Corp. v. Kwan*, 31 Cal. App. 4th 1285, 1294 (1995))).  The LPIs are thus entitled to a copy of all documents in McNellis's files relating to the provision of Services to the LPIs under the GSAs, including the potential sale of the LPIs' portfolio of assets.  McNellis' legal services were billed to and paid for by the LPIs—and more precisely, NECLPI, as LSP did not contribute capital for legal services.

154.    On August 27, 2024, the LPIs, through their counsel, sent a letter to McNellis informing him that the LPIs had terminated the GSAs and LSI's agency authority, and asking McNellis to cease work with LSI on any matters being handled by Sunridge Legal on the LPIs' behalf.  The LPIs also demanded that McNellis and his law firm provide the LPIs with their full client file.

155.    The LPIs, through their managers and through counsel, reiterated their request for the full client file in writing on September 13, 2024, when the LPIs terminated McNellis's representation of the LPIs.

156.    Nonetheless, McNellis has refused to return anything close to a complete client file to the LPIs, providing only some execution versions of documents with certain of the LPIs' investees.  To date, McNellis has not provided the LPIs with any responsive work product or communications with the LPIs' investees or the prospective buyer in the aforementioned sale transaction.

157.    McNellis's former law firm, Clean Energy Counsel, has taken a similar stance, refusing to provide any client files at all to the LPIs (even non-privileged ones).

158.    The LPIs have a crucial need for immediate access to their client files.  The files include, *inter alia*, the communications that attorney McNellis and LSI had on the LPIs' behalf (as their then-agent) with the several companies in which the LPIs are still invested.  With the GSAs now terminated, it is imperative for the LPIs to have access to the full record of the prior interactions that

McNellis and LSI undertook with the investee companies so that it can successfully manage those investments.

159.    To obtain their full client files, the LPIs were forced to send a notice of arbitration to McNellis and Sunridge Legal on November 27, 2024 (the "Sunridge Arbitration"), pursuant to the mandatory arbitration clause in Sunridge Legal's engagement letter.  According to McNellis's counsel in the Sunridge Arbitration, LSI has provided written objections to McNellis instructing McNellis not to provide the LPIs with their full client file.

160.    The Sunridge Arbitration is currently in its early stages.  The full costs associated with LSI's objection to providing the LPIs' with their client file thus remains unknown.  To date, however, McNellis has refused to pay his portion of the arbitration fees, and the LPIs have had to advance those fees to ensure that the LPIs' claim will be heard.

## CAUSES OF ACTION

### COUNT I

**Intentional Interference with Contractual Relations - Investees**

**(LPIs v. LSI and Bauer)**

161.    Counterclaim Plaintiffs Fox, Collier, and the LPIs incorporate by reference Paragraphs 1 through 160 as if fully set forth herein.

162.    As a threshold matter, Fox and Collier, as managers of the LPIs, have the sole contractual authority to pursue claims on behalf of the LPIs under Section 8.2(i) of the LPI LLC Agreements.   Fox and Collier may therefore cause the LPIs to bring Counterclaims in this Action.

163.    The LPIs are improperly named as Plaintiffs in the Amended Complaint.  The LPIs are, in fact, nominal defendants under Delaware law, which governs the internal affairs of the LPIs.  *See* 2 Corp & Commercial Practice in DE Court of Chancery § 11.06(e) (2025) ("The general rule in derivative litigation is that the entity on whose behalf plaintiff asserts a claim is an indispensable party.  Accordingly, failure to join the entity as a *nominal defendant* will result in a dismissal of the entire action." (emphasis added) (citing *Sternberg v. O'Neil*, 550 A.2d 1105, 1124 (Del. 1988), and *Levine v. Milton*, 219 A.2d 145, 146–47 (Del. Ch. 1966))).

164.    A nominal defendant may bring a counterclaim against a named plaintiff when the

relief requested is "individual and 'by-passes' the corporation." *In re Arthur Treacher's Fish & Chips of Ft. Lauderdale, Inc*., 386 A.2d 1162, 1165 (Del. Ch. 1978); *see also Faunus Grp. Int'l, Inc. v. Ramsoondar*, No. 13-cv-6927 (JSR), 2015 WL 4557132, at *4 (S.D.N.Y. July 22, 2015) (recognizing that a defendant may assert a counterclaim in a different capacity from the one in which the defendant was sued if doing so advances principles of equity and judicial economy, or if the counterclaim would benefit both capacities of the defendant asserting the claim).

165.    Here, the relief requested in the Amended Complaint by LSI and LSP bypasses the LPIs.  Although the allegations concerning damages are vague, the Amended Complaint focuses on the forfeiture of LSI's Profits Interests (which it incorrectly calls its "carried interest") and calling of LSP's membership interests in the LPIs—both of which alleged injuries are unique to LSI and LSP.

166.    The LPIs entered into contracts with investee companies in the renewable energy sector in order to invest in those companies.

167.    As the former servicer of the LPIs, LSI and Bauer are aware of the contractual relationship between the LPIs and each of their investees, and the manner in which those investments are managed.  Bauer signed many of these contracts on behalf of the LPIs.

168.    Upon the LPIs' proper termination of the GSAs on August 8, 2024, Bauer and LSI no longer had authority to operate as the LPIs' service provider.

169.    Despite this, LSI, through Bauer, has continued to intentionally communicate and coordinate with the LPIs' investees regarding the LPIs' investments.  LSI, through Bauer, has explicitly instructed investees not to speak with the LPIs' managers, Fox and Collier.  Upon information and belief, Bauer and other LSI employees also told investees that the LPIs' managers did not have the authority to interact with or manage the LPIs' investments and threatened the investees by emphasizing their contractual confidentiality obligations.

170.    Following the termination of the GSAs, LSI also executed wire transfers from LPI-II's bank account without notice to or authorization from the LPIs' managers.  LSI's actions caused the Bank to effectively freeze the LPIs' bank accounts, which interfered with the LPIs' ability to fund capital calls for its investments.  LSI has since admitted in arbitration filings that its agency authority and the GSAs were terminated as of August 8, 2024, meaning it knew at the time it executed the wires

1    that it did not have the authority to do so.

2    171.    Upon information and belief and as indicated by filings in this Action, the purpose of

3    LSI's and Bauer's contact with investees is to undermine the LPIs' ability to manage their investments

4    without LSI as the LPIs' service provider.

5    172.    As a result of this intentional interference by Bauer and by LSI, contact between the

6    LPIs' managers and investee entities ceased for months, causing a disruption to the LPIs' contractual

7    relationship with its investees.

8    173.    LSI and Bauer knew that, by instructing investees not to speak with the LPIs and by

9    threatening them, this disruption to the LPIs' contractual relationship with investees was substantially

10    certain to occur.

11    174.    The intentional interference by Bauer and by LSI, through Bauer, has damaged the

12    LPIs by causing them to expend additional time and money to manage the LPIs' investments in the

13    investees.

14    175.    LSI and Bauer's interference was the only reason that investees would not

15    communicate with Fox and Collier, as the LPIs' managers, during this period, and thus was a

16    substantial factor in causing the LPIs' harm.

17    176.    The foregoing actions were taken with malice, fraud, and/or oppression, thus entitling

18    the LPIs to punitive damages.

19    ## COUNT II

20    **Intentional Interference with Contractual Relations – Sunridge Legal**

21    **(LPIs v. LSI and Bauer)**

22    177.    Counterclaim Plaintiffs Fox, Collier, and the LPIs incorporate by reference Paragraphs

23    1 through 176 as if fully set forth herein.

24    178.    The LPIs entered into a contract with their former counsel, Connor McNellis, to engage

25    him jointly to represent them in connection with LSI's provision of Services under the LPI GSAs.

26    McNellis is a founding partner of Sunridge Legal and previously worked for Clean Energy Counsel,

27    among other law firms.

28    179.    The LPIs, LSI, and LSP engaged McNellis in a joint representation.  Due to the nature

of a joint representation, each party to the representation has no privilege or confidentiality claims over information in the files of the entities' joint lawyer. *See Anten v. Superior Court*, 233 Cal. App. 4th 1254, 1259 (2015) ("[I]n a joint client situation, confidences are necessarily disclosed." (quoting *Zador Corp. v. Kwan*, 31 Cal. App. 4th 1285, 1294 (1995))).  The LPIs are thus entitled to a copy of all documents in McNellis's files relating to the provision of Services to the LPIs under the GSAs, including the potential sale of the LPIs' portfolio assets.  These legal services were billed to and paid for by the LPIs—and more precisely, NECLPI, as LSP did not contribute capital for legal services.

180.    LSI and Bauer are aware of the contractual relationship between the LPIs and McNellis given that LSI and LSP, of which Bauer is a member and manager, are members of the contemplated joint representation.  Bauer also signed the engagement letter on behalf LSI, LSP, and the LPIs.

181.    On September 13, 2024, the LPIs terminated their relationship with McNellis.  Upon termination of a client relationship, a client is entitled to the return of their full client file.  S*ee Taylor v. Cnty of L.A.*, 50 Cal. App. 5th 205, 212 (2020) (citing Cal. R. Prof. Conduct 1.16(e)(1)); *see also Kallen v. Delug*, 157 Cal. App. 3d 940, 950 (1984) (noting that retaining a client's case files after discharge breaches attorney's duty, as attorney's work product belonged absolutely to client).

182.    Bauer, who is an attorney admitted to the State Bar of California, is also aware that under California law, one client in a joint representation is entitled to all files generated in connection with that joint representation, and that no claim of privilege may lie as to one party of the joint representation against another.

183.    Nonetheless, upon information and belief, LSI, through Bauer, has instructed McNellis, Sunridge Legal, and Clean Energy Counsel not to provide the LPIs with their full client file upon termination of McNellis as attorney for the LPIs.

184.    Upon information and belief, the purpose of this instruction is to undermine the LPIs' ability to manage their investments without LSI as the LPIs' service provider, by intentionally depriving the LPIs of their counsel's work product and communications with respect to the negotiation, execution, and administration of the LPIs' investments.

185.    LSI and Bauer knew that, by instructing McNellis not to share the full joint representation client file with the LPIs, the disruption to the contractual relationship between

McNellis and the LPIs was substantially certain to occur.

186.    The intentional interference by LSI and Bauer has damaged the LPIs by causing them to initiate the Sunridge Arbitration against McNellis and Sunridge.  The Sunridge Arbitration has forced the LPIs to expend legal resources to obtain their client files that would otherwise already be in their possession if LSI, through Bauer, had not instructed McNellis, Sunridge Legal, and Clean Energy Counsel to withhold their files from the LPIs.

187.    Bauer's instruction to McNellis to withhold the full client file from the LPIs was a substantial factor causing the disruption of the contractual (and fiduciary) relationship between McNellis and the LPIs.

188.    The foregoing actions were taken with malice, fraud, and/or oppression, thus entitling the LPIs to punitive damages.

## COUNT III

### Intentional Interference with Prospective Economic Relations – Sale Transaction

### (LPIs v. LSI and Bauer)

189.    Counterclaim Plaintiffs Fox, Collier, and the LPIs incorporate by reference Paragraphs 1 through 188 as if fully set forth herein.

190.    By virtue of the December 12, 2023 term sheet governing the proposed sale of the LPIs' entire portfolio, an economic relationship between the LPIs and the prospective buyer of their assets existed—albeit an unauthorized one created through dishonest means—with the probability of future economic benefit to the LPIs.

191.    LSI, through Bauer, knew of that prospective economic relationship because LSI, through Bauer, secretly negotiated the sale terms behind the LPIs' managers backs for many months, starting in as early as April 2023.  Bauer executed the term sheet on behalf of the LPIs.

192.    Upon the LPIs' proper termination of the GSAs on August 8, 2024, Bauer and LSI no longer had authority to operate as the LPIs' service provider. And while Bauer and LSI never had the unilateral authority to negotiate the sale of the LPIs' entire asset portfolio, any authority Bauer and LSI would have had to hold themselves out as agents of the LPIs ceased on August 8, 2024.

193.    Upon information and belief, following the termination of the GSAs, LSI, through

Bauer, nonetheless instructed the prospective buyer not to communicate with the LPIs' managers or share any information regarding the prospective sale—including, for example, financial modeling or valuations, items that would be integral to assess the fairness of the transaction.

194.    LSI's and Bauer's actions disrupted any potential transaction between the LPIs and the prospective buyer.  Without all of the relevant transactional information, including information regarding the fundamental economics of the transaction, the LPIs have not been able to seriously consider moving forward with the transaction.

195.    LSI's and Bauer's disruption of the economic relationship between the prospective buyer and the LPIs has caused the LPIs to lose profits associated with the potential sale.

196.    LSI's and Bauer's actions were a substantial factor in causing the LPIs' harm.

197.    The foregoing actions were taken with malice, fraud and/or oppression, thus entitling the LPIs to punitive damages.

## COUNT IV

### Abuse of Process

### (Fox and Collier v. LSI and Bauer)

198.    Counterclaim Plaintiffs Fox, Collier, and the LPIs incorporate by reference Paragraphs 1 through 197 as if fully set forth herein.

199.    In this action, LSI, at Bauer's direction, has filed a frivolous lawsuit that LSI is unauthorized to pursue under the LSI LLC Agreement, and which is based on the same conduct underlying the first-filed arbitration between LPI-II and LSI, in which LPI joined in September 2023 (prior to LSI and LSP's filing of the Amended Complaint).  Pursuant to Section 5.1(c) of the LSI LLC Agreement, the consent of all LSI managers is required to take any action when LSI has only two managers.  Bauer and McConnell were the only two managers of LSI as of July 16, 2024, when the Original Complaint and Amended Complaint were filed.

200.    Although McConnell is a manager of LSI in name only, his consent was required to pursue this Action.  Upon information and belief, Bauer did not obtain McConnell's consent to initiate this Action or file the Amended Complaint—which names as defendants LSI member NECLPI's investment manager (Victory) and two of the persons authorized to act on behalf of NECLPI (Fox

se case

1  and Collier).  The lawsuit is therefore a knowingly invalid overreach by Bauer of managerial authority

2  under the LSI LLC Agreement.

3      201.    Moreover, LSI, at Bauer's direction, has improperly used the tools of this Court by

4  filing a motion for preliminary injunction on the eve of a week-long hearing in an underlying

5  arbitration that seeks to cause Fox and Collier to discharge the LPIs' counsel in that arbitration.

6      202.    Upon information and belief, Bauer again caused LSI to file this motion without the

7  requisite approval from McConnell, making it an unauthorized and invalid motion.

8      203.    LSI filed the motion for preliminary injunction while simultaneously boycotting the

9  underlying arbitration, even though it originally admitted its claims were arbitrable.

10     204.    LSI and Bauer intentionally filed their motion for preliminary injunction in this Action

11 to frustrate the arbitration proceedings, to circumvent the orders of the arbitrator in the underlying

12 arbitration (through which the arbitrator held that the dispute was arbitrable and a hearing would occur

13 whether LSI attended or not), and to post materials that would otherwise have been kept confidential

14 in a public forum.  These are all improper uses of this Court's process.

15     205.    This type of tactical, bad-faith use of the tools of the judicial process amounts to an

16 abuse of this Court's process.

17     206.    Fox and Collier were harmed by LSI's and Bauer's improper use of the Court's process

18 by having to expend significant legal fees in defending against this lawsuit and the motion for

19 preliminary injunction.  They have also faced reputational losses, with damages that have yet to be

20 quantified as the harm is ongoing.

21     207.    The filing of this lawsuit without requisite authorization, and subsequent motion for

22 preliminary injunction against Fox and Collier, was a substantial factor in causing Fox and Collier to

23 expend significant legal fees.

24                                    **PRAYER FOR RELIEF**

25     WHEREFORE, Defendants and Counterclaim Plaintiffs Fox and Collier, and Nominal

26 Defendants and Counterclaim Plaintiffs LPI and LPI-II, pray for judgment in their favor, and against

27 Plaintiff and Counterclaim Defendant LSI, Plaintiff LSP, and Counterclaim Defendant Bauer, as

28 follows:

i.    That Plaintiffs LSI and LSP take nothing by way of the Amended Complaint;

ii.    That the causes of action asserted against Fox and Collier be dismissed with prejudice;

iii.    That LSI and Bauer be enjoined from further contacting the LPIs' current and potential investees;

iv.    That LSI and Bauer be enjoined from further contacting the prospective buyer with respect to the sale transaction referenced herein;

v.    That LSI and Bauer be enjoined from preventing Fox and Collier from accessing communications and legal files relating to the LPIs;

vi.    That Fox, Collier, and the LPIs be awarded compensatory and punitive damages on their Counterclaims, as well as attorneys' fees and costs to the maximum extent allowed by law; and

vii.    That the Court provide such further relief as it deems just and proper.

DATED:  March 18, 2025              Respectfully submitted,

ROPES & GRAY LLP

By: */s/ Rocky Tsai*
Rocky Tsai (CSB # 221452)
ROPES & GRAY LLP
Three Embarcadero Center
San Francisco, CA 94111-4006
Tel: (415) 315-6300
Fax: (415) 315-6350
Rocky.Tsai@ropesgray.com

Robert A. Skinner (admitted *pro hac vice*)
Amy D. Roy (admitted *pro hac vice*)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
Tel: (617) 951-7000
Fax: (617) 951-7050
Robert.Skinner@ropesgray.com
Amy.Roy@ropesgray.com

*Attorneys for Defendants Patrick Fox and Bennett Collier and Nominal Defendants Lacuna Project Investments, LLC and Lacuna Project Investments II, LLC*

83

1

## <u>CERTIFICATE OF SERVICE</u>

2

The undersigned hereby certifies that on March 18, 2025 a true and correct copy of the

3 foregoing was transmitted electronically to the Electronic Filing System of the United States District

4 Court for the Northern District of California.  Notice of this filing will be sent by email to all parties

5 by operation of the Court's electronic filing system.

6

Executed on March 18, 2025, at San Francisco, California.

7

8

*/s/ Rocky Tsai*
Rocky Tsai (CSB # 221452)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28